**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 13-cr-00392-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**1.  GEORGE THOMAS BROKAW,**
**2.  JOHN J. PAWELSKI, and**
**3.  MIMI M. VIGIL,**

**Defendants.**

_____

**REPORTER'S TRANSCRIPT**
**(Jury Trial - Day 3)**

_____
        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 8:02 a.m. on the 5th
day of November, 2014, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MATTHEW T. KIRSCH and MARTHA A. PALUCH, U.S. Attorney's
Office - Denver, 1225 17th St., Suite 700, Denver, CO
80202

**FOR DEFENDANT BROKAW:**
Pro Se.
**FOR DEFENDANT PAWELSKI:**
Pro Se.
**FOR DEFENDANT VIGIL:**
Pro Se.

<u>I N D E X</u>

<u>WITNESSES:</u>                                                      <u>PAGE</u>

             **PETER LEE**
DIRECT EXAMINATION BY MS. PALUCH                          451

             **GINGER WRAY**
DIRECT EXAMINATION BY MS. PALUCH                          468

             **HOWARD BECK**
DIRECT EXAMINATION BY MR. KIRSCH                          477

             **DAVID SILVERMAN**
DIRECT EXAMINATION BY MR. KIRSCH                          483

             **CYNTHIA WOOD**
DIRECT EXAMINATION BY MS. PALUCH                          488

             **ANNETTE PEREA**
DIRECT EXAMINATION BY MR. KIRSCH                          500

             **SUSAN SKOVGAARD**
DIRECT EXAMINATION BY MS. PALUCH                          505

             **SPECIAL AGENT ADAM RUTKOWSKI**
DIRECT EXAMINATION BY MR. KIRSCH                          509

             **KYMBERLY JOHNSON**
DIRECT EXAMINATION BY MS. PALUCH                          515

             **BRIAN CANTY**
DIRECT EXAMINATION BY MR. KIRSCH                          528

             **MAUREEN GREEN**
DIRECT EXAMINATION BY MS. PALUCH                          548

             **MARILYN ALVAREZ**
DIRECT EXAMINATION BY MS. PALUCH                          556

             **PAMELA COMBE**
DIRECT EXAMINATION BY MS. PALUCH                          561

# **E X H I B I T S**

| **NO.** | | **ADMITTED** |
|---|---|---|
| 80,<br>81,<br>281<br>282,<br>286-<br>288,<br>290 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 564 |
| 120 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 496 |
| 121 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 524 |
| 211 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 471 |
| 264-<br>268 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 531 |
| 269 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 481 |

| **No.** | | **REFUSED** |
|---|---|---|
| | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

*DARLENE M. MARTINEZ, RMR, CRR*
*United States District Court*
*For the District of Colorado*

1          **NOVEMBER 5, 2014**

2          (Proceedings commence at 8:02 a.m.)

3          (The following is had in open court, outside the

4    hearing and presence of the jury.)

5          THE COURT:  You may be seated.

6          We are back for day three in 13-cr-00392.  The

7    Court notes that counsel for the Government and their

8    representative are present.  Court also notes none of the

9    defendants; Mr. Brokaw, Mr. Pawelski, or Ms. Vigil are

10   present here today, and that is of their own accord, as

11   far as I know.  We didn't hear from them at all today.

12         Anything further before we bring in the jury?

13         MR. KIRSCH:  Your Honor, just to advise the Court

14   of our schedule.  We have managed to get 13 witnesses here

15   for today, which we think will at least get us close to

16   2:30.  Most of the remainder of our witnesses are coming

17   in from out of town, and we've changed all of their flight

18   arrangements, so that we believe that we'll be able to

19   finish with our witnesses on Thursday.

20         THE COURT:  Wonderful.

21         MR. KIRSCH:  We will have another 12 to 15

22   witnesses here on Thursday, and then we are expecting to

23   rest at that point.

24         THE COURT:  All right.  Very well.

25         Ms. Hartmann, would you please bring in the jury.

1              (The following is had in open court, in the hearing

2      and presence of the jury.)

3              THE COURT:  You may be seated.

4              Good morning, ladies and gentlemen.  Welcome back.

5              The Government may call its next witness.

6              MS. PALUCH:  Thank you, Your Honor.  The Government

7      calls Mr. Peter Lee.

8              COURTROOM DEPUTY:  Please enter and remain

9      standing.

10             Your attention, please.

11             Please raise your right hand.

12                            **PETER LEE**

13     having been first duly sworn, testified as follows:

14             COURTROOM DEPUTY:  Please be seated.

15             Please state your name, and spell your first and

16     last names for the record.

17             THE WITNESS:  My name is Peter Lee, L-E-E.

18             MS. PALUCH:  May I proceed?

19             THE COURT:  You may proceed.

20             MS. PALUCH:  Your Honor, I will be asking this

21     witness about Government's Exhibit 51, 2003 through 2008.

22     All of these exhibits have been previously admitted.  I

23     would ask at this time these exhibits be allowed to be

24     published as the witness is speaking about them.

25             THE COURT:  All right.  When you say 2003 through

1    2008, is that page numbers?

2          MS. PALUCH:  No, Your Honor, Exhibits 2003 through

3    Exhibits -- I am sorry, I guess it is early.  I apologize.

4    203 to 208.

5          THE COURT:  That is what I thought you meant.  I

6    don't remember exhibits like that.  That is fine.  You may

7    proceed to publish them.  All you have to say is you want

8    to publish.  You don't need my permission.

9          MS. PALUCH:  Thank you very much, Your Honor.

10                      **DIRECT EXAMINATION**

11   **BY MS. PALUCH:**

12   Q.   Good morning, Mr. Lee.

13   A.   Good morning.

14   Q.   How are you employed, sir?

15   A.   I work for the Treasury Department.

16   Q.   What is your position with the Treasury Department?

17   A.   I am the Deputy Executive Secretary Correspondence

18   and Records Management.

19   Q.   I would ask if you can scoot closer to the

20   microphone.

21          Okay.  Where is your office located?

22   A.   1500 Pennsylvania Avenue.

23   Q.   1500 Pennsylvania Avenue is in what city and state?

24   A.   Northwest Washington, D.C.

25   Q.   And is 1500 Pennsylvania the headquarters for the

1    Department of Treasury?

2    A.   Yes, it is.

3    Q.   How long have you held your current position?

4    A.   Since 2010.

5    Q.   Prior to your current position, were you employed by

6    the Department of Treasury?

7    A.   Yes, I was.

8    Q.   How many years total have you worked for the

9    Department of Treasury?

10   A.   For 13 years.

11   Q.   And, generally, can you describe what your duties

12   involve?

13   A.   Yes.  I see -- I oversee all correspondence, lawyer

14   requests, and records for the Secretary, Deputy Secretary,

15   Chief of Staff and Executive Secretary for the Treasury

16   Department.

17   Q.   Are you familiar with how mail received by the

18   Department of Treasury is processed?

19   A.   Yes, I am.

20   Q.   Can you please describe for the jury that process?

21   A.   Sure.  So, before mail is sent for delivery to the

22   Department, it is prescreened by the White House, because

23   the Treasury Department is part of the Executive Office of

24   the President compound.  We are right next door to the

25   White House.

1          So all mail that comes or is addressed to the

2     Treasury Department goes through an EOP, Executive Office

3     of the President, screening process, in Ohio, or some

4     place that is not in Washington, D.C., and that is

5     basically to ensure the safety and prevent -- or to make

6     sure that the packages or letters that we receive don't

7     contain anything that might harm anyone at the Treasury or

8     the Government.

9          So they are screened at remote location and then

10    delivered to the Treasury mailroom, where they are

11    filtered and sent to the respective offices.

12    Q.   Okay.  So once the mailing has gone through that

13    process and it actually arrives at the Department of

14    Treasury, can you explain what would happen to that

15    mailing?  In particular, I will direct your attention to

16    mail that would be addressed to the Secretary of the

17    Treasury.

18    A.   Yes.  Once it has been screened and sent to the

19    Treasury, the mailroom receives it and will send it to the

20    respective offices.  For letters that are addressed to the

21    Secretary, they will be received by my office, and

22    somebody on my staff will go through the letters and

23    screen them to make sure it is something that is worth

24    forwarding or that it is an actual policy or legitimate

25    letter that we should deliver to the Secretary.

1   Q.   So someone on your staff reviews the contents of each

2   mailing that then it arrives for the Secretary of the

3   Treasury?

4   A.   Yes.  We screen everything that is addressed to the

5   Secretary.

6   Q.   Prior to your testimony here today, sir, were you

7   asked to review certain documents?

8   A.   Yes, I was.

9   Q.   I am going to refer your attention first --

10       MS. PALUCH:  And if I could have published

11  Government's Exhibit 51.

12  Q.   (BY MS. PALUCH)  Do you see, sir, a stack of exhibits

13  to your left?  And the exhibit is also shown on the

14  screen.  So feel free to look at each.

15       First, I will ask you to take out the actual

16  Exhibit 51, if you could.

17  A.   Yes.

18  Q.   Is that an original mailing?

19  A.   Yes, it is.

20  Q.   Can you hold that up just so the jury can see.  It is

21  also on your screen.

22  A.   (Indicating).

23  Q.   Can you state whether that document -- first of all,

24  to whom is that document addressed?

25  A.   This document is addressed to Timothy Geithner.

1    Q.   And his position?

2    A.   He was the Secretary of the Treasury.

3    Q.   Okay.  And can you state, by looking at that mailing,

4    whether it, in fact, was received by the Department of

5    Treasury?

6    A.   Yes, it was.

7    Q.   And how is it you are able to determine that?

8    A.   If you will look on this document, there is -- it is

9    upside down, but there is a "010" and Insp. #."

10         THE COURT:  There is a little stylus at the top of

11   the monitor.  You can use it to point that out.

12         THE WITNESS:  Thank you.  So if you look here, that

13   is the White House inspection (indicating).  So that

14   confirms that this letter was screened at the White House

15   and then delivered to the Department afterwards.

16         So what happens is -- I should have explained

17   better.  We don't record every piece of mail, or we don't

18   stamp it at the Treasury that we have reviewed it, because

19   there is too much mail to actually record.  So we only

20   process or we only stamp or mark it being processed

21   legitimate correspondence or actual materials that should

22   be given to the Secretary.

23         For materials like this, that fall in the category

24   of what we call "scam" letters, we put it in a separate

25   pile and send it to the IRS Servicing Center.  So this

1    stamp is the White House.  This verifies the White House

2    had actually screened this.

3         Our process is then to pull this aside and send it

4    to the IRS Servicing Center for further action.

5    Q.   (BY MS. PALUCH)  Thank you for that explanation.  But

6    prior to you sending it to the IRS Service Center, someone

7    on your staff has to review that mailing?

8    A.   Absolutely.

9    Q.   The "Insp.," what would that stand for?

10   A.   Inspector or inspection.

11   Q.   Is the number 010 -- would that designate who

12   actually inspected?

13   A.   Yes, it would.

14   Q.   Okay.  Whose name appears in the return address on

15   this mailing?

16   A.   Clara Mueller.

17   Q.   And if you could look to the postal stamp.  Can you

18   determine, or do you see an indication as to from what

19   city and state this mailing was received?

20   A.   Colorado Springs, Colorado.

21   Q.   Okay.  Please look to pages 2 and 3 of that document

22   if you will.  And what does that document appear to be?

23   A.   It appears to be a letter from the Internal Revenue

24   Service.

25   Q.   And from whom?  Who is sending this letter?

    1   A.    Mimi Michelle Vigil.

    2   Q.    At the top, on page 2, this is sent to the attention

    3   of whom?

    4   A.    Ms. Green.

    5   Q.    Can you please look -- turn to pages 4 through 9 of

    6   that document and state, if you could, generally what

    7   those pages appear to be.

    8   A.    This appears to be an Income Tax Return.

    9   Q.    Okay.  For what taxpayer?

   10   A.    For Mimi -- is it Vigil.

   11   Q.    Okay.  It is Vigil.  Can you look at page 6 of that

   12   return.  And I will direct your attention to Part I, where

   13   it says "Interest."  Do you see an entity listed there?

   14   A.    Yes, I do.

   15   Q.    What is the name of that entity?

   16   A.    Mistar Financial.

   17   Q.    Okay.  And what is the amount over to the right?

   18   A.    $373,965.

   19   Q.    Do you see in bold down below where it starts "OID"?

   20   A.    Yes, I do.

   21   Q.    Can you read what that sentence states?

   22   A.    "OID adjustment.  Return principal to originator and

   23   surety."

   24   Q.    Does that same $373,000 amount appear there?

   25   A.    Yes, it does.

1    Q.   Reviewing this evidence and this mailing, what

2    determination would your Department have made?

3    A.   We would have determined that this is a fraudulent

4    taxpayer or scam, something that didn't bear further

5    attention from the Department.

6    Q.   What would your office, then, have done with this

7    mailing?

8    A.   We would have set this aside, along with other

9    correspondence we would have sent to the appropriate

10   Internal Revenue Service Servicing Center for the

11   processing.

12   Q.   Thank you.  I will turn your attention now to

13   Government's Exhibit 203.

14        MS. PALUCH:  If that could please be published.

15   Q.   (BY MS. PALUCH)  And first could you look at the

16   original document in front of you and state whether you

17   are looking at an original mailing?

18   A.   I am looking at an original mailing.

19   Q.   And, again, could you use the stylus to circle --

20   first of all can, you state, in looking at this exhibit,

21   sir, whether this was received by the Department of

22   Treasury?

23   A.   Yes.  It was received by the Department of Treasury

24   for the same reasons.

25   Q.   That we discussed?

 1   A.    Yes.

 2   Q.    Could you please circle or indicate on the screen

 3   there the markings indicating that?

 4   A.    (Indicating).

 5   Q.    Okay.  Now, if you could look at the second page.

 6   What is the title of that document?

 7   A.    The title of the document is Affidavit of Notary

 8   Presentment.

 9   Q.    And the second bolded heading?

10   A.    Certification of Mailing.

11   Q.    And the date of that mailing?

12   A.    April 1, 2009.

13   Q.    And if you look in that paragraph, for whom is this

14   packet being mailed?  It indicates someone appeared before

15   the notary.

16   A.    George Thomas Brokaw.

17   Q.    Okay.  If you turn to the second page, who signed

18   that document as the notary?

19   A.    Mimi Vigil.

20   Q.    Let's turn to page 63 of that exhibit.  Can you state

21   what this document is?

22   A.    This is a Notice Concerning Fiduciary Relationship.

23   Q.    And are you familiar with what this document -- the

24   purpose of this document?

25   A.    Generally speaking, I have a sense of what the IRS

1    forms are used for.  This is -- I would say that it is

2    used to appoint a fiduciary.

3    Q.   Okay.  And can you see -- first of all, in whose name

4    is listed at the beginning?  Who is filling out this

5    document?

6    A.   George Thomas Brokaw.

7    Q.   Who is he naming as his fiduciary?

8    A.   Timothy F. Geithner.

9    Q.   Would Mr. Geithner act as a fiduciary for a taxpayer?

10   A.   Never.

11   Q.   Let's turn to page 74 of this exhibit.  And can you

12   state the title of that document?

13   A.   This is a Private Registered Bond for Setoff,

14   Non-Negotiable.

15   Q.   What is the amount of that bond?

16   A.   It is for a hundred million dollars.

17   Q.   And the name on the top left?

18   A.   George Thomas Brokaw.

19   Q.   And did Mr. Brokaw, in fact, sign this document as a

20   principal?

21   A.   Yes, he did.

22   Q.   And is this a document your agency would have

23   reviewed in determining how to route this mail?

24   A.   For this -- whether this is a legitimate.

25   Q.   You would have looked through this document; is that

461

1    correct?

2    A.    Yes.

3    Q.    And what happened with this mailing?

4    A.    We would say that this is not a legitimate

5    correspondence, and we would sent it to the IRS.

6    Q.    Okay.  So the Data Processing Center?

7    A.    Correct.

8    Q.    Please look now, if you would, at Government's

9    Exhibit 204.  We are looking now at Exhibit 204.

10   A.    Okay.

11   Q.    If you bear with he for one minute.

12         Can you state -- first of all, do you have the

13   original in front of you?

14   A.    Yes, I do.

15   Q.    Can you state, in looking at that document, whether

16   that document was received by the Department of Treasury?

17   A.    Yes, it was.

18   Q.    Once again, would you circle where that is indicated?

19   A.    Yes.  (Indicating).

20   Q.    And it was received by the Department of Treasury

21   pursuant to the process you have already described?

22   A.    Yes, it was.

23   Q.    If you could turn to the second page.  Again, the

24   title of that document?

25   A.    Affidavit of Notary Presentment.  Certification of

1      Mailing.

2      Q.    The date of that mailing?

3      A.    April 1, 2009.

4      Q.    And in the body of that paragraph, for whom is this

5      document being mailed?

6      A.    Timothy F. Geithner.

7      Q.    I am sorry?

8      A.    John Joseph Pawelski.

9      Q.    So John Joseph Pawelski is the one doing the mailing?

10     A.    Yes.

11     Q.    You indicated it was going to Mr. Geithner?

12     A.    Correct.

13     Q.    On the bottom of that page, do you see who mailed it?

14     A.    Yes.  It was Mimi Vigil.

15     Q.    Could you turn to page 57 of that document.  And once

16     you are there, if you could state the title of that

17     document.

18     A.    Private Registered Bond for Setoff, Non-Negotiable.

19     Q.    Okay.  And the amount of that bond?

20     A.    A hundred billion dollars.

21     Q.    The individual name to the left?

22     A.    John Joseph Pawelski.

23     Q.    And did Mr. Pawelski, in fact, sign that bond?

24     A.    Yes, he did.  Signed as principal.

25     Q.    Where would this mail have been routed?

1   A.   To the IRS Service Center.

2   Q.   You know, I did have one other question as to who

3   signed that document as a surety on the left-hand side.

4   A.   George Thomas Brokaw.

5   Q.   Okay.  Let's turn to Government's Exhibit 205,

6   please.  Are you looking at the original document, sir?

7   A.   Yes, I am.

8   Q.   Can you state whether that was received by the

9   Department of Treasury?

10   A.   It was received on April 10, 2009.

11   Q.   And just looking at the front of that document,

12   looking on the screen, can you circle whether or not it is

13   indicated on this document that it was received by the

14   Department of Treasury?

15   A.   Yes, it is.  It is right here (indicating).

16   Q.   Okay.  And who mailed that document, if you can see

17   in the return address?

18   A.   Clara Mueller.

19   Q.   And you said this was mailed to Mr. Geithner?

20   A.   Yes, it was.

21   Q.   And if we go to the second page, the date of that

22   mailing?

23   A.   The date is the 10th day of April 2009.

24   Q.   And in the body of that first paragraph, for whom was

25   this mailing being mailed?

```
 1    A.    Mimi Michelle Vigil.

 2    Q.    And who signed the document at the bottom?

 3    A.    Clara Mae Mueller.

 4    Q.    Okay.  Let's turn to page 70 of this exhibit.  Can

 5    you state the title and the amount of this document?

 6    A.    It is a Private Registered Bond for Setoff

 7    Non-Negotiable, valued at $100 billion.

 8    Q.    And up in the upper left-hand corner, the name of the

 9    individual allegedly issuing this bond?

10    A.    Mimi Michelle Vigil.

11    Q.    Does she sign this document as principal?

12    A.    Yes, she does.

13    Q.    Who are the names appearing to the left of her

14    signature?

15    A.    George Thomas Brokaw, John Joseph Pawelski.

16    Q.    Exhibit 206, please, sir.  Is that an original

17    document?

18    A.    Yes, it is.

19    Q.    Was that received by the Department of Treasury?

20    A.    Yes, it was.

21    Q.    Can you please circle the stamp.

22    A.    (Indicating).

23    Q.    I am going to turn your attention to page 3 of that

24    document.  What was the date of this mailing?

25    A.    April 20, 2009.
```

```
 1   Q.   And to whom was that document mailed?
 2   A.   Timothy F. Geithner.
 3   Q.   I will turn your attention to the next page, page 4.
 4   And what is the title of that document?
 5   A.   Private Registered Indemnity Bond, Non-Negotiable.
 6   Q.   The amount of that bond?
 7   A.   $300 million.
 8   Q.   Under the words for who is allegedly issuing this
 9   document?
10   A.   Mimi Michelle Vigil.
11   Q.   If you could turn your attention to page 8 of that
12   document.  Do you see three signatures at the top of that
13   document?
14   A.   Yes, I do.
15   Q.   And the bottom signature, who is signing as
16   principal?  I am sorry, the three signatures that are at
17   the top of that document -- I am sorry, are we displaying
18   page 8?
19        Page 8, there are three signatures that appear at
20   the top.  Do you see those?
21   A.   Yes, I do.
22   Q.   The last signature, it says "principal."  Whose name
23   appears there?
24   A.   Mimi Michelle Vigil.
25   Q.   The two names above, signing as the surety?
```

1    A.    George Thomas Brokaw and John Joseph Pawelski.

2    Q.    Thank you.  We will turn now to Exhibit 207.  Do you

3    have the original, sir?

4    A.    Yes, I do.

5    Q.    Can you say that original document was received by

6    the Department of Treasury?

7    A.    Yes, it was, for the same reasons that we stated

8    before.

9    Q.    Specifically, it was addressed to Mr. Timothy

10   Geithner; is that correct?

11   A.    Yes, that's correct.

12   Q.    Whose name is in the return address?

13   A.    Clara Mueller.

14   Q.    Okay.  I will direct your attention to page 3 of that

15   exhibit.  Does that state the date of that mailing?

16   A.    Yes, it does.

17   Q.    What is that date?

18   A.    June 2, 2009.

19   Q.    Referring your attention back to page 2, can you

20   state the title of that document and the amount?

21   A.    Yes.  It is a Registered Private Offset and Discharge

22   Bond, Non-Negotiable.  And the amount is $300 million.

23   Q.    For whom is that; the benefit of whom?

24   A.    For Mimi Michelle Vigil.

25   Q.    If you turn to page 4 of that document, do you see

1   three signatures there at the top?

2   A.   Yes, I do.

3   Q.   Again, if you could state the principal and the two

4   sureties.

5   A.   Principal is Mimi Michelle Vigil.   The two others are

6   George Thomas Brokaw and John Joseph Pawelski.

7   Q.   Finally, last exhibit is exhibit -- Government's

8   Exhibit 208.   If you can pull that out of the envelope.

9   You have that, sir?

10   A.   Yes, I do.

11   Q.   Can you say that was received by the Department of

12   Treasury?

13   A.   Yes, it was.

14   Q.   And, okay.   So the marking there.   To whom is that

15   document addressed?

16   A.   Eric Thorson.

17   Q.   Who mailed that document?

18   A.   Clara Mueller.

19   Q.   All right.   Turn your attention to page 66 of that

20   document.   Can you state the title and the amount of that

21   document?

22   A.   This is a Private Registered Bond for Setoff,

23   Non-Negotiable, valued at 100 billion dollars.

24   Q.   Okay.   And do you see the signatures on the bottom of

25   this bond?

```
1    A.    Yes.

2    Q.    Can you state those for the record, please?

3    A.    George Thomas Brokaw, John Joseph Pawelski, Mimi

4    Michelle Vigil.

5          MS. PALUCH:  Thank you, sir.

6          One second, if I may?

7          THE COURT:  You may.

8          MS. PALUCH:  No further questions, Your Honor.

9          THE COURT:  All right.  Thank you very much,

10   Mr. Lee, you are excused.

11         Government may call its next witness.

12         MS. PALUCH:  Your Honor, the Government calls

13   Ginger Wray.

14         COURTROOM DEPUTY:  Please remain standing.

15         Your attention, please.

16         Please raise your right hand.

17                         GINGER WRAY

18   having been first duly sworn, testified as follows:

19         COURTROOM DEPUTY:  Please be seated.

20         Please state your name, and spell your first and

21   last names for the record.

22         THE WITNESS:  Ginger Wray.  G-I-N-G-E-R W-R-A-Y.

23         MS. PALUCH:  May I proceed, Your Honor?

24         THE COURT:  You may.

25                      DIRECT EXAMINATION
```

1    **BY MS. PALUCH:**

2    Q.   Good morning, ma'am.

3    A.   Good morning.

4    Q.   How are you employed?

5    A.   I work for the Internal Revenue Service.

6    Q.   And what is your position with the Internal Revenue

7    Service?

8    A.   I am a revenue officer.

9    Q.   And, generally, could you describe what your duties

10   are as a revenue officer?

11   A.   I collect delinquent taxes and delinquent tax

12   returns.

13   Q.   Prior to a case being assigned to a revenue officer,

14   can you describe what actions, if any, are taken by the

15   IRS with respect to trying to bring a taxpayer into

16   compliance?

17   A.   They usually get a notice of the liability.  They

18   have 10 days.  Then they can get up to four other notices

19   that are usually about a month a part.  Then it usually

20   goes to our automated collection site, which is a phone

21   collection service.  And then it finally gets -- if it is

22   not resolved, it gets assigned to a revenue officer.

23   Q.   And do revenue officers attempt to meet personally

24   with the taxpayers?

25   A.   Yes, we do.

1    Q.   Is to set up a payment plan an option, as well, for

2    these taxpayers?

3    A.   That is one option.

4    Q.   Have you ever been assigned as the revenue officer to

5    a matter involving the personal or business taxes of a

6    person named George Thomas Brokaw?

7    A.   No.

8    Q.   Same question with respect to John Joseph Pawelski.

9    A.   No.

10   Q.   Same question with Mimi Michelle Vigil.

11   A.   No.

12   Q.   I will show you what has been marked as Government's

13   Exhibit 211.  This has not been admitted so I would ask

14   you to look -- there should be a folder.  Can you state

15   generally what this document is?

16   A.   The title at the top?

17   Q.   I am sorry, can I just ask you before we do that,

18   just generally.  I will ask you the question of, is this

19   document addressed to you?

20   A.   Yes, it is.

21   Q.   Did you receive this document?

22   A.   Yes, I did.

23   Q.   And from whom did you receive it?  If you could look

24   in the first paragraph, does it say to whom this document

25   is being mailed?

1    A.    John Joseph Pawelski.

2          MS. PALUCH:  Your Honor, at this time I move for

3    the admission of Government's Exhibit 211, and permission

4    to publish.

5          THE COURT:  Exhibit 211 is admitted.

6          (Exhibit No. 211 is admitted.)

7          THE COURT:  You may publish.

8          MS. PALUCH:  Thank you, Your Honor.

9    Q.   (BY MS. PALUCH)  Okay.  Ma'am, now I ask you the

10   contents here.  If you could state what the title of this

11   document is.

12   A.    Affidavit of Notary Presentment.  Certificate of

13   Mailing.

14   Q.    And who is signing as having mailed that document?

15   A.    It is signed by a notary.  I can't read the first

16   name, Vigil.

17   Q.    Okay.  Do you see the stamp towards the bottom right?

18   A.    Mimi Vigil.

19   Q.    You said that in the body this is being mailed for

20   John Joseph Pawelski?

21   A.    Yes.

22   Q.    And your name appears on this; correct?

23   A.    Yes, it does.

24   Q.    And is that -- it is addressed to you at the Internal

25   Revenue Service.  Is that -- can you tell me about the

```
 1   address listed on this document?

 2   A.   That was my personal home address.

 3   Q.   At that time?

 4   A.   Yes.

 5   Q.   Okay.  Now I am going to -- was it unusual for you to

 6   receive mail from a taxpayer at your home address?

 7   A.   Absolutely.

 8   Q.   Okay.  Now let's turn to the second page of that

 9   document.  Does your name and home address also appear at

10   the top of that document?

11   A.   Yes.

12   Q.   What is the title of this page?

13   A.   Pre-Offset Notice for Balanced Book Adjustment.

14   Q.   And who signs that document?

15   A.   John Joseph Pawelski.

16   Q.   Next page of that document, page 3.  I will direct

17   your attention to the bottom left of this document.

18        Does your name and home address appear on this

19   document?

20   A.   Yes.

21   Q.   What is the title of this document?

22   A.   Registered Bonded Promissory Note.

23   Q.   Could you state for the record the amount of this

24   bonded promissory note?

25   A.   $767,551.15.
```

 1   Q.   And to whom is that amount to be paid?

 2   A.   To the Internal Revenue Service.

 3   Q.   Okay.  I will direct your attention to where it says

 4   "For Credit to."  Can you read the names that appear in

 5   that paragraph?

 6   A.   It says to the Internal Revenue Service for John J.

 7   Pawelski.  Then it says for the benefit of Nancy D.

 8   Berryman.

 9   Q.   And who signs that document?

10   A.   John Joseph Pawelski.

11   Q.   Do you know the name Nancy Berryman?

12   A.   Yes.

13   Q.   And how is it you know that name?

14   A.   I was assigned a delinquent tax account for her.

15   Q.   Okay.  If you could turn to page 7 of that document.

16   A.   I don't see numbers.

17   Q.   It is page 7.  It is page 7 of Exhibit 211.  You can

18   look on the screen, as well, ma'am.

19   A.   Okay.

20   Q.   Can you state what the title of that document is?

21   A.   It is a Notice of Levy.

22   Q.   And can you state what a Notice of Levy is?

23   A.   It is a legal document the Internal Revenue Service

24   uses to attach to property.

25   Q.   And at the top, is that your name?

1    A.    Yes.

2    Q.    And does your name also appear as the signature for

3    the service representative in the bottom left?

4    A.    Yes.

5    Q.    Okay.  And to whom is this Notice of Levy directed?

6    A.    I sent it to the First National Bank of Estes Park.

7    Q.    And it is regarding what taxpayer?

8    A.    Nancy D. Berryman.

9    Q.    Okay.  And can you explain why it was sent to the

10   First National Bank of Estes Park?

11   A.    Because I was trying to attach the funds that Nancy

12   Berryman had in the bank account.

13   Q.    And what is the amount of this levy?

14   A.    $614,040.92.

15   Q.    What does that amount represent?

16   A.    It represents how much she had due and owing on tax

17   liability for 1040 tax and for civil penalty through

18   11/20/2009.

19   Q.    Now I will direct your attention back.  And if we can

20   keep that amount in mind, I will direct your attention

21   back to page 3 of this exhibit.  And I am going to direct

22   your attention to the paragraph that reads "For Credit,"

23   where Nancy Berryman's name appears.  Do you see that?

24   A.    Yes.

25   Q.    Do you see a dollar amount represented there?

1    A.    It is exactly the same as what is on the levy.

2    Q.    And is that that $614,040.92 amount?

3    A.    Yes.

4    Q.    Okay.  Let's turn back to the Notice of Levy, which

5    is found at page 7.  And you can see that on the screen,

6    or you can look at the hard copy.  Do you see a stamp at

7    the bottom?

8    A.    Yes.

9    Q.    Is there a name and a signature at the bottom there?

10   A.    John Joseph Pawelski.

11   Q.    And are you able to read just the first few letters

12   of that stamp?

13   A.    "Accepted for Value."

14   Q.    Okay.  I am going to have you turn your attention to

15   the next page of that document.  Do you see that -- I am

16   on page 8.  Do you see that same stamp appearing at the

17   bottom?

18   A.    Yes.

19   Q.    Signed by Mr. Pawelski?

20   A.    Yes.

21   Q.    Is this page 2 that would have been sent to

22   Ms. Berryman?

23   A.    It's actually the back side of --

24   Q.    Of the levy?

25   A.    -- the notice.  And it was sent to the bank.

476

```
 1    Q.   Okay.  Now, if you could look at page 9 of that

 2    exhibit.  Does your name appear on this?

 3    A.   Yes.

 4    Q.   And is that actually just a copy of the front of the

 5    envelope?

 6    A.   Yes, it is.

 7    Q.   And you had the original envelope there with you.

 8    Okay.  Now, you stated earlier it was unusual to receive

 9    mail from a taxpayer at your home address?

10    A.   Absolutely.

11    Q.   Do you provide your home address or phone number to

12    taxpayers when you are assigned their case as a revenue

13    officer?

14    A.   Never.

15    Q.   How did you feel when you received this packet of

16    documents at your home address in Dillon, Colorado?

17    A.   I felt concerned.  I felt a little panicky.

18    Threatened.

19    Q.   And so what action, if any, did you take once you

20    received this document?

21    A.   We have an internal department within the Internal

22    Revenue Service called TIGTA, and we report anything that

23    is of a threat or a concern to us.

24    Q.   And one follow-up question.  The documents that you

25    received, do they have any effect at all on the debt that
```

1    Ms. Berryman owed?

2    A.    No.

3          MS. PALUCH:  One moment, Your Honor.

4          No further questions.

5          THE COURT:  All right.  Thank you very much,

6    Ms. Wray, you are excused.

7          Government may call its next witness.

8          MR. KIRSCH:  Thank you, Your Honor.  The Government

9    calls Howard Beck.

10         COURTROOM DEPUTY:  Good morning.  Please enter and

11   remain standing.

12         Your attention, please.

13         Please raise your right hand.

14                         **HOWARD BECK**

15   having been first duly sworn, testified as follows:

16         COURTROOM DEPUTY:  Please be seated.

17         Please state your name, and spell your first and

18   last names for the record.

19         THE WITNESS:  My name is Howard Beck.  H-O-W-A-R-D.

20   Last name is B, as in boy, E-C-K.

21         THE COURT:  You may proceed.

22         MR. KIRSCH:  Thank you, Your Honor.

23                     **DIRECT EXAMINATION**

24   **BY MR. KIRSCH:**

25   Q.   Good morning, sir.  Can you tell the jury how you are

478

1    employed.

2    A.   Attorney licensed in the State of Colorado.

3    Q.   I will try to not make it too weird for you to be

4    sitting up there rather than back here.

5    A.   It is unusual.

6    Q.   Mr. Beck, where do you -- are you working as an

7    attorney now?

8    A.   Yes.  I am still in private practice.

9    Q.   And do you work with a particular firm now?

10   A.   Yes.  Presently my law firm is Beck, Payne, Frank &

11   Piper, PC.

12   Q.   Did you ever work at a firm called Beck & Cassinis?

13   A.   Yes.  It is actually the same firm.  We changed the

14   name about 4 years ago from Beck & Cassinis to the present

15   name.

16   Q.   I see.  Okay.  While your firm was called Beck &

17   Cassinis, did either you or your firm ever work on a case

18   involving a person named John Pawelski?

19   A.   We did.  We represented a client who brought suit

20   against Mr. Pawelski on a collection case.

21   Q.   And do you recall what the result of that case was?

22   A.   We received a judgment in favor of our client and

23   against Mr. Pawelski.  I believe it was 2004, but I am not

24   sure.

25   Q.   Okay.  Do you remember the approximate amount of that

1    judgment you received?

2    A.   At that time it was approximately $23,000, but it is

3    considerably greater now because it has accrued interest.

4    Q.   While your firm was called Beck & Cassinis, were you

5    responsible for tax documents that that firm would have

6    prepared?

7    A.   I have been the president of that professional

8    corporation since 1991.

9    Q.   Okay.

10        MR. KIRSCH:   Your Honor, I would ask to publish

11   now, please, Government Exhibit 31, page 4.   It has been

12   previously admitted.

13        THE COURT:   You may.

14   Q.   (BY MR. KIRSCH) I am putting the document up on the

15   screen for you, Mr. Beck.   We will focus in on the bottom

16   of that page.   Do you see that on the screen now?

17   A.   I do, sir.

18   Q.   Before you came to court today, were you asked to

19   determine whether or not this was a form that Beck &

20   Cassinis issued?

21   A.   Yes, I was so asked.

22   Q.   Did Beck & Cassinis issue this form?

23   A.   No, sir.   I reviewed the documents kept by our

24   bookkeeper, who works for me.   I went -- the document is

25   dated 2004.   I went back 2 years and went forward a couple

1    of years, just to make sure, and our firm never issued

2    this 1099 OID form.

3    Q.   Has your firm ever issued a 1099 OID form, period?

4    A.   No, sir, we never have.

5    Q.   Did your firm withhold $23,446.27 in taxes from

6    Mr. Pawelski in 2004?

7    A.   No, sir.  We never recovered anything on the judgment

8    that we received for our client against Mr. Pawelski.

9    Q.   Were you trying to actually collect money from

10   Mr. Pawelski, as opposed to paying him?

11   A.   We did -- shortly after we obtained the judgment on

12   behalf of our client, we did do some collection efforts on

13   Mr. Pawelski.  We were never able to collect anything.

14   Q.   Okay.  I want to ask you to look at one other

15   document now.

16        MR. KIRSCH:  For now, I would like it just to be

17   shown on the witness' screen --

18        THE COURT:  You may.

19        MR. KIRSCH:  -- marked as Government's Exhibit 269.

20   If you can try to enlarge that a little bit more.

21   Q.   (BY MR. KIRSCH)  Is that big enough for you to be

22   able to read, Mr. Beck?

23   A.   Thank you for considering my age.  Yes.

24   Q.   We all need it, believe me.  Can you see that?

25   A.   I can, sir.

1    Q.    Do you recognize that document?

2    A.    Yes, I do.

3    Q.    How do you recognize that document?

4    A.    Well, I received it from either your office or the

5    IRS Treasury Department a week or two ago.  We had

6    received a copy of this several years ago from

7    Mr. Pawelski.

8    Q.    The copy that you received, did it look like this

9    one?

10   A.    It does.  I believe that this one does not show

11   signatures at the bottom.  The copy we received was

12   signed.

13          MR. KIRSCH:  Your Honor, I move to admit and

14   publish Government's Exhibit 269.

15          THE COURT:  Exhibit 269 is admitted.

16          (Exhibit No. 269 is admitted.)

17          THE COURT:  And you may publish.

18          MR. KIRSCH:  Thank you, Your Honor.

19   Q.    (BY MR. KIRSCH)  Okay.  We have this on the screen so

20   the jury can see it.  Now, Mr. Beck, what is the title of

21   this document?

22   A.    It says it is a Registered Bonded Promissory Note in

23   the amount of $10 million.

24   Q.    And there in the middle, where it says "For Credit

25   to," what does it say there?

1    A.    It says "For Credit to Beck & Cassinis, PC" which at

2    that time was the name of our firm when we had the case

3    with Mr. Pawelski.  The problem we had was Mr. Pawelski

4    didn't owe my law firm any money then or ever.  He owed

5    our client the money.

6    Q.    Assuming that Mr. Pawelski had owed your firm money,

7    as opposed to your client, would you have attempted to

8    cash or somehow negotiate this note?

9    A.    I did not understand what this was -- this document

10   was supposed to do.  From reading it, when we read it then

11   and re-read it in preparation for today, it appears as if

12   I was to go to the Department of Treasury and collect the

13   money that Mr. Pawelski owed our client or us from the

14   Department of Treasury.  We couldn't figure out how to do

15   that, so we didn't do anything.

16        MR. KIRSCH:  Thank you, sir.

17        Can I have one moment, Your Honor?

18        THE COURT:  You may.

19        MR. KIRSCH:  Thank you, Mr. Beck.

20        No other questions, Your Honor.

21        THE COURT:  All right.  Thank you very much,

22   Mr. Beck, you are excused.

23        THE WITNESS:  Thank you very much, Your Honor.

24        THE COURT:  Government may call its next witness.

25        MR. KIRSCH:  Thank you, Your Honor.  The Government

1    calls David Silverman.

2         COURTROOM DEPUTY:  Good morning.  Please remain

3    standing.

4         Your attention, please.

5         THE COURT:  Ms. Paluch.

6                       **DAVID SILVERMAN**

7    having been first duly sworn, testified as follows:

8         COURTROOM DEPUTY:  Please be seated.

9         Please state your name, and spell your first and

10   last names for the record.

11        THE WITNESS:  David Silverman.  D-A-V-I-D

12   S-I-L-V-E-R-M-A-N.

13        THE COURT:  You may proceed.

14        MR. KIRSCH:  Thank you, Your Honor.

15                    **DIRECT EXAMINATION**

16   **BY MR. KIRSCH:**

17   Q.   Good morning, Mr. Silverman.

18   A.   Good morning.

19   Q.   How are you employed, sir?

20   A.   I am sorry?

21   Q.   How are you employed?

22   A.   I am self-employed.  David Silverman, Attorney at

23   Law.

24   Q.   Okay.  And how long have you been practicing as an

25   attorney?

```
1    A.    Since 1982.

2    Q.    Have you ever been associated with a firm called the

3    Silverman Law Firm?

4    A.    Yes.

5    Q.    Approximately when was that?

6    A.    I began practicing on my own in December of 1983.

7    And Silverman Law Firm, either as a sole proprietor or as

8    a P.C. was in existence through 2010.  I had a

9    partnership, Silverman Bornstein for 4 years, and just

10   recently went back out on my own.

11   Q.    Okay.  While you were practicing through the entity

12   Silverman Law Firm, did you ever work on a case involving

13   a person named John Pawelski?

14   A.    Yes.

15   Q.    Do you recall the basic nature of that case?

16   A.    It was a collection case.

17   Q.    Who was your client in that case?

18   A.    I believe it was Household.  HSBC.

19   Q.    HSBC?

20   A.    That is my recollection.

21   Q.    You said it was a collection case?

22   A.    Yes.

23   Q.    Do you recall the result of that case?

24   A.    There was a default judgment entered against the

25   defendant in favor of my client.
```

485

1    Q.   Okay.  And while you were working with the Silverman

2    Law Firm, did you have responsibility for any tax

3    documents that that law firm prepared?

4    A.   Yes.

5        MR. KIRSCH:  I am going to ask to publish now page

6    13 of Government Exhibit 35, which has been previously

7    admitted.

8        THE COURT:  You may.

9        MR. KIRSCH:  Can we focus in on that form.  Can we

10   focus in on that form in the middle, please.

11   Q.   (BY MR. KIRSCH) Can you see that form on the screen

12   now, Mr. Silverman?

13   A.   Yes, sir.

14   Q.   That form -- well, first of all, did the Silverman

15   Law Firm generate this form?

16   A.   This is -- I am trying to -- the 1099, no.  We don't

17   generate those.  No.  We don't generate these.

18   Q.   Okay.  Your firm has never generated 1099 OID forms?

19   A.   No.

20   Q.   In 2005, did your firm withhold $1,618.03 in income

21   tax from Mr. Pawelski?

22   A.   No.  We got a judgment against Mr. Pawelski.  We

23   wouldn't be withholding money from him.  We would be

24   trying to collect money from him.

25   Q.   Okay.  Did the Silverman Law Firm -- do you see the

1  box on the left of the screen underneath Silverman Law

2  Firm that says "Payer's Federal Identification Number."

3  That is blank?

4  A.   Yes.

5  Q.   When the Silverman Law Firm prepares tax documents,

6  does it include its employer identification number in

7  those documents?

8  A.   Yes.

9  Q.   Do you see on the Box 5, the "Description" box --

10  A.   Yes.

11  Q.   -- it says "Court Case Account 05C15015."

12  A.   Yes.

13  Q.   Do you recognize that number at the end there,

14  05C15015?

15  A.   Yeah.  That would probably be the Court case.  The 05

16  -- I don't know what account -- we use an account number

17  and case numbers different.  So I am not sure what -- the

18  05C would probably be the case number, representing that

19  it was filed in 2005.

20      MR. KIRSCH:  Can we please display page 15 of this

21  same exhibit.  And highlight those top two forms.

22  Q.   (BY MR. KIRSCH)  Mr. Silverman, does that same

23  information appear in Box 5 of these forms that purport to

24  come from the El Paso County Court and the El Paso County

25  District Attorney?

1    A.    Yeah.  The 05C1505, yes.

2    Q.    Where did you -- where was the collection case

3    against Mr. Pawelski filed?

4    A.    Probably in El Paso County.

5         MR. KIRSCH:  Can I have just one moment, please,

6    Your Honor?

7         THE COURT:  You may.

8         MR. KIRSCH:  Thank you, Mr. Silverman.

9         No other questions, Your Honor.

10        THE COURT:  Thank you very much, Mr. Silverman, you

11   are excused.

12        MR. KIRSCH:  Your Honor, could I have just a moment

13   to see which witness we have available next?

14        THE COURT:  You may.

15        MR. KIRSCH:  Your Honor, the Government will call

16   Cyndi Wood.

17        THE COURT:  All right.

18        COURTROOM DEPUTY:  Enter the witness box and remain

19   standing.

20        Your attention, please.

21        Please raise your right hand.

22                        **CYNTHIA WOOD**

23   having been first duly sworn, testified as follows:

24        COURTROOM DEPUTY:  Please be seated.

25        Please state your name, and spell your first and

```
 1    last names for the record.
 2              THE WITNESS:  Cynthia Wood.  C-Y-N-T-H-I-A W-O-O-D.
 3              THE COURT:  You may proceed.
 4              MS. PALUCH:  Thank you, Your Honor.
 5                        DIRECT EXAMINATION
 6    BY MS. PALUCH:
 7    Q.   Good morning, ma'am.
 8    A.   Good morning.
 9    Q.   How are you employed?
10    A.   I am a Vice President Operations' Manager for First
11    National Bank of Monument.
12    Q.   How long have you held that position?
13    A.   About 13 months now.
14    Q.   And prior to becoming the Vice President of
15    Operations at First National Bank, were you employed in
16    the banking industry?
17    A.   Yes.  I was employed at Banner Bank in Washington
18    State.
19    Q.   How many years total have you been involved in the
20    banking industry?
21    A.   Probably about 28 years.
22    Q.   I believe you stated you work in Monument?
23    A.   That's correct.
24    Q.   And approximately how far is that from Colorado
25    Springs?
```

1    A.    It is about 15 miles.

2    Q.    Okay.  In preparation for today's testimony, were you

3    asked to review certain documents?

4    A.    Yes, I was.

5          MS. PALUCH:  I would ask that previously-admitted

6    Government's Exhibit 16 be published.

7    Q.    (BY MS. PALUCH)  Ma'am, you have a stack of folders

8    to your left there.

9    A.    Yes.

10   Q.    And the exhibit will show up on the screen in front

11   of you, as well.

12         I am going to direct your attention to page 11 of

13   that document.  Can you see it on the screen in front of

14   you?

15   A.    Yes.

16   Q.    I will direct your attention to that first form.

17         MS. PALUCH:  If you could display the whole page,

18   please.  And then go to the first form.

19   Q.    (BY MS. PALUCH)  Can you state the title of that

20   document?

21   A.    It is a 1099 OID.

22   Q.    For what tax year?

23   A.    For tax year 2006.

24   Q.    And who is listed as the payer?

25   A.    First National Bank.

1    Q.    And who is listed as recipient?

2    A.    George T. Brokaw.

3    Q.    Do you see in Box 1, are you able to read the

4    typewritten description of that box?

5    A.    I believe it says $22,021.11.

6    Q.    Are you able to read the wording in that box?

7    A.    Original Issue Discount for 2006, I believe.

8    Q.    Can you read -- are you able to see the amount in Box

9    4?   Does it appear to be the same?

10   A.    It appears to be the same.

11   Q.    It is difficult to read, isn't it?

12   A.    It is.

13   Q.    And how about Box 5, what is the description?

14   A.    Bank Account.  Account 200501677.

15   Q.    And at our request, did you research that account

16   number?

17   A.    I am sorry?

18   Q.    At our request, did you research that account number?

19   A.    Yes, I did.

20   Q.    And how did you go about researching that?

21   A.    I looked to see if it was still an active account at

22   the bank.  And it is.  And also we have managed services

23   for our cold reports, where we archive our tax documents

24   we issue at the end of the year.

25   Q.    Okay.  And did you find an account with that number?

1    A.    I did.

2    Q.    And in whose name is that account?

3    A.    George Brokaw and his wife.  I am sorry, I don't

4    recall what her name is.

5    Q.    And does your bank maintain copies of Form 1099 OIDs

6    they issue?

7    A.    We do.

8    Q.    Were you able to look to determine whether or not

9    your bank issued this Form 1099 OID?

10   A.    I was able to look.

11   Q.    And what did you find?

12   A.    I did not find a 1099 OID issued to George Brokaw for

13   2006.

14   Q.    Would First National Bank withhold federal income tax

15   from this account that you located?

16   A.    No.  It is a checking account.

17   Q.    Okay.  Now, on page 11, do you see there appears --

18   there appears to be another Form 1099 listing Wells Fargo.

19   Do you see that?

20   A.    Yes.

21   Q.    In your experience, would First National Bank ever

22   create a tax form on the same page as another financial

23   entity?

24   A.    No.  I have never seen that happen.

25   Q.    And why is that?

1    A.    Normally these tax forms are -- there are three

2    copies to a page.  One goes to the bank, one to the

3    recipient.  And so we would never ever issue one for Wells

4    Fargo Bank.

5    Q.    Does one go to the IRS, as well?

6    A.    Yes.  I am sorry, yes.

7    Q.    Okay.  So you would never -- it wouldn't appear on

8    the same page, is that what you are saying?

9    A.    That's correct.

10   Q.    Okay.  I would like to move now to Government's

11   Exhibit 18.  And I am going to direct your attention to a

12   page that has been admitted.  I will direct your attention

13   to page 10 of that exhibit.  Do you see that, ma'am?

14   A.    Yes.

15         MS. PALUCH:  And now if we can just highlight the

16   first form on that page.

17   Q.    (BY MS.  PALUCH)  What is the title of that document?

18   A.    It is a 1099 OID for the tax year 2007.

19   Q.    And who is listed as the payer?

20   A.    First National Bank.

21   Q.    And the recipient?

22   A.    George T. Brokaw.

23   Q.    And in Boxes 1 and 4, are you able to read the amount

24   of money there?

25   A.    66,623.80.

1     Q.   Is that representing income tax withheld?

2     A.   Yes.

3     Q.   Description?

4     A.   Bank Account.  Credit Account 20050677.

5     Q.   Is that the same account we discussed on the previous

6     exhibit?

7     A.   Yes, it is.

8     Q.   Again, you stated earlier you researched that

9     account?

10    A.   Yes, I did.

11    Q.   Did you use the same method that you described with

12    the cold reports?

13    A.   Yes, I did.

14    Q.   Did you find any Form 1099 OIDs prepared for George

15    Brokaw for the year 2007?

16    A.   No.

17    Q.   Did First National withhold any income tax from

18    Mr. Brokaw on this checking account?

19    A.   No.

20    Q.   Is that correct, you characterized it as a checking

21    account?

22    A.   That's correct.

23    Q.   And do you see --

24         MS. PALUCH:  If we could display the whole page.

25    Q.   (BY MS.  PALUCH)  Now do you see other financial

1    entities listed on the same page?

2    A.   Yes.

3    Q.   And your same answer would apply as to whether you

4    would issue that type of form?

5    A.   Correct.

6    Q.   Now I would like to direct your attention to

7    Government's Exhibit 20, and specifically I would ask to

8    page 10 of that document.  If we could look at the full

9    page first.  And then if we could narrow down to the first

10   form on that page.

11        Can you state the title of that document?

12   A.   It is a 1099 OID.

13   Q.   And for the tax year?

14   A.   2008.

15   Q.   And, again, could you state the payer and the

16   recipient listed on this?

17   A.   Payer is First National Bank.  Recipient is George T.

18   Brokaw.

19   Q.   The description in Box 5, is that the same bank

20   account we have been discussing?

21   A.   Yes.

22   Q.   Can you read the amounts listed in Boxes 1 and 4?

23   A.   $79,099.71.

24   Q.   Did you research whether or not First National Bank

25   prepared this document?

1    A.    Yes, I did.

2    Q.    Again, using the system you have described?

3    A.    Correct.

4    Q.    Did First National Bank issue this form?

5    A.    No, we did not.

6    Q.    Did you withhold $79,099 from Mr. Brokaw for this

7    checking account?

8    A.    No, we did not.

9    Q.    Again, you see the other financial institutions.

10          MS. PALUCH:  If we can show the whole form now.

11   Q.    (BY MS. PALUCH)  Does your same answer apply with

12   respect to all of these institutions appearing on one

13   page?

14   A.    Yes.

15   Q.    Okay.  Now I will direct your attention to

16   Government's Exhibit 120, which has not yet been admitted.

17          Just generally, ma'am, if you could look in the

18   folder next to you.  Can you generally state what that

19   exhibit appears to be?

20   A.    It is a statement for his account.

21   Q.    And when we say "his account," who are we discussing?

22   A.    George T. Brokaw.

23   Q.    Is there another name?

24   A.    His wife, Debra S. Brokaw.

25   Q.    On the first page is there reference to an account

1    number?

2    A.   Yes.

3    Q.   Is that the same account number we have been

4    discussing on all of the prior exhibits?

5    A.   Yes.

6    Q.   And are you considered a custodian of records for

7    First National Bank for these types of documents?

8    A.   Yes, I am.

9    Q.   Were these documents kept in the course of

10   regularly-conducted business activity of First National

11   Bank?

12   A.   Yes, they were.

13   Q.   Was the making of these records a regular practice of

14   that activity?

15   A.   Yes, it was.

16   Q.   Did First National Bank rely on the accuracy of these

17   records in the course of its business?

18   A.   Yes, we do.

19        MS. PALUCH:   Your Honor, at this time I move to

20   admit and publish Government's Exhibit 120.

21        THE COURT:   Exhibit 120 is admitted.

22        (Exhibit No. 120 is admitted.)

23        THE COURT:   You may publish.

24        MS. PALUCH:   Thank you, Your Honor.

25   Q.   (BY MR. KIRSCH)   Now, this is a pretty thick exhibit.

1    Are these statements for the checking account that you

2    testified about?

3    A.   Yes.

4    Q.   And the name of George and Debra Brokaw?

5    A.   Yes.

6    Q.   Please turn to page 20 of that exhibit.  And what

7    does that appear to be?

8    A.   That is a statement dated 12/20/06 for the checking

9    account that we have been talking about for George and

10   Debra Brokaw.

11   Q.   Does it reflect the balance of this account at the

12   end of 2006?

13   A.   It does.

14   Q.   What was that balance?

15   A.   $5,698.

16   Q.   If you could turn to page 57 of this document.  Can

17   you state what that page appears to be?

18   A.   It is a checking account statement dated 12/20/07 for

19   George T. Brokaw and Debra S. Brokaw.

20   Q.   Balance?

21   A.   6,947.86.

22   Q.   Finally, if you could turn to page 105 of that

23   exhibit.  Can you state what that page appears to be?

24   A.   That is a checking account statement dated 12/18/08

25   for the same account number under the game of George T.

 1   Brokaw and Debra S. Brokaw.

 2   Q.   The balance at that time at the end of 2008?

 3   A.   $704.38.

 4        MS. PALUCH:   Okay.   And now I would like to ask

 5   that Exhibit 72, which I believe has already been

 6   admitted -- am I correct?   Yes, Exhibit 72, if that could

 7   be published, please.   And I am sorry, page 28 of Exhibit

 8   72.

 9   Q.   (BY MS.  PALUCH)  Do you have 72?  Can you see that

10   on the screen, ma'am?

11   A.   Yes.

12   Q.   Can you identify that document?

13   A.   It is a 1099 Interest Form for the tax year 2008.

14   Q.   Okay.  And who is listed as the payer?

15   A.   First National Bank.

16   Q.   And who is the recipient?

17   A.   George T. Brokaw and Debra S. Brokaw.

18   Q.   Can you state whether this appears to be a form

19   issued, in fact, by First National Bank?

20   A.   Yes, it is.

21   Q.   And what is reported here in Box 1?

22   A.   Their interest income on their account.   $12.67.

23   Q.   Is that for the account we have been discussing here

24   today?

25   A.   Yes.

1    Q.   So is this a correct representation of what a 1099

2    form would look like had it been issued by First National

3    Bank?

4    A.   Yes, it is.

5         MS. PALUCH:   One moment, Your Honor.

6    Q.   (BY MS. PALUCH)   Ma'am, could you explain on the bank

7    address, as we see here on page 28, indicates First

8    National Bank of Las Animas, Colorado?

9    A.   Yes.

10   Q.   I believe we discussed that you are located out of

11   Monument?

12   A.   That's correct.

13   Q.   Could you explain that?

14   A.   Our bank is actually headquartered in Las Animas,

15   Colorado.   It is our Las Animas office that generates all

16   of these forms.

17   Q.   You were employed out of the branch in Monument?

18   A.   That's correct.

19        MS. PALUCH:   Thank you.   No further questions, Your

20   Honor.

21        THE COURT:   All right.   Thank you very much,

22   Ms. Wood.   You are excused.

23        THE WITNESS:   Thank you.

24        THE COURT:   Government may call its next witness.

25        MR. KIRSCH:   Thank you, Your Honor.   The Government

1    calls Annette Perea.

2         COURTROOM DEPUTY:  Good morning.  Please enter and

3    remain standing.

4         Your attention, please.

5         Please raise your right hand.

6                        **ANNETTE PEREA**

7    having been first duly sworn, testified as follows:

8         COURTROOM DEPUTY:  Please be seated.

9         Please state your name, and spell your first and

10   last names for the record.

11        THE WITNESS:  Annette J. Perea.  A-N-N-E-T-T-E, J,

12   P-E-R-E-A.

13        THE COURT:  You may proceed.

14        MR. KIRSCH:  Thank you, Your Honor.

15                     **DIRECT EXAMINATION**

16   **BY MR. KIRSCH:**

17   Q.   Good morning.  Can you tell the jury where you work?

18   A.   I work at the Fourth Judicial District, District

19   Attorney's Office in Colorado Springs.

20   Q.   And for folks who don't know the numbers, where is

21   the Fourth Judicial District?

22   A.   Colorado Springs, El Paso, and Teller County.  But

23   located in downtown Colorado Springs.

24   Q.   What do you do there?

25   A.   I am a budget and finance director.

1    Q.    How long have you held that position?

2    A.    For 21 years.

3    Q.    And what are your duties as the budget and finance

4    director for that office?

5    A.    Well, we're responsible for creating and adopting the

6    budget with the funds that the County gives us.  We also

7    handle all of the accounts payables, which we pay all of

8    our vendors, all of receivables, and we do payroll and

9    benefits.

10   Q.    As a result of or in connection with those duties, do

11   you also end up with responsibility for tax forms that are

12   generated by that office?

13   A.    Yes, we do.  For the tax payable function, we have to

14   keep track of anyone that we pay over $600 per year and

15   pay out 1099 forms.

16   Q.    So your office does use 1099 forms?

17   A.    Yes, we do.

18   Q.    Is there a particular kind of 1099 form your office

19   uses?

20   A.    We always only use the 1099 Miscellaneous.  That is

21   the only form we have used it for.

22         MR. KIRSCH:  I will ask to publish Government

23   Exhibit 35, page 11.  We will get this up on the screen

24   for you in a moment, Ms. Perea.  Go to page 11, please.

25   Sorry.  We will try to get you to the right place here.

502

1   Page 15.  There we go.  And can we go ahead and expand the

2   top forms there.

3   Q.   (BY MR. KIRSCH)  Okay.  So I will direct your

4   attention to the form at the top of the page there.  Can

5   you see that, Ms. Perea?

6   A.   Yes.

7   Q.   Is that something -- so the office that is

8   represented at the top, is that an office you would have

9   responsibility for the tax forms for?

10  A.   No.

11  Q.   No.  How about the next one?

12  A.   Yes.

13  Q.   Okay.  So that -- did your office issue that form?

14  A.   No, we did not.

15  Q.   Did your office withhold $3 million in income tax

16  from a person named John Pawelski for 2005?

17  A.   No, we did not.

18  Q.   Does your office, or does the El Paso County District

19  Attorney's Office, does it have an employer identification

20  number?

21  A.   Yes, it does.

22  Q.   When your office creates tax forms, does it put that

23  employer identification number on the forms?

24  A.   Yes, we do.

25  Q.   Do you see the reference to a court case in Box 5

1   there?

2   A.   Yes.

3   Q.   Is the number at the end of that entry that starts

4   with "05," is that in a format that is consistent with

5   cases from the District Attorney's Office?

6   A.   No.

7   Q.   Do you know, is that consistent with cases from

8   anywhere in the El Paso County Court system?

9   A.   I don't know if it could be a civil case.  It could

10  maybe be a civil case, which we do not do civil cases.

11  Q.   It is not a Criminal Case No.

12  A.   No.  Our criminal cases are CR case numbers.

13  Q.   Okay.  When your office does generate 1099 forms, do

14  you list the case number on them?

15  A.   No, we do not.

16  Q.   Now I want to direct your attention to Government

17  Exhibit 38.  I will put this up on the screen for you, as

18  well.  And I want to ask you about page 10 of this

19  exhibit.  Direct your attention to the form in the middle.

20  Can you see the form there that says it comes from the El

21  Paso County District Attorney?

22  A.   Yes.

23  Q.   Did your office generate that form?

24  A.   No, we did not.

25  Q.   Did your office withhold $3 million from John

1    Pawelski in 2006?

2    A.   No, did not.

3    Q.   If your office had generated a form like this in

4    2006, would it have included a case number, as appears in

5    Box 5 of this form?

6    A.   No, it would not.

7         MR. KIRSCH:  One moment, please, Your Honor.

8    Q.   (BY MR. KIRSCH)  Just one other question for you,

9    Ms. Perea.  If there were to be a handwritten Form 1099

10   OID that listed the El Paso County District Attorney as

11   the payer, would that be a legitimate form?

12   A.   No, it would not.

13   Q.   Does your office create and file any tax forms with

14   the IRS that are handwritten?

15   A.   No, we do not.

16        MR. KIRSCH:  Thank you, ma'am.

17        Those are all of my questions, Your Honor.

18        THE COURT:  Thank you, Ms. Perea, you are excused.

19        THE WITNESS:  Thank you.

20        THE COURT:  Government may call its next witness.

21        MS. PALUCH:  Your Honor, the United States calls

22   Susan Skovgaard.

23        COURTROOM DEPUTY:  Your attention, please.

24                    **SUSAN  SKOVGAARD**

25   having been first duly sworn, testified as follows:

```
 1              COURTROOM DEPUTY:  Please be seated.

 2              Please state your name, and spell your first and

 3     last names for the record.

 4              THE WITNESS:  My name is Susan Skovgaard.

 5     S-U-S-A-N S-K-O-V-G-A-A-R-D.

 6              THE COURT:  You may proceed.

 7              MS. PALUCH:  Thank you, Your Honor.

 8                        DIRECT EXAMINATION

 9     BY MS. PALUCH:

10     Q.   Good morning, ma'am.

11     A.   Good morning.

12     Q.   Where do you work?

13     A.   I work at Credit Systems, Inc., in Colorado Springs.

14     Q.   How long have you worked there?

15     A.   I've worked there about 14 years.

16     Q.   What type of company is Credit Systems?

17     A.   We are a third-party collection agency.

18     Q.   What do your duties involve?

19     A.   I am the operations' manager of the company.  So it

20     is my job to set policies and procedures for the entire

21     office.  And I also do the accounting for the company.

22     And I do personal management, also.

23     Q.   In doing the accounting for your company, do you have

24     any involvement with issuing or creating 1099s?

25     A.   I would be involved if we had a requirement for that,
```

1    yes.

2    Q.   Does Credit Systems issue Form 1099 OIDs?

3    A.   To my knowledge, we have never issued one of those

4    forms.

5         MS. PALUCH:   I would ask that page 5 of

6    Government's Exhibit 31 be published.

7         If we could look at the whole form, then I would

8    ask the middle form be highlighted, please.

9    Q.   (BY MS. PALUCH)  Do you see that document on the

10   screen, ma'am?

11   A.   Yes, I do.

12   Q.   Could you state the title of that document?

13   A.   It is a 1099 Original Issue Discount.

14   Q.   For what tax year?

15   A.   2004.

16   Q.   And who is listed as the payer?

17   A.   My company that I work at, Credit Systems.

18   Q.   And the recipient?

19   A.   Is John Pawelski.

20   Q.   And do you see where it says payer's "Federal

21   Identification Number"?

22   A.   Yes.

23   Q.   What is written in that box?

24   A.   It is filled in with "Unknown."

25   Q.   And working in the accounting division of Credit

1    Systems in preparation of tax forms, would you ever list

2    your payer's identification number as "unknown"?

3    A.    No.

4    Q.    Do you see the amounts listed in Boxes 1 and 4?

5    A.    Yes.

6    Q.    Could you read those amounts for the record?

7    A.    It is $16,383.65.

8    Q.    In both 1 and 4?

9    A.    Yes.

10   Q.    Four is indicating that is federal income tax

11   withheld?

12   A.    Correct.

13   Q.    Do you see the description in Box 5?

14   A.    Yes.

15   Q.    And there is an account number there?

16   A.    Correct.

17   Q.    And at our request, did you research that account

18   number?

19   A.    Yes, I did.

20   Q.    And what did, if anything, did you find?

21   A.    Mr. Pawelski does have an account at our agency with

22   that number.

23   Q.    And what type of an account would that be?

24   A.    It was an account where Mr. Pawelski owed the Gazette

25   Telegraph, the newspaper in Colorado Springs, he owed them

1    for some commercial advertising.

2    Q.   And do you know the amount that he owed?

3    A.   It was -- the account was listed back in the late

4    1990s for roughly about $12,000.  And it is interest

5    bearing.  So the balance would change over the years.

6    Q.   Okay.  But, in any event, would Credit Systems, a

7    third-party collection agency, have ever withheld money

8    from Mr. Pawelski and sent that money to the IRS?

9    A.   No.

10            MS. PALUCH:  One moment, please, Your Honor.

11            No further questions.

12            THE COURT:  All right.  Thank you very much.  You

13   are excused.

14            Government may call its next witness.

15            MR. KIRSCH:  Your Honor, can I go check again?

16            THE COURT:  You may.

17            MR. KIRSCH:  Your Honor, we will call Special Agent

18   Rutkowski.

19            THE COURT:  All right.

20            COURTROOM DEPUTY:  Your attention, please.

21            Please raise your right hand.

22                    **SPECIAL AGENT ADAM RUTKOWSKI**

23   having been first duly sworn, testified as follows:

24            COURTROOM DEPUTY:  Please be seated.

25            Please state your named, and spell your first and

1    last names for the record.

2           THE WITNESS:  My name is Adam Rutkowski.  A-D-A-M

3    R-U-T-K-O-W-S-K-I.

4           THE COURT:  You may proceed.

5           MR. KIRSCH:  Thank you, Your Honor.

6           Your Honor, I am sorry, I will ask for one minute.

7    I am trying to locate a particular exhibit to be able to

8    show to Special Agent Rutkowski.

9           Your Honor, can I ask to publish, please,

10   Government Exhibit 73, previously admitted?

11          THE COURT:  You may publish it.

12                       **DIRECT EXAMINATION**

13   **BY MR. KIRSCH:**

14   Q.   Special Agent Rutkowski, before we do that, let me

15   just ask you, what do you do?

16   A.   I am a Special Agent with the Internal Revenue

17   Service Criminal Investigation.

18   Q.   How long have you held that position?

19   A.   Since 2010.

20   Q.   Are you familiar with an agency -- a different

21   Department of Treasury agency known as TIGTA?

22   A.   Yes, I am.

23   Q.   Have you had an occasion to work -- do you sometimes

24   work with TIGTA agents in the course of criminal

25   investigations?

1    A.    Yes, I do.

2    Q.    Have you had the occasion to do that with respect to

3    Mr. Brokaw, Mr. Pawelski, and Ms. Vigil?

4    A.    Yes.

5    Q.    And at what point did you begin working on that

6    investigation?

7    A.    The investigation began with another special agent in

8    the IRS.  It was ultimately given over to me at some

9    point.  I cannot recall specifically when.

10   Q.    That is fine.  Let me ask you a little bit more.  As

11   a special agent -- you were here earlier in the courtroom

12   when Ms. Morgan testified; right?

13   A.    I was.

14   Q.    Did you hear her testify about the master database

15   that the IRS maintains in West Virginia?

16   A.    I did.

17   Q.    Do you, as a special agent, have access to the

18   information that is in that database, as well?

19   A.    Yes, I do.

20   Q.    And have you had the opportunity to review

21   information in that database with respect to Mr. Brokaw in

22   connection with your work on this case?

23   A.    Yes, I have.

24   Q.    Now I want to ask you to look at Government Exhibit

25   73.

1          MR. KIRSCH:  Can we go ahead and enlarge the text

2     of that.

3     Q.   (BY MR. KIRSCH)  Can you remind the jury what this

4     letter is, please?  Do you know what this letter is?

5     A.   Yes.  This letter is an indication of what occurred

6     with a refund that was generated for Mr. Brokaw based on

7     his 2008 Tax Return.  Specifically, if a person gets a

8     refund based on a tax return, and there is still money

9     owed to the IRS for other years -- prior years, for

10    instance, that money can be applied to those prior years

11    instead of firstly applied to the first year outstanding

12    balances before any refund check would be put into the

13    mail and sent to the taxpayer.  This letter indicates

14    that.

15    Q.   And so if we go down to the text that appears at the

16    bottom of the screen, does that indicate how the

17    particular years for which this refund that was issued to

18    Mr. Brokaw were applied?

19    A.   I am doing quick math in my head.

20    Q.   I am glad that is you and not me, then.

21    A.   The amounts at the bottom of the page for the tax

22    years 1999, 2000 and 2001 appear to be approximately the

23    same amount as what is up a little higher in the page

24    under "Total Amount Applied."

25         MR. KIRSCH:  Okay.  Can we scroll back up to the

512

1    top of this page, please.

2    Q.   (BY MR. KIRSCH)  What is the date that this letter

3    was issued?  Is that on the top of the screen under

4    "notice number"?

5    A.   Yes.  Under "Notice Number CP49," the date listed is

6    June 8, 2009.

7    Q.   Let me take you back now to the information that you

8    reviewed from the IRS's database with respect to

9    Mr. Brokaw.  Did you have access to information from that

10   database from a time period after June 8th of 2009?

11   A.   Yes, I did.

12   Q.   Do you know whether or not after that date, did the

13   IRS continue to give Mr. Brokaw this credit for the

14   $62,607?

15   A.   I am sorry, can you rephrase the question?

16   Q.   Did the IRS continue to apply this credit for

17   Mr. Brokaw for this $62,607 after June 8, 2009, as this

18   letter indicates, or did the position change?

19   A.   Yes, sir.  Thank you for the clarification.  There

20   came a time when the IRS became aware that the refund that

21   was generated in the amount of $62,607 was based on a tax

22   return that was fraudulent.  When the IRS became aware

23   that that refund was generated -- was based on a

24   fraudulent tax return, the IRS took steps to reverse the

25   application of that refund from the earlier tax years, as

1    displayed on the bottom of the page, essentially wiping it

2    out.  If you have a positive, then you apply a negative,

3    you get a zero.

4    Q.   So at the end of the day, then, did Mr. Brokaw

5    receive a credit for the refund that he claimed for tax

6    year 2008?

7    A.   No.

8         MR. KIRSCH:  Thank you, Special Agent.

9         Those are all of my questions for this witness,

10   Your Honor.

11        THE COURT:  All right.  Thank you very much, you

12   may step down.

13        All right.  The Government may call its next

14   witness.

15        MR. KIRSCH:  Your Honor, unless things have changed

16   in the last 5 minutes, we have three to four witnesses

17   that are literally en route from the airport right now,

18   but we do not have any here at the moment.  I apologize.

19        THE COURT:  I don't think anybody will mind taking

20   a short break.  So why don't we break for 15 minutes, hope

21   they will be here, maybe a little longer.

22        Remember, ladies and gentlemen, you are not to talk

23   about this case among yourselves.  We will reconvene as

24   soon as we have our witnesses.  We are moving along very

25   rapidly, which I think everybody appreciates.

1          MR. KIRSCH:  Thank you, Your Honor.

2          THE COURT:  The Court will be in recess until they

3     tell us the witnesses are here.

4          (A break is taken from 9:42 a.m. to 10:13 a.m.)

5          THE COURT:  You may be seated.

6          Ms. Hartmann, would you please bring in the jury.

7          (The following is had in open court, in the hearing

8     and presence of the jury.)

9          THE COURT:  All right.  You may be seated.

10          Government may call its next witness.

11          MS. PALUCH:  Yes, Your Honor.  The Government calls

12     Kymberly Johnson.

13          COURTROOM DEPUTY:  Please remain standing.

14          Your attention please.  Please.

15          Raise your right hand.

16                         **KYMBERLY JOHNSON**

17     having been first duly sworn, testified as follows:

18          COURTROOM DEPUTY:  Please be seated.

19          Please state your name, and spell your first and

20     last names for the record.

21          THE WITNESS:  My name is Kymberly Johnson.  My

22     first name is spelled K-Y-M-B-E-R-L-Y.  My last name is

23     spelled J-O-H-N-S-O-N.

24          THE COURT:  You may proceed.

25          MS. PALUCH:  Thank you, Your Honor.

1                    **DIRECT EXAMINATION**

2    **BY MS. PALUCH:**

3    Q.   Good morning, ma'am.

4    A.   Good morning.

5    Q.   How are you employed?

6    A.   Legal manager with Capital One.

7    Q.   How long have you held that position?

8    A.   I have been in this role for 3 years.

9    Q.   And I would ask if you could speak a little bit more

10   into the microphone.

11   A.   Sorry.

12   Q.   How many years total have you worked in the banking

13   industry?

14   A.   Approximately 13 years.

15   Q.   Okay.  Are you familiar with forms 1099 OID?

16   A.   Yes, I am.

17   Q.   And how is it you are familiar with those forms?

18   A.   In my current role, I am a process manager, and I am

19   responsible for 1099 reporting for the Capital One

20   department.  And I also assist with escalated disputes

21   from customers related to Capital 1099 reporting.

22   Q.   Would Capital One ever issue a 1099 OID for a credit

23   card account?

24   A.   No.

25   Q.   Why not?

```
 1    A.    Capital One does not issue 1099 OIDs for credit card

 2    accounts because, generally, the appropriate reporting is

 3    a Form 1099 C to report debt.   My understanding is 1099

 4    OIDs report the original issue discount associated with

 5    securities, and specifically bonds or other securities

 6    issued at a discount.   And the form reports the difference

 7    between the issuance price and the redemption price of

 8    that security.   And a credit card is not the appropriate

 9    type of account to report on that form.

10    Q.    I think there is a stack of exhibits next to you,

11    ma'am, and they will be displayed on the screen, as well.

12          MS. PALUCH:   Permission to publish Government's

13    Exhibit 31.

14          THE COURT:   You may.

15          MS. PALUCH:   If we could publish page 4 of 31.

16    Looking at the full form there, and then if we could

17    highlight the first two forms.

18    Q.    (BY MS. PALUCH)   Ma'am, in preparation for your

19    testimony today, were you asked to review certain

20    documents?

21    A.    Yes, I was.

22    Q.    And were these two forms documents that you reviewed?

23    A.    Yes, they were.

24    Q.    And directing your attention to the first form on

25    this page, can you state the title of this form?
```

1    A.    This is a Form 1099 OID issued for tax year 2004.

2    Q.    And could you please state the name of the payer and

3    the name of the recipient?

4    A.    The payer's name is Capital One.  And the recipient's

5    name is John J. Pawelski.

6    Q.    And if you could look at Boxes 1 and 4 and state what

7    the typewritten words are in Box 1?

8    A.    Box 1 states "Original Issue Discount" for 2004.

9    Q.    And the amount reflected there ma'am?

10   A.    $2,000.

11   Q.    And Box 4, please?

12   A.    Box 4 states "Federal Income Tax Withheld," and the

13   amount is $2,000.

14   Q.    And do you see in Box 5, the description there?

15   A.    Yes.

16   Q.    And what is listed there?

17   A.    "Credit Card Installment Account."  And there is an

18   Account No. 9007144904278678.

19   Q.    And I would like to direct your attention back to the

20   payer's information.  Is that an address that Capital One

21   would use on a tax form?

22   A.    No, it is not.

23   Q.    What address would Capital One use?

24   A.    Capital One would use a post office box address that

25   corresponds to the correspondence return mail address

1    associated with that customer account.  So for a credit

2    card account, for example, it would be in Salt Lake City,

3    Utah.

4    Q.   Okay.  Salt Lake City would be what is represented on

5    a tax form?

6    A.   Yes.

7    Q.   And the city and state here, do you recognize

8    anything about the spelling of that city?

9    A.   The city name is actually misspelled.  Our

10   headquarters' address, which I believe is what it is

11   intended to represent, is in McLean, Virginia,

12   M-C-L-E-A-N, and it has "McClean."

13   Q.   Would Capital One ever issue a tax form to the IRS

14   listing "unknown" for its federal identification number?

15   A.   No, Capital One would not.

16   Q.   Okay.  If Capital One were to issue a Form 1099, what

17   type of form would it use?

18   A.   We issue multiple form 1099s, multiple types of 1099

19   forms for credit card account.  The most common form would

20   be a 1099 C, to report the forgiveness of debt.

21   Q.   Do you use generated forms?

22   A.   Yes.  It is generated through an automated system

23   that processes.

24   Q.   Computer-generated?

25   A.   That's correct.

```
 1   Q.   If you look at the top of both of these forms, do you
 2   see where it says "Corrected"?
 3   A.   Yes.
 4   Q.   Would that ever occur with Capital One where you
 5   would use handwriting to mark those boxes?
 6   A.   No, it would not.
 7   Q.   Would Capital One --
 8        MS. PALUCH:  If we could display the whole page.
 9   Q.   (BY MS. PALUCH)  -- ever issue a tax form with
10   another entity listed on that form?  Do you see the
11   reference to Beck & Cassinis at the bottom?
12   A.   Yes, I do.  We would not include another company's
13   name as the payer on a tax form issued by Capital One.
14   Q.   Why is that?
15   A.   We are required to use the IRS forms as required
16   under the Treasury statutes.  And we issue one form,
17   generally, per account.  We are required and we would use
18   the form to include the instructions and the other details
19   as required in those regulations.
20   Q.   Can you look at the description of the account listed
21   in Box 5, as well as the account listed under the City of
22   Colorado Springs, Colorado?  Can you compare those?
23   A.   Yes.
24   Q.   Are they the same?
25   A.   No, they are not.
```

1    Q.   And can you explain the difference?

2    A.   The account numbers vary with the last four digits.

3    The account number listed in Box 5 ends in 8678, and the

4    account number listed under the recipient's address ends

5    in 8670.

6    Q.   And did you research both of those account numbers?

7    A.   Yes, I did.

8    Q.   And what, if anything, did you find?

9    A.   Capital One did not issue a 1099 form in connection

10   with these accounts.  I did not locate any accounts in our

11   record where we tracked 1099 forms that match these

12   account numbers.

13   Q.   Were you able to find an account number with either

14   of those numbers in the name of John J. Pawelski?

15   A.   No, I was not.

16   Q.   So your answer would be the same for the second form

17   on this page --

18   A.   Yes.

19   Q.   -- as far as whether Capital One issued that form?

20   A.   Capital One did not issue these forms.  We do not

21   have any accounts in our system record with these account

22   numbers.

23   Q.   Direct your attention, ma'am to, the next page of

24   that exhibit, page 5.

25            MS. PALUCH:  And if we could look at the whole

1    page, and then if we could highlight the first form on

2    that page.

3    Q.   (BY MS. PALUCH)  Can you state the title of that

4    form?

5    A.   This is a Form 1099 OID for tax year 2004.

6    Q.   And who is listed as the payer, and who is the

7    recipient?

8    A.   The payer name is listed as Household Credit

9    Services.  The recipient name is John J. Pawelski.

10   Q.   What relationship, if any, does Capital One have with

11   Household Credit Services?

12   A.   I believe Capital One did acquire a small portfolio

13   of Household Credit Services' accounts through the HSBC

14   acquisition a few years ago.  However, I don't know that

15   we would have issued a 1099 form in the name Household

16   Credit Services to acquire that account.

17   Q.   Did you research this document at our request?

18   A.   Yes, I did.

19   Q.   Did you find any evidence that Household Credit

20   Services issued this form?

21   A.   No, I did not.

22        MS. PALUCH:  If we could show admitted Government

23   Exhibit 38, specifically page 4 of that exhibit.  Looking

24   at the whole form first, then highlight the middle form on

25   that page.

1   Q.   (BY MS. PALUCH)   Can you state the title of that

2   form?

3   A.   This is a Form 1099 OID for tax year 2006.

4   Q.   And what is the name of the payer on this document?

5   A.   HSBC Finance Company.

6   Q.   And the recipient?

7   A.   John J. Pawelski.

8   Q.   And what relationship, if any, does HSBC Finance

9   Company have with Capital One?

10  A.   Capital One acquired a portfolio of accounts from

11  HSBC in 2005.

12  Q.   Do you see the description "credit card installment

13  accounts"?

14  A.   Yes.

15  Q.   Did you research that account?

16  A.   Yes, I did.

17  Q.   What did you determine?

18  A.   Capital One did not issue any tax forms in connection

19  with this account.   And we found no record of HSBC issuing

20  a Form 1099 OID in connection with this account.

21  Q.   Did you find an account number related to John

22  Pawelski with that number or an account with a number that

23  is close to what is represented here?

24  A.   I did find one with an account number that is close

25  to this, yes.

1   Q.   What was the discrepancy between -- that you found,

2   and what is represented on this form?

3   A.   I believe there was a slight variation in the first

4   few digits of the account number.

5   Q.   I can show you another exhibit, ma'am, to help with

6   that.  But from your research, are you able to state today

7   whether or not HSBC issued this form?

8   A.   Yes, I am.

9   Q.   And your answer, ma'am?

10   A.   We have no record of issuing this form.

11        MS. PALUCH:  I would like now for the witness to be

12   shown Government's Exhibit 121.

13   Q.   (BY MS. PALUCH)  And you should have just a folder in

14   front of you with that exhibit.

15        THE COURT:  This has not been admitted yet.

16        MR. KIRSCH:  It has not been, Your Honor.

17        THE COURT:  So it shouldn't be published.

18        MS. PALUCH:  Right.  That's correct.  I am sorry,

19   121.

20        THE COURT:  I am just telling that for Ms. Hartmann

21   to note.

22        MS. PALUCH:  Certainly.

23   Q.   (BY MS. PALUCH)  Can you state generally what you

24   have in front of you there?

25   A.   Yes.  This is a series of account documents.

```
 1    Q.   For what entity?

 2    A.   For Capital One.  Capital One.

 3    Q.   For what customer?

 4    A.   John Pawelski.

 5    Q.   Are you considered a custodian of record for Capital

 6    One for these documents?

 7    A.   I am a custodian of records for Capital One.

 8    Q.   Were these documents kept in the course of

 9    regularly-conducted business of Capital One?

10    A.   Yes.

11    Q.   Was the making of these records a regular practice of

12    that activity?

13    A.   Yes.

14    Q.   Did Capital One rely on the accuracy of these records

15    in the course of its business?

16    A.   Yes.

17         MS. PALUCH:  Your Honor, at this time I move for

18    admission and publication of Government's Exhibit 121.

19         THE COURT:  121 is admitted.  You may publish.

20         (Exhibit No. 121 is admitted.)

21    Q.   (BY MS. PALUCH)  What do these records indicate?

22    A.   These records indicate that Capital One had an

23    Account No. 85510 in the name of John Pawelski.

24    Q.   If you could look back now to Government's Exhibit

25    38.
```

```
 1          MS. PALUCH:  If we could somehow put those side by
 2    side.
 3    Q.   (BY MS. PALUCH)  Can you compare the account number
 4    that is listed on the first page of 121 with the account
 5    number that appears in the middle form on page 4 of
 6    Exhibit 38?
 7    A.   Yes.
 8    Q.   And how are they off?
 9    A.   The first few digits are slightly different.  Our
10    account number starts with 5406.  And the account number
11    referenced on this form OID starts with 5408.
12    Q.   Okay.  Other than that, are the numbers the same?
13    A.   There is also a slight variation closer to the end of
14    the account number.  Our account number includes 17035510
15    as the last eight digits, and the form includes 17085510.
16    Q.   Thank you, ma'am.  On the first page of Exhibit
17    121 --
18          MS. PALUCH:  If we can just display that first
19    page.
20    Q.   (BY MS. PALUCH)  What is reflected as the date this
21    account was opened?
22    A.   This account opened on September 4th of 2007.
23    Q.   And there is an indication of date charged off.  Can
24    you state that date?
25    A.   December 31, 2009.
```

```
 1   Q.   What does that mean when an account is charged off?
 2   A.   That means the account has reached the status of
 3   delinquency, generally of 180 days or more past due, and
 4   we are considering the default of account.
 5   Q.   The research you did, were you able to determine how
 6   much was owed on this account?
 7   A.   Yes, I was.
 8   Q.   And how much was owed?
 9   A.   I apologize, but I do not remember the exact balance,
10   but I believe unpaid principal balance was approximately
11   $998.
12   Q.   If you see, there is personal information on this
13   first page, to include a name and Social Security number,
14   address.  Do you see all of that information?
15   A.   Yes, I do.
16   Q.   Also an e-mail address?
17   A.   Yes.
18   Q.   And where would Capital One obtain that information?
19   A.   From our system of record; specifically, the account
20   application or other account application data reflected in
21   our system record.
22   Q.   Would the customer have to provide that to you?
23   A.   Yes, they would.
24   Q.   Looking back at Exhibit 38, if you could look at the
25   second page of that document, do you see in the middle of
```

```
 1    the page --
 2            MS. PALUCH:  If we could highlight the middle block
 3    of that exhibit.
 4    Q.   (BY MS. PALUCH)  Do you see the signature at the
 5    bottom?
 6    A.   Yes, I do.
 7    Q.   And what is the date of that signature?
 8    A.   February 25, 2009.
 9    Q.   And can you read the name of that signature?
10    A.   It appears to read John Joseph Pawelski.
11    Q.   So at the time that this document was signed, does it
12    indicate whether this particular account in 121 was open
13    at that time?
14    A.   It was still open at that time.
15            MS. PALUCH:  Thank you.
16            Can I have one moment, Your Honor?
17            THE COURT:  You may.
18            MS. PALUCH:  No further questions.
19            THE COURT:  All right.  Thank you very much.  You
20    are excused.
21            THE WITNESS:  Thank you.
22            THE COURT:  Government may call its next witness.
23            MR. KIRSCH:  Thank you, Your Honor.  The Government
24    calls Brian Canty.
25            COURTROOM DEPUTY:  Your attention, please.
```

1           Please raise your right hand.

2                          **BRIAN CANTY**

3    having been first duly sworn, testified as follows:

4           COURTROOM DEPUTY:  Please be seated.

5           Please state your name, and spell your first and

6    last names for the record.

7           THE WITNESS:  My name is Brian Canty.  B-R-I-A-N

8    C-A-N-T-Y.

9           THE COURT:  You may proceed.

10          MR. KIRSCH:  Thank you, Your Honor.

11                       **DIRECT EXAMINATION**

12   **BY MR. KIRSCH:**

13   Q.   Good morning, sir.  Can you tell the jury what you do

14   for a living, please?

15   A.   Special agent for the United States Treasury

16   Department Treasury Inspector General for Tax

17   Investigation.

18   Q.   What sort of duties do you have as a special agent

19   for that agency?

20   A.   I investigate criminal activity as pertains to the

21   United States Treasury Department.  And, additionally, we

22   perform some administrative functions for the IRS, as

23   well.

24   Q.   How long have you -- is your agency commonly called

25   TIGTA?

```
 1    A.    Yes, sir.

 2    Q.    How long have you been a special agent for TIGTA?

 3    A.    For 4 years.

 4    Q.    Did you have any experience working for the Treasury

 5    Department before you joined TIGTA?

 6    A.    Yes, sir.  Prior to joining TIGTA, I worked for the

 7    Internal Revenue Service for a year.

 8    Q.    Okay.  As part of your duties as a special agent for

 9    TIGTA, did you participate in the execution of a search

10    warrant at 2260 Palm Drive, Unit C, in Colorado Springs,

11    Colorado?

12    A.    Yes, sir, I did.

13    Q.    Do you recall approximately when that was?

14    A.    That was, I believe, in September.  Around September

15    of -- I am trying to remember the year.  Forgive me, 2011,

16    I believe.

17    Q.    Okay.  Did you have an understanding about whose

18    residence that was?

19    A.    Yes, sir.

20    Q.    Whose did you understand?

21    A.    George Brokaw.

22    Q.    And what role did you play in connection with that

23    search?

24    A.    I was on the entry team that went into the home

25    originally to clear the home.  And then I participated in
```

1     the search, as well, afterwards.

2     Q.   And when you participated in the search, were you

3     actually finding documents that were specified in the

4     search warrant?

5     A.   Yes, sir, I was.

6     Q.   And when you would find a document like that, can you

7     explain what process you would follow?

8     A.   Typically, I would find the document that I thought

9     was pertinent to our -- that was contained in the search

10    warrant -- on the search warrant, and I would take that

11    piece of evidence.  There was an evidence team there with

12    us.  And we would secure the evidence, put it in a

13    container, tape it up, make identifying marks so that we

14    could identify it later.  Then they would take it and lock

15    it into evidence.

16    Q.   Before you came to court today, did you have an

17    opportunity to go back and review some of the items that

18    were obtained during that search warrant?

19    A.   Yes, I did.

20    Q.   Specifically, did you look at items that were marked

21    as Government Exhibits 264 through 268?

22    A.   Yes, sir.

23    Q.   Were you able to determine whether or not those were

24    items that you had participated in collecting during that

25    search?

1    A.    Yes, sir.

2    Q.    Were they all items that you had collected?

3    A.    Yes, sir, they were.

4    Q.    Do you recall, did those items come from a particular

5    location in Mr. Brokaw's house?

6    A.    I found all of those items in the office -- in an

7    office closet there.  The focus of my search took place

8    right there in that one location.

9    Q.    And all of those items came from that location?

10   A.    Yes, sir.

11         MR. KIRSCH:  Your Honor, I am going to move to

12   admit Government Exhibits 264 through 268.

13         THE COURT:  Exhibits 264 through 268 are admitted.

14         (Exhibit Nos. 264-268 are admitted.)

15         THE COURT:  You may publish as you see fit.

16         MR. KIRSCH:  Thank you, Your Honor.

17   Q.    (BY MR. KIRSCH)  I am going to put up on the screen

18   for you now, Special Agent Canty, the first page of

19   Government Exhibit 264.  I will ask you some questions

20   that may be a little easier for you to look at the paper

21   documents that are there, as well, including maybe this

22   one.

23         Can you just generally describe what the set of

24   documents is that is in Government Exhibit 264?

25   A.    This one is titled Affidavit of Notary Presentment,

1    found in the same spot with all of those papers there.  It

2    contains some things -- some items he had mailed to

3    Maureen Green at the Internal Revenue Service, is the one

4    that piqued our interest.

5    Q.   What is the date that was indicated that this mailing

6    occurred?

7    A.   14th day of January 2010.

8    Q.   Who acted as the notary public and did the

9    certification of this mailing?

10   A.   Clara Mueller.

11   Q.   And is there an indication in the paragraph there

12   that a particular person appeared before Ms. Mueller with

13   some documents?

14   A.   She had identified George Thomas Brokaw appeared

15   before her.

16       MR. KIRSCH:  Can we go back just a couple of pages.

17   Briefly display the first couple of pages of that exhibit.

18   Is that page 1?  How about page 2?  Okay.  Next we can

19   page through the next couple of pages.

20   Q.   (BY MR. KIRSCH)  What are those pages that were just

21   up on the screen?

22   A.   Certified mailing identifiers that he had attached to

23   all of the documents.

24   Q.   Did those particular ones pertain to the mailings to

25   Ms. Green?

1   A.   They do.

2   Q.   Now can we go ahead and go to page 5 there, please.

3        What is the caption on this document?

4   A.   This is Not a Public Communication.  Notice of

5   International Commercial Claim Within the Admiralty.

6   Q.   And how about right here where I just made a mark on

7   the screen, what is the caption there?

8   A.   First Notice of Fault and Demand for Payment.

9        MR. KIRSCH:  And can we scroll down on the screen a

10  little bit there.

11  Q.   (BY MR. KIRSCH)  Does Maureen Green's name appear

12  there under the heading "Libellees"?

13  A.   Yes, sir.

14       MR. KIRSCH:  Can we go to the next page of that

15  exhibit, please.  And highlight the top half, please.

16  Q.   (BY MR. KIRSCH)  Is there an amount listed in this

17  document as a Demand for Settlement?

18  A.   There is.  72 million.

19  Q.   And under the "Demand for Payment" section, is there

20  a schedule that Mr. Brokaw purported to set out for

21  Ms. Green to pay that money?

22  A.   This gives him three days to settle the payment of

23  the claims contained in the document.

24       MR. KIRSCH:  Can we display page 7 of that exhibit,

25  please.  Go ahead and highlight the top text if we could.

534

1   Q.   (BY MR. KIRSCH)  What is the name that appears there

2   in the first signature for the first signature line?

3   A.   George Thomas Brokaw.

4        MR. KIRSCH:  Can we please display page 12 of this

5   exhibit now.

6   Q.   (BY MR. KIRSCH)  Special Agent Canty, what is the

7   caption on this document there sort of about a third of

8   the way down the page?

9   A.   This is a Second Notice of Fault and Demand for

10  Payment.

11  Q.   Does it contain the same information as the document

12  we were just looking at concerning the libelant and

13  libellees?

14  A.   Yes, it does.

15  Q.   Can we go to page 13, please.  How about the amount

16  of money demanded, how does that compare to the document?

17  A.   Dollar amount is the same; 72 million.

18  Q.   Could we now please go to page 19 of this document.

19  What is the caption of this document about a third of the

20  way down?

21  A.   This the Final Notice of Default and Demand for

22  Payment.

23  Q.   Does it appear to involve the same parties?

24  A.   Yes, sir, it does.

25  Q.   Can we go to page 20 again, please.  Is the same

 1   amount repeated again on this document, as well?

 2   A.   Yes, sir, 72 million.

 3        MR. KIRSCH:  Now can we go to page 28.  Let's

 4   expand the top half if we could.

 5   Q.   (BY MR. KIRSCH)  So what is the date on this

 6   document?

 7   A.   December 16, 2009.

 8   Q.   And does Ms. Green -- is she an addressee of this

 9   document?

10   A.   Yes, sir, she is.

11   Q.   Who does it appear to come from?

12   A.   It appears to come from George Thomas Brokaw.

13   Q.   The address that is listed under Mr. Brokaw's name

14   there, is that the address where you did the search?

15   A.   Yes, sir.

16        MR. KIRSCH:  Can we scroll down on that page,

17   please.

18   Q.   (BY MR. KIRSCH)  What does the bold type at the

19   bottom of the page say?

20   A.   Administrative Affidavit of Specific Negative

21   Averment, Opportunity to Cure and Counterclaim.

22        MR. KIRSCH:  Can we go now to page 29, please.  And

23   can you highlight Count One there for us.

24   Q.   (BY MR. KIRSCH)  Can you read for us, Special Agent

25   Canty, this portion where this Count One text, where it

1    begins "these diversions"?

2    A.   "These diversions and taking of property were/are

3    base upon unlawful liens/levies, not authorized by a U.S.

4    District Court order, as is required by the U.S. Code.  I

5    believe there is no evidence to the contrary.  Failure to

6    return all funds is theft, fraud, conspiracy,

7    racketeering, collusion and abuse of power, et cetera."

8         MR. KIRSCH:  Now can we please highlight or expand

9    the text that says, "As to Count Five" on that same page.

10   Q.   (BY MR. KIRSCH)  Are there representations in this

11   paragraph about additional criminal activity that was

12   committed by Ms. Green?

13   A.   Yes.  The bottom part of that one, it says, "all of

14   which include deprivation of rights, collusion and theft

15   of property."

16        MR. KIRSCH:  Can we go to the next page of this

17   exhibit, please, page 30.  Can we expand the text under

18   "The Opportunity to Cure."

19   Q.   (BY MR. KIRSCH)  What is listed as an opportunity to

20   cure, as option No. 2 there?

21   A.   "Pay the total amount of damages as indicated in the

22   counterclaim herein."

23   Q.   How about for No. 3?

24   A.   "Surrender all public hazard bonds, corporate bonds,

25   blanket bonds, insurance policies, CAFR funds, 401Ks,

```
 1    801Ks retirement funds, personal wealth and property, and
 2    any other source of revenue as needed to cure your
 3    dishonor in commerce and submit to the authorities for
 4    criminal prosecution."
 5    Q.   Is there a different damage amount listed in
 6    paragraph No. 4?
 7    A.   "Pay damages in the amount of $150,000."  But that
 8    says "in addition," I believe.
 9    Q.   Then is there a deadline for some sort of response or
10    curing dishonoring, the second paragraph of No. 4?
11    A.   Yes, sir.  It says "contained herein within 21 days."
12         MR. KIRSCH:  Can we go to page 31, please.  And can
13    we make that text a little bit bigger.
14    Q.   (BY MR. KIRSCH)  What is the sort of dollar range of
15    the various claims that are stated here on this page,
16    Special Agent?
17    A.   1 million.  There is 5 million.  3 million.  And
18    another 5 million.
19    Q.   Okay.  Then finally can we go to page 32, please, the
20    next page.  What name is on the top of that document?
21    A.   George Thomas Brokaw.
22         MR. KIRSCH:  Now I am going to ask to publish
23    Government Exhibit 265.
24    Q.   (BY MR. KIRSCH)  Now, is this -- this one, it may
25    help to refer to the actual exhibit, the paper exhibit
```

1    there, Special Agent Canty.  Can you locate 265 there?

2    A.   Yes, sir.

3    Q.   Let me know when you have that?

4    A.   Okay.  All right.  I have 265 in front of me.

5    Q.   And is this actually an entire folder?  Is that

6    document an entire folder of documents?

7    A.   It is an entire folder.

8         MR. KIRSCH:  Let's see if we can expand.  We have

9    got on the screen now the cover.

10   Q.   (BY MR. KIRSCH)  Is that the caption of this folder?

11   A.   Yes, sir.  Bonded Promissory Notes.  IRS-GTB.

12   IRS-RRD.

13        MR. KIRSCH:  And now I am going to publish page 2

14   of this exhibit.

15   Q.   (BY MR. KIRSCH)  Is this the inside cover of that

16   folder?

17   A.   Yes, sir.

18   Q.   At least on my screen, it is a little bit difficult

19   to read.  But can you help us with the information that is

20   in the lower half of the screen right now?

21   A.   Administrative Negative Averment.  Mailed July 27,

22   '09, via regular mail, to IRS, Shulman and Pryor, IRS.

23   Q.   And then are there a series of dates underneath that?

24   A.   Yes, sir.  He listed a number of different dates,

25   what was mailed, and how they were mailed.

1        MR. KIRSCH:  Okay.  Now can we please display page

2    12 of this exhibit.  And expand that text, if you could.

3    Q.   (BY MR. KIRSCH)  So what is this page we have on the

4    screen now?

5    A.   An Affidavit of Notary Presentment.  Certification of

6    Mailing.

7    Q.   What is the date listed here?

8    A.   The date listed on this is the 27th day of July 2009.

9    Q.   Does this document indicate whether or not there was

10   a mailing made to IRS Revenue Officer Michael J. Pryor?

11   A.   Yes, sir, it is does.

12   Q.   And who was -- on whose behalf was this mailing done?

13   A.   George Thomas Brokaw.

14        MR. KIRSCH:  Can we now display page 14, please.

15   Q.   (BY MR. KIRSCH)  Who was this document addressed to?

16   A.   Commissioner Douglas Schulman, as well as Michael

17   Pryor, Revenue Officer.

18   Q.   Who does it say it came from?

19   A.   It says it came from George Thomas Brokaw.

20   Q.   Does this document bear any resemblance to any of the

21   documents that you looked at already today?

22   A.   Yes, sir.

23   Q.   Specifically, to documents that were sent to

24   Ms. Green?

25   A.   Yes, sir.

1    Q.   What is the caption in bold about halfway down the

2    page here?

3    A.   It says Administrative Affidavit of Specific Negative

4    Averment, Opportunity to Cure and Counterclaim.

5         MR. KIRSCH:  Can we go to the next page of this

6    exhibit, please.  I am sorry, can we go to page 16.  We

7    are in the right place.  Thank you.

8    Q.   (BY MR. KIRSCH)  Does this document list a series of

9    counts, like the one that we looked at before?

10   A.   Yes, sir, it does.  Two through Six, to be specific.

11   Q.   And with respect to Count Six, does Count Six make

12   reference to crimes allegedly committed by Mr. Pryor?

13   A.   Yes, sir, it does.

14   Q.   Can we go to page 17, please.  And do the

15   counterclaim section -- what sorts of amounts are listed

16   there?

17   A.   $1 million on all three of those that appear there.

18        MR. KIRSCH:  Okay.  Then can we go to the next

19   page, please.  Highlight that text, if we could, please.

20   Q.   (BY MR. KIRSCH)  Are there more claims for a million

21   dollars per count per violation per officer?

22   A.   Yes, sir, there are.

23   Q.   And who appears to have signed this document?

24   A.   George Thomas Brokaw.

25   Q.   Can we now please display page 65.  What is the

```
 1   caption of this document about halfway down?

 2   A.   Second Notice of Fault and Demand for Payment.

 3   Q.   Who is listed as the libelant here?

 4   A.   George Thomas Brokaw, and notary Clara Mueller.

 5   Q.   Who is listed as the libellee?

 6   A.   Michael J. Pryor.

 7   Q.   Can we go to page 66, please.  What is the amount

 8   listed here as under the demand for settlement?

 9   A.   36 million.

10        MR. KIRSCH:  Can we go to page 67, please.  And

11   expand that text.

12   Q.   (BY MR. KIRSCH)  Can you -- who appears to have

13   signed this document, Special Agent?

14   A.   George Thomas Brokaw.

15   Q.   Can we go to page 83 of this exhibit, please.  What

16   is the caption on this document?

17   A.   This is a Final Notice of Default and Demand for

18   Payment.

19   Q.   Does it otherwise appear to involve the same parties?

20   A.   Yes, sir, it does.

21   Q.   Can we go to page 85 now, please.  What is the amount

22   listed on this document?

23   A.   $37,233,982.

24        MR. KIRSCH:  And then, finally, can we go back to

25   page 36, please.  Let's try 37.  Keep going down, if you
```

542

1  would, please.  Which page are we on now?  40?  39.  Thank

2  you.

3  Q.   (BY MR. KIRSCH)  What is the caption here on page 39

4  of this exhibit, about a quarter of the way down?

5  A.   Notice of Final Determination and Judgment.

6  Q.   Okay.  And whose name appears at the bottom of this

7  one?

8  A.   George Thomas Brokaw.

9       MR. KIRSCH:  Can I have just one moment, please,

10  Your Honor?

11      THE COURT:  You may.

12  Q.   (BY MR. KIRSCH)  Can we display page 30, please.

13  Does this document have the same caption?

14  A.   Yes, sir, it does.

15  Q.   Who is listed as the libellee on this page?

16  A.   Michael J. Prior.

17  Q.   Is there a reference to a particular dollar amount

18  that Mr. Pryor owes in this document?

19      MR. KIRSCH:  We can expand the lower half.

20      THE WITNESS:  $36,000,000.

21  Q.   (BY MR. KIRSCH)  And is there a deadline in that

22  final paragraph related to when collection or other

23  activities is going to begin?

24  A.   Will begin in three business days if this claim is

25  not paid in full.

1    Q.   Now I am going to ask you to look at Government

2    Exhibit 266.  Again, can I ask you to start with the paper

3    document, Special Agent Canty, for 266?

4    A.   Certainly.  Okay.

5    Q.   Is 266 another complete folder?

6    A.   Yes, sir, it is.

7    Q.   All right.  And we have got page up on the screen

8    now.  Does that reflect the title of that folder?

9    A.   Yes, sir, it does.  Birth Certificate Bond.

10   Q.   And can you go ahead and read the rest of that?

11   A.   "Mailed to Geithner at Treasury.  Mailed April 1,

12   2009."

13        MR. KIRSCH:  I want to put page 2 of that exhibit

14   on the screen now.  And can we expand that text?

15   Q.   (BY MR. KIRSCH)  What is this in relation to that

16   folder?

17   A.   It is a sticky note on the inside of the folder.

18   Q.   And what does it say?

19   A.   It says "Copy of Original to Geithner."

20        MR. KIRSCH:  Can we display page 3, then page 4

21   now.

22   Q.   (BY MR. KIRSCH)  And what are those pages, Special

23   Agent?

24   A.   Those are the certified mailings that were attached

25   to the documents.

1    Q.   Who does it -- what is the name that is reflected as

2    the sender on this page 4 that is on the screen right now?

3    A.   Mimi Vigil.

4         MR. KIRSCH:  And now could we go to page 7, please.

5    And go ahead and expand the top half of that, if you

6    could, please.

7    Q.   (BY MR. KIRSCH)  What is the caption of this

8    document?

9    A.   This is a Private Registered Bond for Setoff.

10   Q.   And in what amount?

11   A.   A hundred million dollars -- or 100 billion, sorry.

12   Q.   100 billion, with a B?

13   A.   Yes, sir, with a B.

14   Q.   And what is the name there on the top left?

15   A.   George Thomas Brokaw.

16   Q.   And who is it payable to?

17   A.   Paid to the order of the United States Department of

18   Treasury, Timothy Geithner, Fiduciary.

19        MR. KIRSCH:  Could we please leave that up on one

20   side of the screen and then display on the other side

21   Government Exhibit 203.  And then within Exhibit 203, can

22   we please display page 74.  Maybe we can just start with

23   the top half of those again.

24   Q.   (BY MR. KIRSCH)  Are those large enough for you to be

25   able to see, Special Agent Canty?

1    A.    Yes, sir.

2    Q.    How do those documents compare?

3    A.    They are very similar.

4    Q.    Thank you.  I will ask you now to -- I will ask that

5    we go to Government Exhibit 267.  This is another item

6    that you seized during that search warrant?

7    A.    Yes, sir, it is a People Lookup.

8    Q.    Do you know what a People Lookup is, based on your

9    work as a special agent?

10   A.    Yes, sir.  We occasionally use systems like this to

11   try to locate individuals that we are either running an

12   investigation on or if we need to interview them as a

13   witness or something like that.

14         MR. KIRSCH:  Can we try to expand the lower half of

15   that, starting with the map.

16   Q.   (BY MR. KIRSCH)  What is the name that was being

17   looked up here?

18   A.    Michael J. Pryor.

19   Q.    Is there an address that is circled on this form?

20   A.    Yes, sir, 7304 South Robb Street, Littleton,

21   Colorado.

22   Q.    And looking at the map there, does it appear to show

23   a location for that particular address?

24   A.    Yes, sir.

25   Q.    Where is that?

```
 1    A.    The pindrop there above Denver.

 2    Q.    The pindrop here in downtown Denver?

 3    A.    Yes, sir.

 4    Q.    Then is there another one here (indicating)?

 5    A.    Yes, sir.  Another one on the right side.

 6          MR. KIRSCH:  Can we go back to the top of this

 7    document, please.

 8    Q.    (BY MR. KIRSCH)  I will direct your attention up

 9    there to the top right corner.  Is there an e-mail address

10    reflected there?

11    A.    On the top right-hand corner, it says

12    pawelski.john@yahoo.com.

13          MR. KIRSCH:  Can we back out and display that

14    entire page again.

15    Q.    (BY MR. KIRSCH)  See at the very top it says page 1

16    of 2?

17    A.    Yes, sir.

18    Q.    Do you recall, were there additional -- was there a

19    page 2 of this document when you located it?

20    A.    No, sir.  I don't recall finding a page 2.

21          MR. KIRSCH:  Now we are going to display Government

22    Exhibit 268, please.  We can start with the lower half of

23    that one.

24    Q.    (BY MR. KIRSCH)  What is this document?

25    A.    This is another People Lookup, this time for Maureen
```

1    Green.

2    Q.   People Lookup found Maureen Green?

3    A.   Yes, sir.

4    Q.   Is there an e-mail address listed in what is on the

5    screen, at least sort of near the top now?

6    A.   Yes, sir, there is.  This is the same e-mail address

7    as pawelski.john@yahoo.com.

8    Q.   Were you searching Mr. Pawelski's residence?

9    A.   No, sir, I was not.

10   Q.   Whose were you searching?

11   A.   George Thomas Brokaw's residence.

12        MR. KIRSCH:  Can we go to the next page, please,

13   page 2.  Expand the lower half of that document, please.

14   Q.   (BY MR. KIRSCH)  What is shown on the screen here

15   now?

16   A.   The results for a search of Maureen Green.

17   Q.   Are there names listed under the caption "Relatives"?

18   A.   Yes, sir, there are.

19   Q.   And are there home addresses listed here, as well?

20   A.   Yes, sir.

21   Q.   And does the map, does that appear to have any

22   indication about where that home address might be?

23   A.   Yes, sir.  There above the North Ogden, kind of on

24   the right side of the map, there is a pindrop there.

25        MR. KIRSCH:  Can I have just one moment, please,

1   Your Honor?

2        THE COURT:  You may.

3        MR. KIRSCH:  Thank you, Your Honor.  I don't have

4   any other questions for Special Agent Canty.

5        THE COURT:  Thank you very much, Special Agent

6   Canty, you may step down.

7        The Government may call its next witness.

8        MS. PALUCH:  Yes, Your Honor.  The United States

9   calls Maureen Green.

10       COURTROOM DEPUTY:  Remain standing.

11       Your attention, please.

12       Please raise your right hand.

13                       **MAUREEN GREEN**

14   having been first duly sworn, testified as follows:

15       COURTROOM DEPUTY:  Please be seated.

16       Please state your name, and spell your first and

17   last names for the record.

18       THE WITNESS:  My name is Maureen Green.

19   M-A-U-R-E-E-N G-R-E-E-N.

20       THE COURT:  You may proceed.

21       MS. PALUCH:  Thank you, Your Honor.

22                     **DIRECT EXAMINATION**

23   **BY MS. PALUCH:**

24   Q.   Good morning, ma'am.  How are you employed?

25   A.   I work for the Internal Revenue Service.

1    Q.   What is your position?

2    A.   I am a senior manager.

3    Q.   And how long have you been a senior manager?

4    A.   I have been a senior manager for approximately 11

5    years.

6    Q.   And how long have you worked for the IRS?

7    A.   For approximately 28 years.

8    Q.   Did you say you worked for the IRS?

9    A.   Yes, I did.

10   Q.   Okay.  And tell me the number of years again?

11   A.   For 28.

12   Q.   Okay.  I want to direct your attention to the spring

13   of 2008 through the spring of 2012.  What was your title

14   at that time?

15   A.   I was the operations' manager over the examination

16   service center support operation, which has responsibility

17   for the Frivolous Return Program.

18   Q.   I would like to focus on that time in your career.

19   What were your duties as an operations' manager?

20   A.   My duties were to manage a large organization of

21   employees who did a number of different programs.  And one

22   of the major programs that we did is working with the

23   Frivolous Return Program.

24   Q.   In the course of your position, did you become

25   familiar with an individual by the name of George Thomas

1    Brokaw?

2    A.    Yes.

3    Q.    How is it that individual, Mr. Brokaw, came to your

4    attention?

5    A.    I was notified that he had filed a lien against me.

6    Q.    Were you at any time personally assigned to

7    Mr. Brokaw's case?

8    A.    No, I was not.

9    Q.    So, to your understanding, how is it your involvement

10    came about with respect to Mr. Brokaw's case?

11    A.    I suspect it is because my name was on the letter

12    that went out to him.

13    Q.    Okay.  Were you asked to review a number of documents

14    in preparation for your testimony today?

15    A.    Yes, I was.

16          MS. PALUCH:  Permission to publish what has already

17    been admitted Government's Exhibit 23.

18          THE COURT:  You may.

19    Q.    (BY MS. PALUCH)  Ma'am, you have exhibits in front of

20    you in a folder, and this exhibit will appear on the

21    screen in front of you.  If you could look at the second

22    page of that document and state what that is.

23    A.    That is a letter that our organization sends to

24    taxpayers who have submitted a frivolous document that is

25    a frivolous return, and we send it to them.

```
1    Q.    So it is a document that your department has reviewed

2    and deemed to be frivolous.  Okay.  And who is this letter

3    addressed to?

4    A.    It is addressed to George T. and Debra S. Brokaw.

5    Q.    And the date of that letter?

6    A.    It is December 23, 2009.

7    Q.    Can you turn to the second page of that document.

8          MS. PALUCH:  If we can highlight the signature

9    block there, or all of that.

10   Q.    (BY MS. PALUCH)  Does your signature appear on this

11   document?

12   A.    Yes.

13   Q.    And can you paraphrase again the purpose of this

14   letter, what are you notifying the taxpayer?

15   A.    We are noticing the taxpayer that they have filed

16   something that appears to be a frivolous return based on

17   what we determined from legal counsel, and we are telling

18   them that they have 30 days to rescind their position.

19   And, if they don't, we will penalize them.

20   Q.    And I would like to direct your attention to page 1

21   again, to the bottom.

22         MS. PALUCH:  If you could highlight the language

23   that appears at the bottom in bold.

24   Q.    (BY MS. PALUCH)  Can you read that into the record,

25   please, ma'am.
```

1   A.   "Internal Revenue Code Section 6702 imposes a $5,000

2   penalty for the filing of a frivolous tax return or a

3   purported tax return.  We are proposing a $5,000 penalty

4   per return based on your filing of a frivolous tax

5   return/returns or purported tax return/returns."

6   Q.   Again, if you could turn to page 2, and I will direct

7   your attention to the paragraph that says what happens if

8   you don't respond.  And I am going to point your attention

9   to what appears in bold there.

10        Starting with "we will assess," if you can read

11   just the end of that letter.

12   A.   "We will assess the $5,000 penalty for frivolous tax

13   submissions."

14   Q.   Okay.  Now, when these types of letters are sent to

15   taxpayers, does the IRS keep track of these letters going

16   out?

17   A.   Yes, we do.

18   Q.   How is it you keep track of that?

19   A.   We keep track of them in our database.

20   Q.   And these letters are referred to as 3176 C letters?

21   A.   Yes, they are.

22   Q.   I would like to direct your attention to a

23   Government's exhibit which has already been admitted, 259.

24        MS. PALUCH:  If we could please publish that

25   document?

```
 1            THE COURT:  You may.

 2            MS. PALUCH:  Thank you.

 3   Q.   (BY MS. PALUCH)  Ma'am, have you seen this document

 4   in preparation for today's trial?

 5   A.   Yes.

 6   Q.   Do you see your name on this document?

 7   A.   Yes, I do.

 8   Q.   And under what box does your name appear?

 9   A.   It is under Box 1.

10   Q.   What is the title of that box?

11   A.   Name of Vessel.

12   Q.   Okay.  Let's look to Box 2, Unique Identifier.  Does

13   the information in Box 2 pertain to you?

14   A.   Yes, it does.

15   Q.   And Box 5, what is the name of the claimant?

16   A.   George Thomas Brokaw.

17   Q.   And if you could look at Box 6, what is the amount of

18   this lien?

19   A.   2,232,000,000 U.S. plus interest, penalties and fees.

20   Q.   And who signed this lien?

21   A.   George Thomas Brokaw.

22   Q.   And how would this document have been routed through

23   the IRS?

24   A.   It would have been received in our mailroom.  And

25   because of the nature of it, it would have been routed to
```

```
 1    my organization.
 2    Q.   And is that true for any other liens naming you?
 3    A.   Yes.
 4    Q.   Finally, I would like to ask you to look at
 5    Government's Exhibit 268.
 6         MS. PALUCH:  That was just admitted.  If we could
 7    have that published, Your Honor.
 8         THE COURT:  You may.
 9    Q.   (BY MS. PALUCH)  In preparation for today's
10    testimony, have you seen this document?
11    A.   Yes.
12    Q.   Okay.  And what is the title of this page?
13    A.   People Lookup.
14    Q.   Are you familiar with what a People Lookup is?
15    A.   I am.
16    Q.   Above the words "People Lookup," do you see an e-mail
17    address?
18    A.   I do.
19    Q.   Could you read that into the record?
20    A.   Pawelski.john@yahoo.com.
21    Q.   Page 2, do you see -- first of all, do you see your
22    name at the bottom of this page?
23    A.   Yes, I do.
24    Q.   All right.  Let's turn to page 2, ma'am.  Let's start
25    on the left-hand side.  Do you see your name on the
```

1    left-hand side in that column?

2    A.   Yes, I do.

3    Q.   There in bold it says "Relatives."  Could you look at

4    those names, ma'am.  Are those your relatives?

5    A.   Yes.

6    Q.   Could you look at date of birth.  Is that your date

7    of birth?

8    A.   Yes.

9    Q.   Could you look at the addresses.  Are these addresses

10   somehow associated with you?

11   A.   Yes, they are.

12   Q.   As a practice, do you share your personal

13   information, such as home address, family members, date of

14   birth, with any taxpayers?

15   A.   No.

16   Q.   Does it cause you any concern to know that your

17   personal information was assessed by a person with this

18   e-mail address?

19   A.   Yes.

20   Q.   Why is that, Ms. Green?

21   A.   They know where I live.  They know my family.  And

22   that's very upsetting.

23        MS. PALUCH:  No further questions, Your Honor.

24        THE COURT:  All right.  Thank you very much.  You

25   may be excused.

1          Government may call its next witness.

2          MR. KIRSCH:  Your Honor, the Government, we think,

3    is calling Marilyn Alvarez.

4          THE COURT:  Okay.

5          COURTROOM DEPUTY:  Your attention, please.

6          Please raise your right hand.

7                          **MARILYN ALVAREZ**

8    having been first duly sworn, testified as follows:

9          COURTROOM DEPUTY:  Please be seated.

10         Please state your name, and spell your first and

11   last names for the record.

12         THE WITNESS:  Marilyn Alvarez.  M-A-R-I-L-Y-N

13   A-L-V-A-R-E-Z.

14         THE COURT:  You may proceed.

15         MS. PALUCH:  Thank you, Your Honor.

16                        **DIRECT EXAMINATION**

17   **BY MS. PALUCH:**

18   Q.  I will have you speak into the microphone.  Thank

19   you.  Good morning.

20   A.  Good morning.

21   Q.  How are you employed?  Where do you work?

22   A.  I work for the Department of Public Safety.

23   Q.  Is that for the State of Colorado?

24   A.  Yes.

25   Q.  And how long -- what is your position with that

```
 1    agency?

 2    A.    I am an accountant.

 3    Q.    How long have you held that position?

 4    A.    Almost 30 years.

 5    Q.    What do your duties involve?

 6    A.    I process their payroll and oversee the accounts

 7    payable.

 8    Q.    Are you familiar with Form 1099?

 9    A.    Yes.

10    Q.    If the Colorado Department of Public Safety were to

11    issue a Form 1099, would that come to your attention?

12    A.    Yes.

13    Q.    Would you review that document?

14    A.    Yes.

15    Q.    And you have been asked to review certain documents

16    in preparation for your testimony today; is that correct?

17    A.    Yes.

18    Q.    I would like to ask you to look at Government's

19    Exhibit 38, which has been admitted.

20          MS. PALUCH:   Permission to publish page 7 of that

21    exhibit.

22          THE COURT:   You may.

23    Q.    (BY MS. PALUCH)   It will show up on the screen in

24    front of you.   There is also a hard copy there at the

25    witness stand for you.
```

1              I would like to direct your attention to these two

2       forms.  Can you state, ma'am, with respect to the first

3       form, the title of that document?

4       A.    It is a 1099 OID.

5       Q.    Okay.  I will have you speak into the microphone.

6       For what tax year is that?

7       A.    2006.

8       Q.    What is the name of the payer listed on this form?

9       A.    The payer, Colorado Department of Public Safety.

10      Q.    And the recipient?

11      A.    John Pawelski.

12      Q.    And I will direct your attention to Box No. 1.  Can

13      you read the typewritten words for that description of

14      that box?

15      A.    It is very --

16      Q.    It is hard to read.  Can you read the amount

17      represented in that box?

18      A.    Well, looks like $1,000,000.

19      Q.    Okay.  Box 4, does the same amount appear there?

20      A.    Yes.

21      Q.    Can you read that federal income tax withheld?  Is

22      that what it appears to be?

23      A.    Yes.  Federal income tax withheld, yes.

24      Q.    I would like to direct your attention to Box 5.  Do

25      you see what is listed in Box 5?

1    A.    Yes.

2    Q.    And what is that?

3    A.    It is the description.   Summons 2712631.

4    Q.    Okay.  And the name?

5    A.    John J. Pawelski.

6    Q.    Does the Colorado Department of Public Safety oversee

7    any agency that would have the authority to issue a

8    summons?

9    A.    The only one would be the Colorado State Patrol, but

10   they are not this kind of summons.

11   Q.    So the Colorado State Patrol can issue summonses?

12   A.    Yes.

13   Q.    And they fall under the Colorado Department of Public

14   Safety; is that correct?

15   A.    Yes.

16   Q.    But I think your testimony is they would not issue

17   this type of summons?

18   A.    No.

19   Q.    Why is that?  What is different about this summons?

20   A.    Well, this is for income, 1099, and they do just

21   traffic summonses.

22   Q.    I see.  So what you are saying is you wouldn't see a

23   summons referenced on a tax form?

24   A.    No.

25   Q.    Okay.  If you could look at the second form, and look

```
 1    at the description in Box 5.  Is that a different summons

 2    number?

 3    A.   Yes.

 4    Q.   It looks like it is off -- it has a difference of one

 5    number at the end?

 6    A.   Yes.

 7    Q.   And this is also the payer.  Can you state the payer

 8    and recipient?

 9    A.   Payer is Colorado Department of Public Safety.

10    Recipient is John J. Pawelski.

11    Q.   Amount, again, in Box 4?

12    A.   $1,000,000.

13    Q.   And at our request, did you attempt to research

14    whether or not the Colorado Department of Public Safety

15    would have issued either of these forms?

16    A.   They wouldn't have.

17         MS. PALUCH:  One moment, Your Honor.

18         No further questions.

19         THE COURT:  All right.  Very well.  Thank you,

20    Ms. Alvarez, you may step down.

21         Government may call its next witness.

22         MS. PALUCH:  Yes, Your Honor.  The United States

23    calls Pam Combe.

24         COURTROOM DEPUTY:  Remain standing, please.

25         Your attention, please.
```

1           Please raise your right hand.

2                        **PAMELA COMBE**

3   having been first duly sworn, testified as follows:

4           COURTROOM DEPUTY:  Please be seated.

5           Please state your name, and spell your first and

6   last names for the record.

7           THE WITNESS:  My name is Pamela Combe, spelled

8   P-A-M-E-L-A.  Combe is C-O-M-B-E.

9           THE COURT:  You may proceed.

10          MS. PALUCH:  Thank you, Your Honor.

11                      **DIRECT EXAMINATION**

12  **BY MS. PALUCH:**

13  Q.   Good morning.

14  A.   Good morning.

15  Q.   Ma'am, how are you employed?

16  A.   I am a special agent with the Treasury Inspector

17  General for Tax Administration.

18  Q.   Is that agency referred to as TIGTA?

19  A.   It is.

20  Q.   And how long have you been a special agent with

21  TIGTA?

22  A.   For 22-and-a-half years.

23  Q.   And prior to that, where did you work?

24  A.   I worked for the IRS.

25  Q.   Okay.  How long did you work for the IRS?

1    A.    About 5 years.

2    Q.    Were you involved in the search of a residence

3    located at 513 Shady Crest Circle in Colorado Springs,

4    Colorado?

5    A.    I was.

6    Q.    And approximately what date, do you know, did that

7    occur?

8    A.    September 20, 2011.

9    Q.    To your knowledge, who resided at that residence at

10   that time?

11   A.    Mimi Vigil and John Pawelski.

12   Q.    What role did you have in that search?

13   A.    I was on the evidence team.

14   Q.    Can you describe the process during that search?

15   Were items, in fact, seized from that residence?

16   A.    They were.

17   Q.    And can you describe the process by which those items

18   were seized from that residence?

19   A.    Well, we went in and we searched the home and we

20   found evidence.  And we left the evidence where we found

21   it, and we photographed it where we found it.  And then we

22   tagged it and boxed it up and took it into evidence.

23   Q.    Okay.  Were the items given numbers for

24   identification?

25   A.    Yes, they were numbered.

1    Q.    Were they sealed?

2    A.    Yes, we sealed the evidence.

3    Q.    And then state again where the evidence went from the

4    residence?

5    A.    We took it right to our TIGTA office in Denver.

6    Q.    And what happened to it once it arrived at that

7    office?

8    A.    We put it in our evidence room.

9    Q.    Okay.  Now, on the stand you should have before you a

10   certain number of exhibits.  And I will ask you to take a

11   moment and just look through those exhibits.  You should

12   have before you Government's Exhibits 80 through 84, 281

13   to 282, then 286 to 290.

14   A.    Okay.

15   Q.    And are you familiar with those documents and, in

16   fact, did you have an occasion to review that evidence

17   prior to coming to court today?

18   A.    Yes, I did.

19   Q.    And can you state whether each of those items were

20   seized from 513 Shady Crest Circle in Colorado Springs?

21   A.    Yes.  They were all taken from there.

22   Q.    And was the process you described used with respect

23   to the securing of each of those items?

24   A.    Yes.

25         MS. PALUCH:  Your Honor, at this time I am going to

          1    move for the admission of certain exhibits; Government's

          2    Exhibits 82 through 84 and 289 have already been admitted.

          3    A portion of Government Exhibit 80 was previously

          4    conditionally admitted.  I move for the admission at this

          5    time of Government's Exhibits 80, 81, 281, 282, 296

          6    through 290.

          7             THE COURT:  You skipped 280.

          8             MS. PALUCH:  I did skip 280, Your Honor.

          9             THE COURT:  My sheet does not have a --

         10             MS. PALUCH:  I am sorry, 286 through 290.

         11             THE COURT:  I show 289 was already admitted.

         12             MS. PALUCH:  That's correct, Your Honor.  And I had

         13    Government's Exhibit 82 to 84 already admitted.

         14             THE COURT:  All right.  So just to make sure we get

         15    all of our numbers right, Exhibit 80 will be admitted.

         16    Exhibit 81 will be admitted.  281, 282, 286 through 288

         17    and 290 will be admitted.  289 was already admitted.

         18             MS. PALUCH:  Thank you Your Honor.  I ask

         19    permission to as we go along to publish.

         20             (Exhibit Nos. 80, 81, 281 282, 286-288, 290 are

         21    admitted.)

         22    Q.   (BY MS. PALUCH)  Let's start with Government Exhibits

         23    80 through 84.  Do you recall in what part of the house

         24    those items were located when you seized them?

         25    A.   They were taken from a rear bedroom.

1    Q.    And did it appear that that bedroom was a man's or a

2    woman's?

3    A.    It appeared to be a female's bedroom.

4    Q.    What makes you say that?

5    A.    There were articles of clothing that were female, and

6    makeup, nail polish, that type of thing.

7    Q.    All right.  Let's start with Government's Exhibit 80.

8    And can you please hold that up.

9          MS. PALUCH:  With the Court's permission, may the

10   witness hold that up?

11         THE COURT:  She may.

12   Q.    (BY MS. PALUCH)  Okay.  What is that?

13   A.    It is an envelope.

14   Q.    Is there an address to whom that has been addressed?

15   A.    It is addressed to Mimi Vigil.

16   Q.    Is there a name that appears in the return address?

17   A.    Yes.  It is Numbers and Beyond.

18   Q.    And did you find documents inside that envelope?

19   A.    Yes.

20   Q.    And let's take those documents out, if you could, and

21   let's turn to what has been marked as page 25.

22   A.    Okay.

23   Q.    And what is the title of that document?

24   A.    It is titled Form 1040, U.S. Individual Income Tax

25   Return for tax year 2005.

566

1    Q.   Is there a name of a taxpayer on that return?

2    A.   There is, Mimi Vigil.

3    Q.   And could you turn to the second page, page 26.  And

4    I am going to direct your attention to line 73a.  What is

5    the amount claimed as a refund?

6    A.   $372,169.

7    Q.   Could you please turn to page 49 of that exhibit.

8    What does that document appear to be?

9    A.   These are Form 1099 OIDs.

10         MS. PALUCH:  If we could highlight that first form.

11   Q.   (BY MS. PALUCH)  What name is listed as the payer on

12   that form?

13   A.   It is Mistar Financial, LLC.

14   Q.   Okay.  Who is the name of the recipient?

15   A.   Mimi Vigil.

16   Q.   And in Box No. 4, Income Tax Withheld, what is the

17   amount there?

18   A.   It is $373,965.34.

19   Q.   And Box 5, what is the description for that OID?

20   A.   It is Mortgage Loan Account for 2175 Wake Forest,

21   Loan 1090.

22   Q.   If we could turn to page 50.  What does that appear

23   to be?

24   A.   It is, again, a 1099 OID.

25   Q.   Okay.  And the next page, page 51, what does that

1    appear to be?

2    A.   It is the same, a 1099 OID.

3        MS. PALUCH:  Okay.  And if I could have displayed

4    side by side page 2 of Exhibit 50, which has been

5    admitted, and page 25 of Exhibit 80.

6    Q.   (BY MS. PALUCH)  I will have you look at these two

7    documents, these two separate exhibits.  Look at line 73,

8    the amount claimed as a refund.

9        MS. PALUCH:  If we could highlight line 73.

10    Actually, the next page.  If you could go one page over.

11    Thank you.  Highlight line 73.

12    Q.   (BY MS. PALUCH)  Can you compare those, Agent Combe.

13    A.   To the actual return here?

14    Q.   Yes, ma'am.  The return you found to the actual

15    return on line 73.

16    A.   Yes.

17    Q.   Are those amounts the same?

18    A.   They are.

19    Q.   Okay.  If we could go now to page 4 of Exhibit 50.

20    And I am going to refer your attention to under Schedule

21    B, Interest and Ordinary Dividends.  What is listed?  Is

22    there an entity listed there under -- I am sorry, Schedule

23    B, Part I?

24    A.   Are you asking me?

25    Q.   Yes, I am.

1    A.   What page?  Schedule B, Entity, under part 1, is

2    Mistar Financial.

3    Q.   Okay.  And the amount listed for Mistar Financial?

4    A.   It is $373,965.

5    Q.   And refer you back to Exhibit 80 that you found at

6    the Shady Crest residence.  If we could look at Exhibit

7    80, page 49.  Is that page 49?  Is that the same amount

8    represented on that OID?

9    A.   It is, just not the $.34, but it is the same amount.

10   Q.   Okay.  Let's turn now to Government's Exhibit 81.

11   Can you state what that document is?

12   A.   Okay.

13   Q.   What is the title of that document?

14   A.   It is a 2005 Colorado Individual Income Tax Return.

15   Q.   Is there a name of a taxpayer on this form?

16   A.   It is Mimi Vigil.

17   Q.   Okay.  And I will direct your attention to line 13 on

18   this first page.  And it says Colorado Taxable Income.

19   Can you state for the record what amount Ms. Vigil claimed

20   as income for 2005?

21   A.   $6,605.

22   Q.   Turn your attention to Government's Exhibit 82.  What

23   does this one -- let me know when you have 82 in front of

24   you.

25   A.   Okay.

1   Q.   What does this document appear to be?

2   A.   It appears to be a letter to Mimi Vigil from the IRS,

3   specifically Troy Parker from the IRS.

4   Q.   The date?

5   A.   It is a Final Notice, Notice of Intent to Levy.

6   Q.   And this was a document that you indicated was found

7   in what appeared to be a female's bedroom?

8   A.   Yes.

9   Q.   Document 83, can you state what that is?

10  A.   Again, it is a letter from the IRS to Mimi Vigil from

11  IRS employee Troy Parker.

12  Q.   The date of that letter?

13  A.   It is dated December 9, 2008.

14  Q.   Okay.  And Exhibit 84, please.  Same questions for

15  this document.

16  A.   Okay.  Again, it is an IRS letter to Mimi Vigil from

17  IRS employee Troy Parker.  And this one is dated March 4,

18  2009.

19  Q.   Okay.  I would like to now direct your attention to

20  Government's Exhibits 281 and 282.  Let me know when you

21  have those in front of you.

22  A.   Okay.

23  Q.   Can you state where in the Shady Crest residence

24  these documents were found?

25  A.   We found this in the garage bedroom.  The bedroom

1    behind the garage.

2    Q.   Did it appear that that bedroom was used by a man or

3    a woman?

4    A.   It was a man's bedroom.

5    Q.   What items did you find to indicate that?

6    A.   Men's shoes.  Men's clothing.

7    Q.   Did you find anything that indicated the specific

8    name with respect to what was located there?

9    A.   Yes.  There were items, but there was also a name

10   tag.

11   Q.   What was the name on that name tag?

12   A.   John Pawelski.

13   Q.   Could you describe the layout of the house of where

14   that garage bedroom was?

15   A.   It was down on the lower level, behind the garage.

16   Q.   Okay.  Now, Exhibit 281, what does that document

17   appear to be?

18   A.   Appears to be an e-mail from Mimi V to John Pawelski.

19   Q.   And what is the subject line of that e-mail?

20   A.   It says "from Mimi, money order."

21   Q.   What does it appear the first half of that document

22   is?

23        MS. PALUCH:  If we could highlight that first part,

24   I think they can see it actually.

25   Q.   (BY MS. PALUCH)  What does the first part of that

1    e-mail appear to be?

2    A.   It appears to be what text needs to be on a money

3    order.

4    Q.   And then if you go --

5         MS. PALUCH:  If we could highlight down at the

6    bottom, where it says "write the text," if we could

7    highlight that.

8    Q.   (BY MS. PALUCH)  What does that language appear to

9    be?

10   A.   It appears to be instructions or directions on how to

11   send in a money order.

12   Q.   Okay.  Exhibit 282, if you could.  And I will direct

13   your attention to page 5 of that packet of documents.  Can

14   you state the bolded titles of that document?

15   A.   It is a Regular Registered Bonded Promissory Note.

16   Q.   Okay.  Actually, I am on page 5.  Can you state those

17   titles?

18   A.   It is an Affidavit of Notary Presentment.

19   Q.   Next bolded heading?

20   A.   Certification of Mailing.

21   Q.   What is the date of this Certification, in the first

22   line there, that paragraph?

23   A.   The first day -- May 1, 2009.

24   Q.   Okay.  And this -- who appeared before a notary to

25   mail these documents?  Do you see that in that paragraph?

```
 1    A.    John Joseph Pawelski.

 2    Q.    And then who signed as notary?

 3    A.    Mimi Vigil.

 4    Q.    Okay.  If you could turn to page 7 of that document,

 5    and state the title of that page.

 6    A.    It is a Registered Bonded Promissory Note in the

 7    amount of $10 million.

 8    Q.    Sorry to interrupt you.  If you could look at where

 9    it says "for credit to."  Do you see that paragraph?

10    A.    I do.

11    Q.    And who is this for credit to?

12    A.    It says for John Pawelski.

13    Q.    And then when it says "for the benefit of," what name

14    is listed there?

15    A.    Ruth Pawelski.

16    Q.    Okay.  I am going to direct your attention to

17    Government's Exhibit 286, if I could.  If you could go to

18    the actual exhibit.

19          MS. PALUCH:  Your Honor, at this time I would ask

20    permission for the witness to hold this document up.

21          THE COURT:  She may.

22    Q.    (BY MS. PALUCH)  Actually, before you do that, I

23    should have asked you the question of what do those pages

24    appear to be?

25    A.    They appear to be stock paper.
```

573

1    Q.   And where in the home were those pages found?

2    A.   We found those in a dining area.

3    Q.   Was that a common area of the house?

4    A.   It was.

5    Q.   And what are the titles of the first few documents

6    that appear in that stack?

7    A.   It is a Secured Promissory Note.  Next ones are

8    Non-Negotiable Unlimited Private Bond for Setoff.

9    Discharging Indemnity Bond.  And Secured Funding and

10   Offset Bond.

11        MS. PALUCH:  Your Honor, at this time I would ask

12   the witness be allowed to display those to the jury.

13        THE COURT:  She may.

14   Q.   (BY MS. PALUCH)  If you could just hold those up.

15   A.   This is the first one, the Secured Promissory Note.

16   Discharging an Indemnity Bond.  Secured Funding and Offset

17   Bond.  And I missed one, Non-Negotiable Unlimited Private

18   Bond for Setoff.

19   Q.   Okay.  Government's Exhibit 287 through 289, if you

20   could look at those.  Can you state where in the home

21   those documents were found?

22   A.   Okay.  We found this in the rear bedroom, that we

23   believe was Ms. Vigil's bedroom.

24   Q.   When you say "rear bedroom," what level of the house

25   was that?

1    A.    That was upstairs.

2    Q.    That was the upstairs bedroom.  Okay.  So we are

3    talking 287 through 289.  We will start with Exhibit 287.

4    Can you state the title of that document?

5    A.    It says "instructions for the enclosed invoices."

6    Q.    And whose name appears as the title of this document?

7    A.    Mimi Vigil.

8    Q.    And to whom was this document addressed?

9    A.    To the IRS.

10   Q.    And the date?

11   A.    It is September 1, 2011.

12   Q.    Okay.  I'll have you look at Government's Exhibit

13   288.  What is the title of that document?

14   A.    It is a Private Registered Bond for Setoff

15   Non-Negotiable.

16   Q.    The amount of that document?

17   A.    It is $100 billion.

18   Q.    To whom is it addressed?

19   A.    To Timothy Geithner, Secretary of the Treasury.

20   Q.    And whose name appears at the top left of that

21   document?

22   A.    Mimi Vigil.

23   Q.    And the address is in the bottom.  If you look at the

24   bottom right, who signed that document as a principal?

25   A.    Mimi Vigil.

1    Q.   The signatures to the left of her signature, can you

2    read those?

3    A.   George Thomas Brokaw and John Joseph Pawelski.

4    Q.   Okay.  Government's Exhibit 289, if you would,

5    please.  What is the title of that first page of that

6    document?

7    A.   Affidavit of Notary Presentment.

8    Q.   Also states Certification of Mailing?

9    A.   Yes.

10   Q.   And what date was this document mailed?

11   A.   It says the 2nd day of December 2009.

12   Q.   Refer your attention to page 4 of that document.

13   What is the title of that page?

14   A.   Registered Bonded Promissory Note.

15   Q.   And the amount?

16   A.   $62,435.95.

17   Q.   The paragraph that reads "for credit to," for whose

18   credit was this bond to be applied?

19   A.   For Mimi Vigil.

20   Q.   Okay.  Did someone sign this document?

21   A.   Mimi Vigil signed it.

22   Q.   The date she signed it?

23   A.   It was December 2, 2009.

24   Q.   If you could turn to the next page of this document,

25   page 5.  Can you state the title of this document?

1    A.    This is an IRS Notice of Federal Tax Lien.

2    Q.    And what is the total amount of the lien?

3    A.    It is $24,974.38.

4    Q.    And the date of that lien?

5    A.    It is dated December 10, 2008.

6    Q.    And what is the typed name that appears at the bottom

7    left?

8    A.    Troy Parker.

9    Q.    And what is the name of the taxpayer on this lien?

10   A.    Mimi Vigil.

11   Q.    Can you read the writing that appears on an angle on

12   this document?

13   A.    It says "Accepted.  Balance this account to zero."

14   And it is signed by Ms. Vigil.

15   Q.    If you could turn to page 6 of this document.  What

16   is the title of this document?

17   A.    This is an IRS letter from Troy Parker to Mimi Vigil.

18   It is a Final Notice.  Notice of Intent to Levy.  Notice

19   of Your Right to a Hearing.

20   Q.    And the date of that letter?

21   A.    It is dated December 8, 2008.

22   Q.    I will direct your attention now to pages 9 and 10 of

23   this document.  Can you state the title of that?

24   A.    It is an IRS form W-8BEN.  It is a Certificate of

25   Foreign Status of Beneficial Owner for United States Tax

1   Withholding.

2   Q.   Is that page signed, that first page 9?

3   A.   It is.  It is signed by Mimi Vigil on December 26,

4   2008.

5   Q.   Okay.  Let's turn to page 11 of that document.  What

6   is the title of that page?

7   A.   Again, it is a W-8BEN.  Certificate of Foreign Status

8   of Beneficial Order.

9   Q.   I am looking at page 11.  I am sorry.

10   A.   Oh, okay.

11   Q.   What is the title of that page?

12   A.   It is a Summary of Taxpayer Contact.

13   Q.   What does it appear to be in the middle of that?

14   A.   It appears to be a listing of -- it is a listing of

15   things required.

16   Q.   Okay.  And do you see a name of a revenue officer on

17   the bottom left?

18   A.   Yes.  It is Troy Parker.

19   Q.   Does his signature appear on the next page, page 12?

20   A.   It does.

21   Q.   Pages 13 and 14, what do those appear to be?

22   A.   These are IRS letters.  Final Notices.  Notice of

23   Intent to Levy and Notice of Your Right to a Hearing.

24   Q.   And the next couple of pages, is that just a second

25   copy of what we just looked at?

1    A.    Yes.

2    Q.    Okay.  Then go to 17 through 20.  Can you state

3    generally what those documents -- those pages appear to

4    be?

5    A.    They appear to be IRS letters.  They are Requests for

6    Collection Due Process or Equivalent Hearing.

7    Q.    Page 21 of this document, what does that page appear

8    to be?

9    A.    It appears to be a Payment Voucher.  An IRS Payment

10   Voucher.

11   Q.    And whose name appears on this voucher?

12   A.    It is Mimi Vigil.

13   Q.    And the amount owed reflected on this?

14   A.    Money You Owe, it says 5,000.

15   Q.    Can you read the handwriting that appears?

16   A.    Accepted for value.  Returned for setoff and closure

17   of the accounting.

18   Q.    Okay.  Last page of this exhibit is page 22.  Title

19   of that document?

20   A.    It is a Notice of Federal Tax Lien.

21   Q.    And to what taxpayer?

22   A.    It is to Mimi Vigil.

23   Q.    And the address that is listed as the residence?

24   A.    513 Shady Crest Circle, Colorado Springs, Colorado.

25   Q.    That is the address you searched?

1    A.    Yes.

2    Q.    What is the amount of this tax lien?

3    A.    It is $18,559.

4    Q.    And the revenue officer name typed at the bottom?

5    A.    Troy Parker.

6    Q.    Do you see the same handwriting that we have seen on

7    the other pages?

8    A.    Yes.

9    Q.    Okay.  I would like you to look at Exhibit 290,

10   please, our final exhibit here.  Where was this exhibit

11   found?

12   A.    This was in the bedroom behind the garage.

13   Q.    Okay.  And you indicated that that bedroom appeared

14   to belong to Mr. Pawelski?

15   A.    Yes.

16   Q.    And please turn to page 7 of that document.  What is

17   the title of that document?

18   A.    It is Instructions for Enclosed Court Cases and

19   Invoices.

20   Q.    Okay.  And if you could please read the first

21   sentence into the record, up to the name John Pawelski.

22   A.    I am sorry, can you repeat?

23   Q.    Can you read the first sentence under "Instructions"

24   up until you see the name John Pawelski?

25   A.    "All of the following enclosed documents and money

1    orders have been signed with wet signature and stamp under

2    UPU jurisdiction and accepted for value and returned for

3    payment and settlement by the authorized representative."

4    Q.   Okay.  And starting with page 9, can you look through

5    those documents and state what they appear to be.

6    A.   This appears to be --

7         MS. PALUCH:  If you could display page 9, please.

8         THE WITNESS:  That appears to be a Recorded Federal

9    Tax Lien.

10   Q.   (BY MS. PALUCH)  And do you see, if you go further

11   into that exhibit, do you see other entities listed on

12   invoices or liens?

13   A.   Yes.

14   Q.   And I would ask if you could just state for the

15   record the entities that are listed on those liens.

16   A.   Okay.  One looks like the State of Colorado, El Paso

17   County.

18   Q.   Okay.

19   A.   And, again, El Paso County.  Denver County.  Again,

20   an El Paso County.  El Paso County.  GMAC Mortgage.

21   Verizon Wireless.  GEICO Insurance Company.  Again, IRS.

22   Wells Fargo.  Advantage Telecom.  I believe that's it.

23   Q.   Okay.  In looking at the screen, if you could, in

24   front of you, which is displaying page 9, can you read

25   those first three handwritten words?

```
1    A.   Yeah.  It says "Accepted for Value, Exempt From

2    Levy."  It is signed by John Joseph Pawelski, dated May 3,

3    2011.

4    Q.   And all of those invoices that you just listed the

5    entities, did they all appear to have the same type of

6    handwriting over them?

7    A.   Yes.

8    Q.   With the same language?

9    A.   Yes.

10         MS. PALUCH:  If I could have one moment, Your

11   Honor.

12         THE COURT:  You may.

13         MS. PALUCH:  No further questions, Your Honor.

14         THE COURT:  All right.  Thank you very much,

15   Ms. Combe, you may step down.

16         THE WITNESS:  Thank you.

17         THE COURT:  Government may call its next witness.

18         MR. KIRSCH:  Check on one thing again, Your Honor.

19         Can we approach briefly, Your Honor?

20         THE COURT:  You may.

21         (A bench conference is had, and the following is

22   had outside the hearing of the jury.)

23         MR. KIRSCH:  Your Honor, we have one more witness

24   for today who just left the rental car place at Denver

25   International Airport.
```

582

 1          THE COURT:  We could break early for lunch, but if

 2     it only takes 5 minute.

 3          MR. KIRSCH:  He is an agent, but we could keep him

 4     here over night and we can call him tomorrow, if we can

 5     discharge the jury early today.  I don't know if we could

 6     talk about jury instructions today.  But we will finish

 7     all of our witnesses tomorrow morning before lunch even,

 8     including that witness, if we could do that.

 9          THE COURT:  I think the jury would be very happy.

10     We do have instructions to go, so I can get those to you.

11     I think -- I think the only thing we had is your

12     instruction for the conspiracy did not include overt act,

13     where I think the Tenth Circuit has stated it didn't

14     require an overt act.  So I don't see it is in the

15     pattern.  That is the only major issue that I thought we

16     would probably need to discuss.

17          MS. PALUCH:  One issue we discussed, Your Honor, is

18     an instruction regarding the defendants' absence from the

19     courtroom; whether that would be warranted to instruct the

20     jury.

21          MR. KIRSCH:  We were going to try to look at that.

22          THE COURT:  Something not prejudicial.

23          MR. KIRSCH:  But we don't have that yet, Your

24     Honor, but we could do that this afternoon certainly.  You

25     know, we were hoping that the Court would be able to go

 1    ahead and give the defendants notice that closing

 2    arguments would occur either tomorrow or Friday, whatever

 3    schedule the Court prefers, and --

 4         THE COURT:  I will let the probation officer

 5    indicate to them that they need to be here.  It looks like

 6    that could be tomorrow afternoon.

 7         MR. KIRSCH:  We will be able to rest tomorrow and

 8    leave time for that tomorrow, so we can be prepared to do

 9    it tomorrow or do it on Friday morning, if the Court

10    thinks that is better for scheduling the defendants'

11    appearance.

12         THE COURT:  Because they have to be here for the

13    verdict, I don't know, who knows, on Thursday afternoon.

14         MR. KIRSCH:  We will follow the Court's direction

15    with respect to the timing of that.

16         THE COURT:  Okay.

17         MR. KIRSCH:  Thank you, Your Honor.

18         (The following is had in the hearing of the jury.)

19         THE COURT:  Ladies and gentlemen, there is one

20    other witness planned for today, but he, I believe, is en

21    route, but the Government has indicated they can take him

22    tomorrow.  They are moving much more quickly than they

23    estimated they would.  So I think I will just let you go

24    home for the day.  Instead of keeping you here for lunch

25    and having you come back for a witness, I think we will

```
 1    just let you go early.  If you can be back at 8 o'clock
 2    tomorrow morning.
 3         We anticipate that the Government is going to
 4    finish their witnesses tomorrow.  We will get to closing
 5    argument probably tomorrow afternoon.  So this case would
 6    go to you for deliberations either tomorrow afternoon -- I
 7    need to get ahold of the defendants, because they do have
 8    to be here when a verdict comes back.  So I need to let
 9    them know where we are in the trial at this point.
10         So I will let you go home early.  Remember, don't
11    talk to anyone about this case, don't conduct any
12    research, and with that we will see you tomorrow at 8
13    o'clock in the morning.  Jury is excused.
14         (The following is had in open court, outside the
15    hearing and presence of the jury.)
16         THE COURT:  All right.  You may be seated.  What I
17    would propose is that you all submit the additional
18    instruction you mentioned at the bench, and we will
19    finalize our proposed instructions and e-mail those to
20    you.
21         I don't think it will take a lot of time, so I
22    think we can probably just go ahead -- I would like to get
23    them finalized so we can have them printed off and
24    everything and ready to go.  I would like to, rather than
25    delay this, I think I will instruct the probation officer
```

```
 1    to let the defendants know the Government will rest its

 2    case tomorrow, and that we will most likely, unless they

 3    enter any appearance to do anything, we will most likely

 4    do closing arguments tomorrow afternoon, and that the

 5    matter will then go to the jury, so they have to be here

 6    for a verdict either tomorrow afternoon or Friday morning,

 7    and they are just -- we don't know how long it will take

 8    the jury.

 9          MR. KIRSCH:  Your Honor, if the -- what we would

10    request is that the Court make the order to the defendants

11    a little bit more specific and go ahead and require them

12    to be present tomorrow afternoon regardless, and that way

13    we won't give them the -- hopefully, we will eliminate the

14    possibility of any perceived ambiguity in your order, as

15    the defendants claim, with respect to the earlier order.

16          THE COURT:  I will issue a written order.

17          MR. KIRSCH:  Your Honor, this is probably what the

18    Court is planning to do again, already, but we were just

19    going to request that -- or what that would also allow us

20    to do is to allow the Court to again advise the defendants

21    that once we have rested that they still would have the

22    opportunity to present evidence if they desired.  If we

23    could make that a part of record, that would be our

24    request.

25          THE COURT:  I will issue a written order that
```

1  essentially advises that the Government anticipates that

2  it will rest its case tomorrow morning.  That means -- so

3  we will prepare an order and issue an order that I will

4  then ask the probation officer to ensure that the

5  defendants are given or attempted to be given so that they

6  have notice, and we will put some language in to that

7  effect.

8          MR. KIRSCH:  That would be great.  Thank you.

9          THE COURT:  If you have proposed language you want

10  to put in that order, if you could submit that, as well.

11         MR. KIRSCH:  We will, Your Honor.  I am sure we

12  will be comfortable with whatever the Court comes up with

13  there.  And we will try to get -- if we get the Court our

14  instruction by the end of the day, by the end of the

15  business day with respect to the defendants' absence, will

16  that be acceptable?

17         THE COURT:  Yes.  All right.  Court will be in

18  recess.

19         (Court is in recess at 11:53 a.m.)

20

21

22

23

24

25

1

2          **R E P O R T E R ' S     C E R T I F I C A T E**

3

4          I, Darlene M. Martinez, Official Certified

5    Shorthand Reporter for the United States District Court,

6    District of Colorado, do hereby certify that the foregoing

7    is a true and accurate transcript of the proceedings had

8    as taken stenographically by me at the time and place

9    aforementioned.

10

11

12          Dated this 7th day of February, 2015.

13

14          _____

15          s/Darlene M. Martinez

16          RMR, CRR

17

18

19

20

21

22

23

24

25