**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 13-cr-00392-CMA


**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

1.  **GEORGE THOMAS BROKAW,**
2.  **JOHN J. PAWELSKI, and**
3.  **MIMI M. VIGIL,**

**Defendants.**

_____

**REPORTER'S TRANSCRIPT**
**(Jury Trial - Day 4)**

_____
         Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 7:55 a.m. on the 6th
day of November, 2014, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MATTHEW T. KIRSCH and MARTHA A. PALUCH, U.S. Attorney's
Office - Denver, 1225 17th St., Suite 700, Denver, CO
80202

**FOR DEFENDANT BROKAW:**
Pro Se.
**FOR DEFENDANT PAWELSKI:**
Pro Se.
**FOR DEFENDANT VIGIL:**
Pro Se.

# I N D E X

**WITNESSES:**                                                           **PAGE**

### LELAND DEERING
DIRECT EXAMINATION BY MR. KIRSCH                              594
CROSS-EXAMINATION BY DEFENDANT BROKAW                         610
CROSS-EXAMINATION BY DEFENDANT VIGIL                          614
REDIRECT EXAMINATION BY MR. KIRSCH                            615

### MICHAEL QUINN
DIRECT EXAMINATION BY MR. KIRSCH                              617
CROSS-EXAMINATION BY DEFENDANT BROKAW                         623

### STACY EBERT
DIRECT EXAMINATION BY MS. PALUCH                              626
CROSS-EXAMINATION BY DEFENDANT BROKAW                         634

### LINDA CHAVEZ
DIRECT EXAMINATION BY MR. KIRSCH                              636

### LYNETTE CORNELIUS
DIRECT EXAMINATION BY MS. PALUCH                              644
CROSS-EXAMINATION BY DEFENDANT PAWELSKI                       649
REDIRECT EXAMINATION BY MS. PALUCH                            650

### DULCE MARROQUIN
DIRECT EXAMINATION BY MS. PALUCH                              652
CROSS-EXAMINATION BY DEFENDANT PAWELSKI                       660
REDIRECT EXAMINATION BY MS. PALUCH                            661
CROSS-EXAMINATION BY DEFENDANT BROKAW                         662

### ANTHONY DILLMAN
DIRECT EXAMINATION BY MR. KIRSCH                              663
CROSS-EXAMINATION BY DEFENDANT PAWELSKI                       670

### TERRY GEARHART
DIRECT EXAMINATION BY MS. PALUCH                              672
CROSS-EXAMINATION BY DEFENDANT PAWELSKI                       678
REDIRECT EXAMINATION BY MS. PALUCH                            678

### JOHN MALONEY
DIRECT EXAMINATION BY MR. KIRSCH                              679
CROSS-EXAMINATION BY DEFENDANT PAWELSKI                       687
REDIRECT EXAMINATION BY MR. KIRSCH                            688

### PAUL DANLEY
DIRECT EXAMINATION BY MR. KIRSCH                              691
CROSS-EXAMINATION BY DEFENDANT PAWELSKI                       699

**TIMOTHY O'MALLEY**

| | |
|---|---|
| DIRECT EXAMINATION BY MS. PALUCH | 701 |
| CROSS-EXAMINATION BY DEFENDANT BROKAW | 708 |
| CROSS-EXAMINATION BY DEFENDANT PAWELSKI | 709 |

**MARIO MORALES**

| | |
|---|---|
| DIRECT EXAMINATION BY MR. KIRSCH | 711 |
| CROSS-EXAMINATION BY DEFENDANT BROKAW | 718 |
| REDIRECT EXAMINATION BY MR. KIRSCH | 720 |

**DARCY EMME**

| | |
|---|---|
| DIRECT EXAMINATION BY MS. PALUCH | 748 |
| CROSS-EXAMINATION BY DEFENDANT PAWELSKI | 755 |

## E X H I B I T S

| NO. | | ADMITTED |
|---|---|---|
| 113 | ........................................ | 632 |
| 114 | ........................................ | 714 |
| 116 | ........................................ | 638 |
| 117 | ........................................ | 655 |
| 118 | ........................................ | 659 |
| 119 | ........................................ | 707 |
| 122 | ........................................ | 752 |
| 123 | ........................................ | 676 |
| 124 | ........................................ | 621 |
| 126, 127 | ........................................ | 684 |
| 128 | ........................................ | 667 |
| 213 | ........................................ | 601 |
| 270 | ........................................ | 697 |
| 271 | ........................................ | 607 |

| No. | | REFUSED |
|---|---|---|
| | ........................................ | |

```
 1                        NOVEMBER 6, 2014

 2              (Proceedings commence at 7:55 a.m.)

 3              (The following is had in open court, outside the

 4     hearing and presence of the jury.)

 5              THE COURT:  You may be seated.

 6              All right.  We are back in Criminal Case No.

 7     13-cr-00392, United States of America v. George Thomas

 8     Brokaw, John J. Pawelski, and Mimi M. Vigil.

 9              For the record, the Court would note counsel for

10     the Government are present, and all three defendants are

11     present this morning.

12              You have been handed a copy of the proposed jury

13     instructions and the verdict form -- proposed verdict

14     form, which we will discuss and do the charging conference

15     after the Government rests.

16              And I am not sure what the defendants intend to do

17     in terms of putting on a defense, but since they are

18     present, Mr. Pawelski, you are already at the podium, you

19     may proceed to let me know what you intend to do; whether

20     you intend to sit through the remainder of the

21     Government's case or how you intend to proceed.

22              DEFENDANT PAWELSKI:  First of all, my name is

23     private.  For the record, my name is private.  In regards

24     to the all capital letters name on the birth certificate,

25     capital J-O-H-N J P-A-W-E-L-S-K-I, I conditionally accept
```

1    the agent of the general executor, and the Judge is the

2    trustee.  And I do not consent to being the surety.  I

3    accept your oath and bind you to it.  I accept my immunity

4    to 12 U.S.C 95(a)(2) while doing estate business here.

5         Let's move this matter to settlement and closure or

6    a status hearing about who's who.

7         THE COURT:  Denied.

8         DEFENDANT PAWELSKI:  Of course.  Yes, I am going to

9    sit through the prosecutor's questioning.

10        THE COURT:  Okay.  Very well.

11        All right.  Ms. Vigil, you wish to make any

12   statement?

13        DEFENDANT VIGIL:  My name is private.  Spelled in

14   all capital letters as it is on the birth certificate

15   MIMI, all capitals MICHELLE VIGIL, all capitals, and I am

16   here as an agent for the estate as the executor.  And I

17   accept your oath and I bind you to it.  I accept my

18   immunity pursuant to 12 U.S.C. 95(a) while doing estate

19   business here, and I will sit and stay in honor this

20   morning while you go through the process here.

21        THE COURT:  Very good.

22        Mr. Brokaw, do you wish to make any statement?

23        DEFENDANT BROKAW:  Yes, I do, Judge.  My name is

24   private.  And I do not consent to be the surety for the

25   trust.  And I accept your oath.  I bind you to it, also,

1      Judge.  And I also accept my immunity pursuant to 12

2      U.S.C. 95(a) while doing estate business here.  And I will

3      participate today.

4              THE COURT:  Very good.  You may be seated.

5              DEFENDANT BROKAW:  I think I will sit down.

6              THE COURT:  All right.  Ms. Hartmann, would you

7      please bring in the jury.

8              COURTROOM DEPUTY:  Your Honor I will need to check.

9              THE COURT:  Check to see if they are all present.

10             (The following is had in open court, in the hearing

11     and presence of the jury.)

12             THE COURT:  Thank you very much.  You may be

13     seated.

14             Welcome back, ladies and gentlemen.

15             The Government may call its next witness.

16             MR. KIRSCH:  Thank you, Your Honor.  The Government

17     calls Leland Deering.

18             COURTROOM DEPUTY:  Please enter and remain

19     standing.

20             Your attention, please.  Please raise your right

21     hand.

22                          **LELAND DEERING**

23     having been first duly sworn, testified as follows:

24             COURTROOM DEPUTY:  Please be seated.

25             Please state your name, and spell your first and

1    last names for the record.

2         THE WITNESS:  Leland Deering.  L-E-L-A-N-D

3    D-E-E-R-I-N-G.

4         THE COURT:  You may proceed.

5         MR. KIRSCH:  Thank you, Your Honor.

6                        **DIRECT EXAMINATION**

7    **BY MR. KIRSCH:**

8    Q.   Good morning, Mr. Deering.

9    A.   Good morning.

10   Q.   Are you still employed, sir?

11   A.   I am not.

12   Q.   Did you -- from what job did you retire?

13   A.   I retired from the Internal Revenue Service.

14   Q.   How long were you with the Internal Revenue Service?

15   A.   A little over 36 years.

16   Q.   And what was the last position that you held with the

17   Internal Revenue Service?

18   A.   Last 10 years of my service with the Internal Revenue

19   Service, I was a group manager for the Examination Field

20   Group in Colorado Springs.

21   Q.   And what were your duties as the group manager of

22   that Examination Field Group?

23   A.   Basically, I supervised approximately up to 12 field

24   revenue agents at any given time, maintained contact with

25   these 12 people, provided guidance.

1    Q.    And what is it that the revenue agents, themselves,

2    did?

3    A.    The revenue agent -- field revenue agent goes --

4    normally will go into the field with examination of

5    federal income tax returns, from the basic 1040 through

6    the corporate and partnership, reviewing issues and making

7    a determination of the correct tax.

8    Q.    Did you ever work as a revenue agent yourself?

9    A.    I did.

10    Q.    For how long?

11    A.    Prior to my last 10 years, it would have been about

12    26 years as a field agent.

13    Q.    Okay.  From your time as a revenue agent, and then

14    from when you were supervising, are you familiar with the

15    process of the examinations that you just described?

16    A.    Yes, I am.

17    Q.    Does that process ordinarily involve the revenue

18    agent meeting with a particular taxpayer in question?

19    A.    We found that meeting with the individual who is

20    working at that place of business, if it was a business,

21    it was appropriate for us to meet.

22    Q.    Does the revenue agent during that process typically

23    request documents from the taxpayer?

24    A.    After the tax return is reviewed by the revenue

25    agent, they kind of make a pre-plan and create a document

1    request for the documents needed to conduct the

2    examination, yes.

3    Q.   And what is the purpose of gathering those documents?

4    A.   To verify the accuracy and the information contained

5    on the return and to support the items that are on the tax

6    return.

7    Q.   Okay.  While you were the supervisor of the Colorado

8    Springs office, did you supervise a revenue agent named

9    Aubrey Billingsley?

10   A.   Yes.

11   Q.   And did you have any other duties as that group

12   manager in Colorado Springs besides supervising the

13   revenue agents?

14   A.   Yes.

15   Q.   What other sort of duties did you have?

16   A.   I was the Commissioner's representative for the

17   Colorado Springs Postal duty.

18   Q.   What is that?

19   A.   That primarily was looking at the welfare of the

20   entire IRS population in the Colorado Springs office, in

21   security, safety, and those kinds of items.

22   Q.   Okay.  I want to take your attention now back to the

23   date of March 24, 2010.  Do you remember whether there was

24   anything unusual about that day?

25   A.   Yes.

1    Q.    What was that?

2    A.    That particular day, I had made a determination and

3    had contacted the -- my contact in Denver, and we had a

4    2-hour delay.

5    Q.    Why was that?

6    A.    Due to an ice and snowstorm.

7    Q.    Okay.  Were you in the office -- when did you come to

8    the office that day?

9    A.    I went in -- we had a delay to open the office until

10   10 o'clock.  I was in there by 7:30.

11   Q.    And at some point that morning did you learn that

12   someone was trying to come into the office before 10

13   o'clock?

14   A.    Yes.

15   Q.    Did you know whether or not there had been any

16   appointments scheduled with any of your revenue agents

17   that morning?

18   A.    I knew there was scheduled appointments that morning,

19   yes.

20   Q.    Which appointment was that?

21   A.    That was for a gentleman, Mr. Brokaw.

22   Q.    And with whom did Mr. Brokaw have an appointment that

23   morning?

24   A.    What is that again?

25   Q.    With whom did Mr. Brokaw have an appointment that

1    morning?

2    A.   He had it with Aubrey, my employee.   Aubrey was on a

3    2-hour delay and wasn't available.

4    Q.   That is Aubrey Billingsley?

5    A.   That's right.

6    Q.   And so what was Ms. Billingsley doing with respect to

7    Mr. Brokaw at that point, do you know?

8    A.   I had assigned him a case file that we received

9    through the system to conduct an examination of the filed

10   tax return.

11   Q.   Okay.  And so at some point between 7:30 or so when

12   you arrived and 10 o'clock, did you learn that someone was

13   trying to come into the office?

14   A.   Yes.

15   Q.   And did you take any action after you found that out?

16   A.   I did, because the elevators were locked down until

17   10 o'clock because of the delay.  However, I don't recall

18   how I got the notice that somebody was trying to get on

19   the elevator.  But when I was contacted, I did go down the

20   elevator into the lobby.  And so two gentlemen had already

21   departed the entryway to the lobby.  And I went out and

22   called them by name, and they came back into the office.

23   I took them up on the elevator.

24   Q.   When you say "called them by name," what name did you

25   use?

1   A.   I believe Mr. Brokaw.  I don't recall.

2   Q.   All right.

3   A.   To get his attention.  And he did acknowledge that is

4   who he was.

5   Q.   And then you said you took them into the IRS office?

6   A.   I did.

7   Q.   And what happened when you went into the IRS office?

8   A.   What I did is I secured the case file regarding the

9   examination process, which was in Aubrey Billingsley's

10   can, his files and everything else, and I conducted an

11   interview.

12   Q.   During that interview, did you speak with the person

13   who was identifying himself as Mr. Brokaw?

14   A.   I did.

15   Q.   Did you specifically ask Mr. Brokaw about 1099 OID

16   forms that had been included with his tax returns?

17   A.   During the interview process, I did.

18   Q.   What did he say?

19   A.   He acknowledged there were OIDs.  And I did ask him a

20   question regarding was he aware of what an OID was, and

21   his response to me was, "Don't you?"  And I responded,

22   "Well, I am asking you."  And he acknowledged the OIDs.

23   We discussed very, very thoroughly the OIDs.

24   Q.   Did he say anything about whether he had been

25   involved in preparing those OIDs?

600

```
 1   A.   From my notes and everything else that I took during

 2   the interview process, yes, he acknowledged the fact that

 3   he was involved in the preparation of these particular

 4   documents.

 5   Q.   Let me ask you to look now at a document that you

 6   should have in one of those folders there marked as

 7   Exhibit 213.  Do you have that in front of you,

 8   Mr. Deering?

 9   A.   I do.

10   Q.   Do you recognize that document?

11   A.   I do recognize the document.

12   Q.   How do you recognize that document?

13   A.   It has got my signature on it.

14   Q.   And is that a document that you saw -- have seen

15   previously?

16   A.   This document, with my signature and the date of the

17   document, it was a document provided to me to sign for the

18   sheet of records that were provided during the interview

19   process.

20   Q.   During this meeting you have been describing?

21   A.   That's right.

22        MR. KIRSCH:  I am going to move to admit and

23   publish Government's Exhibit 213, Your Honor.

24        THE COURT:  All right.  Any objection from the

25   defendants?
```

1          Hearing no objection, Exhibit 213 is admitted, and

2     you may publish.

3          MR. KIRSCH:  Thank you, Your Honor.

4          (Exhibit No. 213 is admitted.)

5          MR. KIRSCH:  Can we expand the top portion of that

6     first, please.

7     Q.   (BY MR. KIRSCH)  All right.  Can you see that on your

8     screen now, Mr. Deering?

9     A.   Yes, I do.

10    Q.   So the date that is reflected in the paragraph here,

11    is that the date that we have been talking about where

12    these events occurred with the late start and then the

13    meeting in the interview room, right here where it says

14    March 24, 2010?

15    A.   Yes.

16    Q.   Okay.  And then you said that you received this

17    document that day?

18    A.   Yes.

19    Q.   From who?

20    A.   I don't recall who passed it to me, because we had

21    three people that was sitting there at the time.

22    Q.   Okay.  And do you know who those three people were?

23    A.   Yes.

24    Q.   Who were they?

25    A.   They were the three people who are sitting here.

```
1    Q.    Okay.  At the table to my right?

2    A.    Yes.

3          MR. KIRSCH:  May the record reflect he identified

4    the defendants, Your Honor?

5          DEFENDANT VIGIL:  I take exception, I was not

6    there.  I have never laid eyes on you before.

7          THE COURT:  Ms. Vigil, if you wish to ask questions

8    you may, but you can't interrupt.

9          The record will so reflect that he has identified

10   the three defendants.

11         MR. KIRSCH:  Could we please scroll down on this

12   page.

13   Q.    (BY MR. KIRSCH)  Do you see in the middle of the

14   screen now, Mr. Deering, where it says "List of Documents

15   Delivered"?

16   A.    Yes.

17   Q.    Do you recall whether or not you, in fact, received

18   those documents that are listed there?

19   A.    It has been some time since I have -- this meeting

20   took place.

21   Q.    Okay.  Fair enough.  Do you recall seeing the

22   signatures that are at the bottom of the page there get

23   applied to this document?

24   A.    I signed that on that same day.

25   Q.    Which signature is yours on that form?
```

*DARLENE M. MARTINEZ, RMR, CRR*
*United States District Court*
*For the District of Colorado*

1    A.   As the receiver.

2    Q.   Okay.  As you sit here today, you don't recall

3    whether the other signatures were made in front of you or

4    whether they were already on the document; is that fair?

5    A.   That would be fair.

6         MR. KIRSCH:  Okay.  Can we please go to page 19 of

7    this exhibit.  And can you try to make the top half of

8    that bigger for now, please.

9    Q.   (BY MR. KIRSCH)  Can you see that document on the

10   screen now, Mr. Deering?

11   A.   Yes.

12   Q.   And what -- is the caption on that document "Notice

13   of Claim of Maritime Lien"?

14   A.   Yes.

15   Q.   And is there a person's name listed there in Box 1,

16   "Name of Vessel"?

17   A.   Yes.

18   Q.   Who is that?

19   A.   U.S. MV Michael J. Pryor.

20   Q.   Do you know a person named Michael Pryor?

21   A.   I do.

22   Q.   How do you know Mr. Pryor?

23   A.   I worked with Mr. Pryor on other issues during my

24   tenure.

25   Q.   Did you know him to be an IRS employee?

1    A.   I did.

2    Q.   Can I ask you, just on the paper in front of you, to

3    turn back to page 1 of that exhibit, the page we were

4    looking at just a moment ago.  Do you see on the list of

5    documents there a document that is titled a Notice of

6    Claim of Maritime Lien with respect to Michael Pryor?

7         MR. KIRSCH:  Can we publish page 1 of that again,

8    too?

9         THE WITNESS:  Are you referring to the Copy of UCCA

10   Financing Statement?

11   Q.   (BY MR. KIRSCH)  I am referring to this entry that I

12   just made the mark next to on the left.

13   A.   What was your question again, please?

14   Q.   Whether you saw a reference to a Notice of Maritime

15   Lien with respect to Mr. Pryor there?

16   A.   Yes.

17   Q.   And the entry right below that, what does that entry

18   right below that say?

19   A.   This one right here?  Copy of UCC Financing Statement

20   and Notice of Maritime Lien on Maureen Green, IRS, Ogden,

21   Utah.

22        MR. KIRSCH:  Okay.  Can we please now publish

23   Government exhibit -- I am sorry, page 21 of this exhibit.

24   And enlarge the top half of that, if we could.

25   Q.   (BY MR. KIRSCH)  Does this appear to be the Maritime

1    Lien with respect to Maureen Green that was referenced in

2    that document, Mr. Deering?

3    A.   Yes.

4    Q.   What would -- what would you have done with these

5    documents after you received them at this meeting?

6    A.   I would have made them part of the examination file

7    and provided them to Aubrey Billingsley.

8    Q.   The fact that these documents contain liens

9    related -- with the names of IRS employees, would that

10   have caused you any concern?

11   A.   It would cause concerns regarding that they had a

12   lien placed on them, yes.

13        MR. KIRSCH:  Okay.  Can I ask to publish now,

14   please, Your Honor, what I believe has previously been

15   admitted as Government's Exhibit 260.

16        THE COURT:  Yes, it has been admitted, and you may

17   publish.

18        MR. KIRSCH:  Thank you, Your Honor.

19        Can you highlight the top portion -- if we can get

20   all of the text on that, that would be great.

21   Q.   (BY MR. KIRSCH)  Can you see that document on the

22   screen now, Mr. Deering?

23   A.   I have seen the same document.  It is the same

24   document we were just talking about, page 1.

25   Q.   Same document as page 1?

1    A.    Yes.

2    Q.    This one, I want to draw your attention to just one

3    thing right here, sort of in the middle of the screen,

4    where I put the checkmark.  There appears to be a

5    telephone number on this version.  Are you familiar with

6    that telephone number?

7    A.    That was my office phone number.

8    Q.    Okay.  Would you have provided your office phone

9    number during a meeting if a taxpayer had asked for it?

10   A.    It would have been protocol if asked, yes.

11   Q.    Okay.  Finally, I want to ask you to look at the

12   other document that I think you will have in front of you

13   there marked as Government's Exhibit 271.

14   A.    I have it.

15   Q.    Do you recognize that document?

16   A.    At this time, I couldn't say yes or no.

17   Q.    Okay.  Did you have a practice if you received

18   documents that alleged that IRS employees owed taxpayers

19   money, did you have a practice that you followed with

20   those documents?

21   A.    It depends on what the document was.  When you refer

22   to "practice," it depends on what the document was.

23   Because any documents received during an examination

24   process, regardless of what it is, ends up in the

25   examination file of the revenue agent.

1    Q.    Does that Document 271, does it contain Mr. Brokaw's

2    name?

3    A.    Yes.  In the "From" line, yes.

4    Q.    If you look at the bottom of the first page --

5    actually, if you look at the top of the first page, to

6    whom is it addressed?

7    A.    It is addressed to Leland Deering, Group Manager,

8    IRS, and Aubrey Billingsley, Revenue Agent, IRS.

9    Q.    Does the judgment make -- excuse me, does the

10   document make reference to the collection or to the

11   assessment activities in which Mr. Billingsley was engaged

12   at the time?

13   A.    Would you repeat that, please?

14   Q.    Yes.  Does the document make reference to the tax

15   assessment activities in which Mr. Billingsley was engaged

16   during the time period we have been discussing?

17   A.    Yes, in paragraph 2.

18         MR. KIRSCH:  Your Honor, I am going to move to

19   admit Government's Exhibit 271.

20         THE COURT:  Any objection from the defendants?

21         Hearing no objection, Exhibit 271 is admitted.

22         (Exhibit No. 271 is admitted.)

23         MR. KIRSCH:  Thank you, Your Honor.  May we publish

24   it?

25         THE COURT:  You may.

608

1    Q.   (BY MR. KIRSCH)  If you would start with page 1 of

2    that document, please.  All right.  Are you able to read

3    that document on the screen now, Mr. Deering?

4    A.   I can, yes.

5    Q.   Okay.  What is the date at the top of that document?

6    A.   It is the 13th of April 2010.

7    Q.   And what is the caption, in all capital letters, in

8    bold, towards the bottom of the page?

9    A.   Administrative Affidavit of Specific Negative

10   Averment, Opportunity to Cure and Counterclaim.

11        MR. KIRSCH:  Can we go to page 2 of that exhibit

12   now.  And can we begin by expanding where it says "as to

13   Count Two."

14   Q.   (BY MR. KIRSCH)  Does your name appear in this

15   paragraph, Mr. Deering?

16   A.   Yes.

17   Q.   How about Mr. Billingsley's?

18   A.   Yes.

19   Q.   Can you read the next-to-last sentence of this

20   paragraph for us, beginning with "this is theft"?

21   A.   "This is theft, fraud, conspiracy, racketeering,

22   collusion and abuse of power, et cetera."

23        MR. KIRSCH:  Can we now expand where it says "as to

24   Count Four."

25   Q.   (BY MR. KIRSCH)  Does that paragraph contain a

```
 1    similar sentence, Mr. Deering?

 2    A.    The last sentence, yes.

 3          MR. KIRSCH:  Can we display page 3, please.

 4    Q.   (BY MR. KIRSCH)  What is the heading at the bottom

 5    that page, Mr. Deering?

 6    A.    "Opportunity to Cure."

 7          MR. KIRSCH:  And can we go to page 4 now, please,

 8    and expand the top half.

 9    Q.   (BY MR. KIRSCH)  Directing your attention to

10    paragraph number three, Mr. Deering, did you surrender any

11    of your 401Ks or retirement funds or personal wealth or

12    properties to Mr. Brokaw?

13    A.    I did not.

14    Q.    Did you pay him $300,000, as is referenced in

15    paragraph No. 4?

16    A.    I did not.

17          MR. KIRSCH:  Can we scroll down on that page,

18    please.

19    Q.   (BY MR. KIRSCH)  Do you see the references there to

20    damages of a million dollar, Mr. Deering?

21    A.    I do.

22    Q.    Did you pay Mr. Brokaw any multiple of a million

23    dollars?

24    A.    I did not.

25          MR. KIRSCH:  Can we go back to page 1 of this
```

1    exhibit, please, and highlight or expand just the middle

2    of that page.

3    Q.    (BY MR. KIRSCH)  Do you see in the middle of the

4    screen now, Mr. Deering, the paragraph that begins

5    "notice"?

6    A.    Notice to agent?

7    Q.    No -- actually, you are right, that one does begin

8    with "notice."  I meant to ask you the one that says,

9    "Notice, this document is not intended to threaten,

10   harass, hinder or obstruct any lawful operations."

11   A.    Yes.

12   Q.    Did you interpret this document as threatening or

13   hindering you and/or Mr. Billingsley's lawful operations?

14   A.    Yes.

15            MR. KIRSCH:  May I have one moment, please, Your

16   Honor?

17            THE COURT:  You may.

18            MR. KIRSCH:  Thank you, Your Honor.  Those are my

19   questions of Mr. Deering.

20            THE COURT:  All right.  Thank you very much.

21            Do the defendants wish to cross-examine?

22            DEFENDANT BROKAW:  Yes.

23            THE COURT:  You may.

24                        **CROSS-EXAMINATION**

25   **BY DEFENDANT BROKAW:**

1    Q.    Good morning, Mr. Deering.

2    A.    Good morning.

3    Q.    It appears by the record that I had an appointment to

4    meet with Mr. Aubrey Billingsley that morning at your

5    offices of the IRS, and I was supposed to be there, and

6    there was a pretty severe thunderstorm that caused -- or

7    snowstorm that caused the offices to be closed or delayed

8    opening; is that correct?

9    A.    That's correct.

10   Q.    And I appeared there anyway; is that correct?

11   A.    That's correct.

12   Q.    And it looks like the documents that are listed on

13   the exhibits here are the documents that I submitted;

14   forms, letters, notices and so forth, to your offices and

15   to Mr. Billingsley and to others at the IRS, with no

16   attempt to conceal or hide anything, but simply stated on

17   the record.  Would you say that is correct?

18   A.    I guess I am not following.  Would you repeat?

19   Q.    The documents that I presented to you and

20   Mr. Billingsley, was it clear to you that I had an idea of

21   what I was presenting to you; that I was not trying to

22   hide anything from the IRS; that I was simply stating

23   things and putting notices and records on the record?

24   A.    Mr. Billingsley wasn't there.

25   Q.    He wasn't there that day.  But the documents that are

612

1    in the record.

2    A.   The documents --

3    Q.   That were sent to Mr. Billingsley and you?

4         MR. KIRSCH:  To the extent that the witness is

5    being asked to speculate about what Mr. Brokaw's mental

6    state was, I object.

7         THE COURT:  I will sustain that.

8         If you could, Mr. Brokaw, if you could break it

9    down and not be so compound; one fact at a time, I think

10   it would be easier.

11        DEFENDANT BROKAW:  Thank you.

12   Q.   (BY DEFENDANT BROKAW)  I don't have the document that

13   was on the screen first, when it listed the documents that

14   were sent in.  There was a handwritten note on there that

15   said included -- the documents included a certified copy

16   of a search from the records of the Federal District Court

17   here in this building.  Do you recall that on that

18   document?

19   A.   I do not.

20        MR. KIRSCH:  We can display that document.  Are you

21   referring to Exhibit 213, Mr. Brokaw?

22        DEFENDANT BROKAW:  I think that is what I am

23   referring to.

24        THE COURT:  The first page.  Yes, right there.

25   Q.   (BY DEFENDANT BROKAW)  Mr. Deering, do you see where

1    that is written in there by hand?

2    A.    I do.

3    Q.    And what does it say?  Could you read that back to me

4    please?

5    A.    Copy of Certified Search Federal District Court.

6    Q.    Mr. Deering, in that search, when I came up to the

7    Federal District Court and did that search, that was

8    because Mr. Pryor, the agent that was referenced earlier,

9    had filed notices of liens and notices of levy against me?

10          MR. KIRSCH:  Objection, lack of foundation as to

11    why Mr. Brokaw included that.

12          THE COURT:  Okay.  Mr. Brokaw, now you can ask him

13    questions about what he can know -- what he knew.  You

14    cannot testify through your questions.  And so why you did

15    what you did, you can testify if you get on the stand, but

16    you can't ask him that question to get that information

17    in.  So the objection is sustained.

18          DEFENDANT BROKAW:  Thank you.

19    Q.    (BY DEFENDANT BROKAW)  And in that document,

20    Mr. Deering, my certified search, I filed no records up

21    here in the Federal District Court of any cases pending

22    against me, any judgments by any judge against me at that

23    time, that is what that search document indicated?

24          THE COURT:  Now, Mr. Brokaw, again, I have to tell

25    you, you cannot just make statements.  You are here to ask

1    questions and get answers.  I will order that stricken.

2    Hold on.  I will order that stricken, and the jury is to

3    disregard it.

4            DEFENDANT BROKAW:  Thank you.

5    Q.   (BY DEFENDANT BROKAW)  But by your recollection, I

6    came to the office that day in the midst of the snowstorm,

7    voluntarily came down and brought documents with me that I

8    presented to you?

9    A.   Yes.

10           DEFENDANT BROKAW:  Thank you.  That will be all.

11           THE COURT:  Thank you, Mr. Brokaw.

12           Mr. Pawelski, Ms. Vigil, do you wish to make any

13    cross-examination?

14           DEFENDANT PAWELSKI:  I have no questions.

15                        **CROSS-EXAMINATION**

16    **BY DEFENDANT VIGIL:**

17    Q.   My only question is, when did we meet?

18    A.   I met with three people that morning.  All that

19    information -- I don't see a copy of that here, of my

20    statement.  But I listed three people that were there that

21    morning, because somebody acknowledged on that same day

22    the witness, the notary public.

23    Q.   Are you sure I was there?

24    A.   I had three people that were there.

25    Q.   Are you sure I was there?

```
 1    A.   I can't say that for sure.

 2         DEFENDANT VIGIL:  Thank you.

 3         THE COURT:  All right.  Thank you very much.  Any

 4    redirect?

 5         MR. KIRSCH:  I do have brief redirect, Your Honor.

 6         May I approach the clerk, please, Your Honor?

 7         THE COURT:  You may.

 8                     REDIRECT EXAMINATION

 9    BY MR. KIRSCH:

10    Q.   Mr. Deering, if you were able to look at a copy of

11    the statement that you prepared that day, would that

12    refresh your memory about the people that were there?

13    A.   Yes.

14    Q.   I have asked the clerk to hand you a copy of a

15    document.

16         MR. KIRSCH:  I don't have that marked, Your Honor,

17    I apologize.  We could mark that as Government Exhibit

18    402.

19         THE COURT:  Yes, we will, just for the record.

20    Q.   (BY MR. KIRSCH)  Let me know when you have been able

21    to look at that, Mr. Deering.

22    A.   I have seen it, yes.

23    Q.   Does that refresh your memory about who was present

24    at that meeting?

25    A.   It does.
```

1    Q.    Without looking at the document now, can you tell us

2    who was present at that meeting?  Without looking at the

3    document, sir, just from your memory now, who was present

4    at that meeting?

5    A.    Mimi -- lady by the name of Mimi.

6    Q.    What was the last name?

7    A.    Vigil.

8          MR. KIRSCH:  Thank you, sir.

9          I don't have any other questions, Your Honor.

10         THE COURT:  All right.  Thank you very much, sir,

11   you may step down.

12         Government may call its next witness.

13         MR. KIRSCH:  Thank you, Your Honor.  The Government

14   calls Michael Quinn.

15         COURTROOM DEPUTY:  Your attention, please.

16         Please raise your right hand.

17                         **MICHAEL QUINN**

18   having been first duly sworn, testified as follows:

19         COURTROOM DEPUTY:  Please be seated.

20         Please state your name, and spell your first and

21   last names for the record.

22         THE WITNESS:  Michael Brian Quinn.  M-I-C-H-A-E-L,

23   Quinn, Q-U-I-N-N.

24         THE COURT:  You may proceed.

25         MR. KIRSCH:  Thank you, Your Honor.

1                         **DIRECT EXAMINATION**

2    **BY MR. KIRSCH:**

3    Q.    Good morning, Mr. Quinn.

4    A.    Good morning.

5    Q.    Can you tell us where you live, sir?

6    A.    In Clarkston, Michigan.

7    Q.    And what do you do for a living there?

8    A.    I am a payroll tax manager for Chrysler.

9    Q.    How long have you worked in that sort of a position

10   for Chrysler?

11   A.    For 26 years.

12   Q.    In your time working with Chrysler, did you become

13   familiar with a company called TD Auto Finance?

14   A.    Yes, I did.

15   Q.    And was there some relationship between Chrysler and

16   TD Auto Finance?

17   A.    We had -- Chrysler Financial financed the automobiles

18   that Chrysler would -- that the Chrysler dealerships would

19   sell.  And TD Auto Finance eventually purchased the

20   financial arm of Chrysler.

21   Q.    Okay.  During your time working with payroll taxes

22   for Chrysler, did you become familiar with forms 1099 that

23   would be issued by Chrysler?

24   A.    Yes.  We were responsible for issuing all of

25   Chrysler's Form 1099.

618

```
 1    Q.   Does that include an entity called Chrysler

 2    Financial?

 3    A.   Yes, it does.

 4    Q.   I will put a document on the screen and ask you to

 5    look at it, Mr. Quinn.  It is Government Exhibit 16.  And

 6    I will direct your attention to page 10 of that exhibit.

 7         THE COURT:  Do you wish this published?

 8         MR. KIRSCH:  I do.  Thank you, Your Honor.

 9         THE COURT:  It may be published.

10    Q.   (BY MR. KIRSCH) Can you see that document on the

11    screen now, Mr. Quinn?

12    A.   Yes, I can.

13    Q.   Did you attempt to determine, before you came to

14    court today, whether or not this Form 1099 OID was issued

15    by Chrysler Financial?

16    A.   Yes, I did.

17    Q.   Was it issued by Chrysler Financial?

18    A.   No, it was not.

19    Q.   Did Chrysler Financial ever issue 1099 OID forms?

20    A.   Never, no.  To my knowledge, never issued 1099 OIDs.

21    Q.   Were you able to read what is listed as the payer's

22    federal identification number there in the box on the

23    left?

24    A.   Yes.

25    Q.   Is that an -- are you familiar with that EIN number
```

1   in the first place?

2   A.   Yes.   That was an old EIN used by Chrysler Financial,

3   and that was actually discontinued in 2005 in the -- this

4   is a 2006 OID.   And so that is an old tax ID number for

5   Chrysler Financial.

6   Q.   Okay.   In 2006, was the entity name Chrysler

7   Financial being used?

8   A.   No, it was not.

9   Q.   What name was being used at that time?

10   A.   It was called -- the name registered with the IRS and

11   the name we printed on the 1099 was Diamond Chrysler

12   Financial Service Americas, LLC.

13   Q.   How about the address that is listed on this form in

14   Westlake, Texas?   Is that an address that Chrysler

15   Financial would have used on a 1099 OID form?

16   A.   No.   The company headquarters in Michigan was used on

17   all 1099s.   And we printed a contact number, phone number

18   on the 1099, and then any undeliverables were delivered

19   back to the headquarters.   So it was all 1000 Chrysler

20   Drive in Michigan.

21   Q.   Do you recognize that address that is printed on this

22   form?

23   A.   I had to research it.   And I found out it was a

24   Chrysler Financial collections' office in Texas.

25   Q.   Okay.   When you reviewed the Chrysler records, were

1    you able to determine whether or not Chrysler Financial

2    withheld a little over $24,000 in federal income tax from

3    George T. Brokaw in 2006?

4    A.   I went into the 1099 system, and I could not find the

5    Brokaw name or Social Security number.  And I went back 15

6    years in records.  And so I had no record of this

7    transaction.

8    Q.   All right.  I am going to ask you now, Mr. Quinn, to

9    look, again, I think it will be in a folder there for you,

10   it is marked as Government's Exhibit 124.  Do you have

11   that in front of you?

12   A.   Yes.

13   Q.   Does that paperwork contain the TD Auto Finance

14   entity?  Does it refer to that entity?

15   A.   It refers to Diamond Chrysler Services.

16   Q.   Okay.  Diamond Chrysler Services.  Does it contain

17   Mr. Brokaw's name?

18   A.   Yes, it does.

19        MR. KIRSCH:  Your Honor, I am going to move to

20   admit Government Exhibit 124 and, in connection with that,

21   I would bring to the Court's attention Government Exhibit

22   124-D, as well, which is a records declaration from the

23   custodian of records of TD Auto Finance.

24        THE COURT:  All right.  Any objection from the

25   defendants?

1            DEFENDANT BROKAW:  I haven't seen the document.

2            THE COURT:  It was provided.

3            MR. KIRSCH:  There is a copy of it on the table

4    there, Your Honor.

5            For the record, we also provided the documents --

6    all of the exhibits at the beginning -- to the defendants

7    all of the exhibits at the beginning of the trial.

8            DEFENDANT BROKAW:  Can you refer to Exhibit 124?

9            MR. KIRSCH:  I am referring to that entire exhibit,

10   sir.  All of the pages contained within it.

11           THE COURT:  Any objection, Mr. Brokaw, to its

12   admission?

13           DEFENDANT BROKAW:  Question.  Was this an exhibit?

14           THE COURT:  Yes, as an exhibit.

15           DEFENDANT BROKAW:  No objection.

16           THE COURT:  Exhibit 124 may be admitted.

17           (Exhibit No. 124 is admitted.)

18           THE COURT:  And you may publish.

19           MR. KIRSCH:  Thank you, Your Honor.

20           May we publish page 4, please?  Can we expand the

21   top half of that.

22   Q.   (BY MR. KIRSCH)  Are you familiar with this kind of

23   document, Mr. Quinn?

24   A.   No.

25   Q.   Okay.  What is the caption of it there?

1    A.    Retail Installment Contract -- Direct.

2    Q.    Can you read the account number in the upper

3    right-hand corner of that?

4    A.    Yes.   1004555125.

5    Q.    And what is the address listed on this document

6    underneath that account number for Diamond Chrysler

7    Services North America, LLC?

8    A.    It is the West Lake, Texas, address that was listed

9    on that 1099 OID.

10          MR. KIRSCH:   Can I ask you to keep that, or perhaps

11   we can put that document on the left side of the screen,

12   and then get the OID back on the other side, Government

13   Exhibit 16, page 10.

14   Q.   (BY MR. KIRSCH)   How does the account number that is

15   listed on that retail installment account compare to the

16   account number that is listed on the OID form?

17   A.   Yes, it is the same.   They are the same numbers.

18          MR. KIRSCH:   And if we could go back just to

19   Government's Exhibit 124 briefly and expand the top half

20   again.

21   Q.   (BY MR. KIRSCH)   Does this document appear to relate

22   to an auto loan for a Jeep?

23   A.   Yes, it does.

24          MR. KIRSCH:   Those are all of my questions for

25   Mr. Quinn, Your Honor.   Thank you.

```
 1              THE COURT:  All right.  Thank you.

 2              Do any of the defendants wish to cross-examine?

 3              DEFENDANT BROKAW:  Yes, ma'am.

 4              THE COURT:  You may proceed.  Mr. Brokaw.

 5                          CROSS-EXAMINATION

 6   BY DEFENDANT BROKAW:

 7   Q.   Good morning, Mr. Quinn.

 8   A.   Good morning.

 9   Q.   What training do you have on completing or evaluating

10   forms 1099 OID?

11   A.   I am school trained, of course.  Education is Master

12   of Science in Taxation, and I am a certified payroll

13   professional.  And we go through all of the forms.  But

14   that is the schooling and the background.  And then

15   certainly on-the-job training.  We've produced these

16   forms, you know, for 15 to 20 years for Chrysler.

17   Q.   So you have produced these forms for Chrysler

18   previously?

19   A.   1099 Miscellaneous.  Never a 1099 OID, as was listed

20   on the form.  We never had any need for a 1099 OID.  But a

21   1099 Miscellaneous form we have.

22   Q.   So you are not familiar with a Form 1099 OID?

23   A.   I researched it, and it is the original issue

24   discount for a bond that is offered below face value.  And

25   I am not -- we have never produced those.
```

1    Q.    You've never produced those?

2    A.    Yes.

3    Q.    Okay.  Was Chrysler Financial or Chrysler Motors,

4    Diamond Chrysler, were they injured by receiving any of

5    these documents or by this process?

6          MR. KIRSCH:  Objection, relevance.

7          THE COURT:  Sustained.  It is not relevant whether

8    or not they were injured for these charges.

9    Q.    (BY DEFENDANT BROKAW)  Did they send these forms back

10   if they were incorrect?

11   A.    Which forms are those?

12   Q.    1099 OIDs?

13   A.    We never received -- that is the first I have seen

14   the 1099 OID with a Chrysler name on it.

15   Q.    That is the first one you have seen today, then.  So

16   this was not forwarded to Chrysler?

17   A.    No.  I saw it when it was forwarded.  They wanted to

18   know, did we generate it?  It was sometime earlier in the

19   year they said, did Chrysler generate that?  We went

20   through our research to our historical records, and then

21   the document, itself, to determine that it was not

22   produced by Chrysler.

23   Q.    Did they determine if it was incorrect or inaccurate

24   in your research?

25   A.    We were making a determination whether Chrysler had

1    produced that, since our former entity name and EIN was

2    listed on the document.  But it had not come out of

3    Chrysler's database.

4    Q.   But you did not determine if that document was

5    accurate or inaccurate?

6    A.   Well, accurate or inaccurate as far as an OID, we

7    were not researching it for an OID.  We were looking at it

8    for the documents that we produced, miscellaneous.  So we

9    did not research that, no.

10   Q.   So everything you researched is if it was produced by

11   Chrysler?

12   A.   Produced by Chrysler, yes, and any of the information

13   on there; the name, the social, the address.

14   Q.   So you did not determine the accuracy of that

15   document in your research?

16   A.   As far as being an OID, I know that I went to

17   Chrysler Financial through their records.  They have never

18   issued a bond that would require an OID.  They never issue

19   bonds.  So as far as it being an accurate document for

20   Chrysler Financial, they never had a need to produce OIDs.

21           DEFENDANT BROKAW:  Thank you.  No further

22   questions.

23           THE COURT:  Either of the other defendants wish to

24   cross-examine?

25           DEFENDANT VIGIL:  No.

1           DEFENDANT PAWELSKI:  No.

2           THE COURT:  Any redirect?

3           MR. KIRSCH:  I don't have any, Your Honor.  Thank

4    you.

5           THE COURT:  Thank you very much.  You may step

6    down.

7           Government may call its next witness.

8           MS. PALUCH:  Yes, Your Honor.  The United States

9    calls Stacy Ebert.

10          COURTROOM DEPUTY:  Good morning.  Please enter and

11   remain standing.

12          Your attention, please.

13          Please raise your right hand.

14                          **STACY EBERT**

15   having been first duly sworn, testified as follows:

16          COURTROOM DEPUTY:  Please be seated.

17          Pleas state your name, and spell your first and

18   last names for the record.

19          THE WITNESS:  Stacy Ebert.  S-T-A-C-Y, Ebert,

20   E-B-E-R-T.

21          MS. PALUCH:  May I proceed, Your Honor?

22          THE COURT:  I am sorry, you may.

23          MS. PALUCH:  Thank you.

24                      **DIRECT EXAMINATION**

25   **BY MS. PALUCH:**

1    Q.    Good morning, ma'am.

2    A.    Morning.

3    Q.    Where do you work?

4    A.    Key Bank National Association.

5    Q.    How long have you worked for Key Bank?

6    A.    22 years.

7    Q.    What is your position there currently?

8    A.    Currently, I am a corporate investigator.

9    Q.    Okay.  And in preparation for your testimony today,

10   were you asked to review certain documents?

11   A.    Yes, ma'am.

12        MS. PALUCH:  I would ask for permission, Your

13   Honor, to publish Government's Exhibit 12.

14        THE COURT:  You may.

15   Q.    (BY MS. PALUCH)  Ma'am, you will see the exhibit show

16   up on the screen in front of you.

17        MS. PALUCH:  And I am going to ask that page 11 of

18   that document be displayed.  And I would ask that the

19   second form be highlighted.

20   Q.    (BY MS. PALUCH)  Do you see that form, ma'am?

21   A.    Yes, ma'am.

22   Q.    Do you see Key Bank listed on that form?

23   A.    Yes, ma'am.

24   Q.    And who is the name of the recipient listed on this

25   form?

628

1    A.    George T. Brokaw.

2    Q.    And the amounts listed in Boxes 1 and 4, can you

3    state that for the record.

4    A.    $50,000.

5    Q.    Okay.  And at our request -- first of all, do you see

6    in Box 5 a description?

7    A.    Yes.

8    Q.    Do you see an account number there?

9    A.    Yes, ma'am.

10   Q.    At our request, did you research that account number?

11   A.    Yes, ma'am.

12   Q.    First of all, what type of account is that?

13   A.    That is a Key Bank transaction or checking account.

14   Q.    Checking account.  Did Key Bank issue this form?

15   A.    No.  My research shows that for this type of an

16   account, Key Bank would never issue this type of a form.

17   Q.    Could you describe for us the research that you did

18   to determine that.

19   A.    Well, in my job duties, I work with these types of

20   accounts all of the time.  And never having seen one of

21   these forms, I actually contacted and worked with someone

22   back in our tax area and went over the account with her

23   and went over the form with her.  And it was determined

24   that this form would never be issued on this type of an

25   account.

1  Q.   So your research indicated Key Bank would never issue

2  a 1099 OID on this type of an account?

3  A.   On this type of an account, yes, ma'am.

4  Q.   Did you research whether Key Bank ever issues forms

5  1099 OID?

6  A.   They do.

7  Q.   In what type of a situation?

8  A.   The type of situations, I can't speak to.  It is not

9  -- we don't issue them in the type of accounts that I deal

10  with.

11  Q.   Okay.  To your knowledge and from your research, did

12  you discover whether Key Bank withheld this $50,000 amount

13  from Mr. Brokaw and forwarded that amount to the IRS?

14  A.   No, ma'am.

15  Q.   Okay.  If we can move to Government's Exhibit 14.

16       MS. PALUCH:  Your Honor, I would ask for permission

17  to publish page 10 of that exhibit.

18       THE COURT:  You may.

19       MS. PALUCH:  If you could highlight the middle form

20  on that page.

21  Q.   (BY MS. PALUCH)  Ma'am, do you see Key Bank

22  referenced on this form?

23  A.   Yes, ma'am.

24  Q.   What is the title of this form?

25  A.   It is a 1099 OID.

1    Q.   For what tax year?

2    A.   2005.

3    Q.   And who is listed as the recipient?

4    A.   George T. Brokaw.

5    Q.   And is that the same account number that we just saw

6    on the previous form?

7    A.   Yes.

8    Q.   Okay.  And what amount is listed here that is

9    claimed?

10   A.   $20,000.

11   Q.   I am sorry, I spoke over you.  What was the amount?

12   A.   $20,000.

13   Q.   Okay.  Did you research this form?

14   A.   Yes, ma'am.

15   Q.   Did Key Bank issue this form?

16   A.   No, ma'am.

17   Q.   Did Key Bank withhold $20,000 from Mr. Brokaw for the

18   year 2005?

19   A.   No, ma'am.

20        MS. PALUCH:  If we could please look at

21   Government's Exhibit 16, which has already been admitted.

22   And I would ask for permission to publish?

23        THE COURT:  You may.

24        MS. PALUCH:  Let's see which page.  I believe page

25   12 of that document.  And if we could highlight the first

1    form on that page.

2    Q.   (BY MS. PALUCH)  Same questions for you, ma'am.  Do

3    you see Key Bank referenced on this form?

4    A.   Yes, ma'am.

5    Q.   And the recipient's name?

6    A.   George T. Brokaw.

7    Q.   Same account we have been discussing?

8    A.   Yes, ma'am.

9    Q.   Did you research this form?

10   A.   Yes, ma'am.

11   Q.   Did Key Bank issue this form?

12   A.   No, ma'am.

13   Q.   Did Key Bank withhold the amount that is reflected

14   here on this form from Mr. Brokaw?

15   A.   No, ma'am.

16   Q.   I would like to direct your attention now to

17   Government's Exhibit 113.

18       MS. PALUCH:  This has not been admitted.

19   Q.   (BY MS. PALUCH)  I would just ask, do you have 113 in

20   front of you in a folder?

21   A.   Okay.

22   Q.   Can you generally describe what that -- what those

23   documents are?

24   A.   The first document is a computer screen print.

25   Q.   I am sorry to interrupt you, ma'am, just generally

```
 1    what does this packet of documents pertain to?

 2    A.   The packet of documents pertains to the same account

 3    that we have been discussing on the 1099 OIDs, which is --

 4    Q.   I am sorry, go ahead.

 5    A.   It is okay.  It is a transaction checking account

 6    with Key Bank.

 7    Q.   You indicated it is the same account on the previous

 8    three OIDs we looked at?

 9    A.   Yes, ma'am.

10    Q.   In whose name are these documents?

11    A.   George T. Brokaw and Debra S. Brokaw.

12         MS. PALUCH:  At this time, Your Honor, I move

13    admission of and publication of Government's Exhibit 113.

14         THE COURT:  Any objection?

15         DEFENDANT BROKAW:  No objections.

16         THE COURT:  Okay.  Exhibit 113 is admitted, and it

17    may be published.

18         (Exhibit No. 113 is admitted.)

19    Q.   (BY MS. PALUCH)  Are you considered the custodian of

20    records for Key Bank for these type of credit account

21    statements?

22    A.   Yes, ma'am.

23    Q.   Were these documents kept in the course of

24    regularly-conducted business activity of Key Bank?

25    A.   Yes, ma'am.
```

```
 1    Q.   Was the making of these records a regular practice of

 2    that activity?

 3    A.   Yes, ma'am.

 4    Q.   Did Key Bank rely on the accuracy of these records in

 5    the course of its business?

 6    A.   Yes, ma'am.

 7         MS. PALUCH:  If we could look at the first page of

 8    this document, and highlight that.

 9    Q.   (BY MS. PALUCH)  Could you state the date the account

10    was opened?

11    A.   The account was opened September 7, 2004.

12    Q.   And do you know if this account remains open?

13    A.   Yes.

14    Q.   Okay.  I would like to direct your attention to

15    Government's Exhibit 61, please.

16         MS. PALUCH:  And ask for permission, Your Honor --

17    actually, I will skip that part.

18         If I could have one moment, Your Honor.

19         THE COURT:  You may.

20    Q.   (BY MS. PALUCH)  Ma'am, let's look back at Exhibit

21    113, if we could.  If you could page through that exhibit.

22    And I will direct your attention, for example, to -- let's

23    look at page 7 of that exhibit.

24    A.   Okay.

25    Q.   And what does this indicate, or what is this page?
```

1    A.   It's a monthly statement for the Key Bank account

2    issued on September 6, 2006.

3    Q.   Okay.  And it states -- what does it state at the

4    top, as far as the type of account here?

5    A.   Key free interest checking.

6    Q.   So this is a checking account?

7    A.   Yes, ma'am.

8    Q.   Do you see the reference in "Interest Paid Year to

9    Date"?

10   A.   Yes, ma'am.

11   Q.   And that was as of September of 2008.  What was the

12   amount of interest paid?

13   A.   $.04.

14   Q.   Okay.

15        MS. PALUCH:  No further questions of this witness,

16   Your Honor.

17        THE COURT:  All right.  Any cross-examination from

18   the defendants?

19        DEFENDANT BROKAW:  Yes, Your Honor.

20        THE COURT:  All right.  You may proceed,

21   Mr. Brokaw.

22                    **CROSS-EXAMINATION**

23   **BY DEFENDANT BROKAW:**

24   Q.   Good morning, Ms. Ebert.  So you are a corporate

25   investigator, you testified to, for Key Bank?

```
 1    A.   Yes, sir.

 2    Q.   Thank you.  And you also testified that Key Bank did

 3    not issue those 1099 OIDs?

 4    A.   Yes, sir.

 5    Q.   That's correct.  You also indicated that you had

 6    never seen those kind of documents for those kind of

 7    accounts; is that correct?

 8    A.   Yes, sir.

 9    Q.   And are you trained and an expert in the various

10    income tax forms?

11    A.   No, sir.  I do not deal with these forms.

12         DEFENDANT BROKAW:  Thank you very much.  No further

13    questions.

14         THE COURT:  Any redirect?

15         MS. PALUCH:  No, Your Honor.  Thank you very much,

16    Ms. Ebert, you are excused.

17         THE WITNESS:  Thank you.

18         THE COURT:  Government may call its next witness.

19         MR. KIRSCH:  Thank you, Your Honor.  The Government

20    calls Linda Chavez.

21         COURTROOM DEPUTY:  Please enter and remain

22    standing.

23         Your attention, please.

24         Please raise your right hand.

25                        LINDA CHAVEZ
```

```
1    having been first duly sworn, testified as follows:

2            COURTROOM DEPUTY:  Please be seated.

3            Please state your name, and spell your first and

4    last names for the record.

5            THE WITNESS:  Linda Chavez.  L-I-N-D-A.  Last name

6    is Chavez, C-H-A-V-E-Z.

7            THE COURT:  You may proceed.

8            MR. KIRSCH:  Thank you, Your Honor.

9                        DIRECT EXAMINATION

10   BY MR. KIRSCH:

11   Q.   Good morning, Ms. Chavez.  Will you please tell us

12   where you are from.

13   A.   San Antonio, Texas.  Security Service Federal Credit

14   Union.

15   Q.   That is where you work?

16   A.   Yes, sir.

17   Q.   What is your position there?

18   A.   Assistant manager of the accounts services

19   department.

20   Q.   How long have you worked in that department?

21   A.   I've worked there for 22 years.

22   Q.   And what is your position there?

23   A.   Assistant manager in the account services department.

24   Q.   What are your duties as the assistant manager in that

25   department?
```

1    A.   We do a variety of different duties, some of them

2    being loan adjustments.  We handle IRA transactions.  And

3    I also have a team that handles tax form corrections.

4    Q.   Okay.  So are you familiar with the tax forms that

5    Security Service Federal Credit Union issues?

6    A.   Yes, I am.

7    Q.   Are you also familiar with other types of records

8    that Security Service Federal Credit Union maintains?

9    A.   Yes, I am.

10   Q.   I am going to ask you to look at what is marked as

11   Government's Exhibit 116.  I think it will be in the

12   folder there in front of you.  Do you have it?

13   A.   Yes, I do.

14   Q.   Were you asked to review those records before you

15   came to court today?

16   A.   Yes, I was.

17   Q.   Generally, what are those?  Can you explain what

18   those records are?

19   A.   Yes.  In the folder there is a Member Agreement Form,

20   and that form is a document that we have our members sign

21   to establish ownership of an account.

22   Q.   Do the remainder of the documents in that folder

23   pertain to that same account or related accounts?

24   A.   Yes, it does.  There is a Statement, Bank Statement

25   that shows the account.

```
1    Q.    Okay.  And is the name on that account George Brokaw?

2    A.    Yes, it is.

3    Q.    Were those records made in the ordinary course of

4    your credit union's business activity?

5    A.    Yes, it is.

6    Q.    Were they made at or near the time of the

7    transactions that are reflected in the records?

8    A.    Yes, it is.

9    Q.    Okay.  Does Security Service Federal Credit Union

10   keep those records in the ordinary course of its business?

11   A.    Yes, we do.

12   Q.    And do you rely on the accuracy of them when you

13   conduct your business?

14   A.    Yes.

15         MR. KIRSCH:  Your Honor, I move to admit

16   Government's Exhibit 116.

17         THE COURT:  Any objection?

18         DEFENDANT BROKAW:  No.

19         DEFENDANT PAWELSKI:  I don't either.

20         THE COURT:  Exhibit 116 is admitted.

21         (Exhibit No. 116 is admitted.)

22         MR. KIRSCH:  Thank you, Your Honor.  May we publish

23   this?

24         THE COURT:  You may.

25         MR. KIRSCH:  We will put these up on the screen for
```

1    you now, Ms. Chavez.  We will start with page 1.  If we

2    can get from the top down to the signatures, please.

3    Q.   (BY MR. KIRSCH)  Can you please explain, again, what

4    this form is, Ms. Chavez?

5    A.   Yes.  This is a form that we used to establish an

6    account with our credit union, a Member Agreement Form.

7    Q.   Okay.  And so the information that is in the box at

8    the top of the page, who does that pertain to?

9    A.   That is the primary owner of the account.  It shows

10   George Brokaw.

11   Q.   And is the -- is there an account number -- is that

12   on the screen somewhere now?

13   A.   Yes, it is, on the top right corner.

14        MR. KIRSCH:  Can we try to expand that top right

15   corner so we can make that a little bit bigger.

16   Q.   (BY MR. KIRSCH)  Is it on the screen now, where I

17   just put a checkmark?

18   A.   Yes it is.

19   Q.   What is that number?

20   A.   That is the member account number.

21   Q.   Okay.  Can you just read that number for us.

22   A.   Yes.  4624918000.

23   Q.   Thank you.  And this is for -- this account, again,

24   is in what name?

25   A.   The name of George Brokaw.

1          MR. KIRSCH:  All right.  Can we display page 2 of

2     that exhibit now, please.  And just highlight to the text

3     there.

4     Q.   (BY MR. KIRSCH)  Can you explain what this page is.

5     A.   Yes.  This is a bank statement that we issue for

6     balance information to our members.

7     Q.   And does the information on the screen here indicate

8     what kind of account this is?

9     A.   Yes.  It shows it is a savings plus account.

10    Q.   Is that the information where I just put a checkmark?

11    A.   Yes, it is.

12         MR. KIRSCH:  Okay.  Now can we please publish page

13    5 of this exhibit.  And expand the text again there, if

14    you could.

15    Q.   (BY MR. KIRSCH)  What is this document, Ms. Chavez?

16    A.   It is also a statement that we issued to our

17    membership showing the type of account and balances.

18    Q.   How many accounts are reflected on this statement?

19    A.   This statement has two accounts.

20    Q.   And what are those two accounts?

21    A.   The one is the savings plus account.  And the next

22    one is an installment loan.

23         MR. KIRSCH:  Can we expand just this section where

24    it says "Installment Loans."  If we can make that a little

25    bit bigger.

1    Q.   (BY MR. KIRSCH)  Is that installment loan portion on

2    the screen now, Ms. Chavez?

3    A.   Yes, it is.

4    Q.   Is there a different account number that is

5    associated with the installment loan?

6    A.   Yes.  It is slightly different.

7    Q.   What is that number?

8    A.   That number is 4624918020.

9    Q.   And based on your review of the records contained in

10   this Exhibit 116, do the remainder of the documents in

11   there pertain to these two accounts?

12   A.   Yes, they do.

13        MR. KIRSCH:  Okay.  Now I will ask to publish

14   previously-admitted Government Exhibit 16, page 10.  Can

15   we focus on the form in the middle of that page, please.

16   Q.   (BY MR. KIRSCH)  Can you see that document on the

17   screen now, Ms. Chavez?

18   A.   Yes.

19   Q.   Did you have an opportunity to review this document

20   before you came to court today, as well?

21   A.   Yes.

22   Q.   And, first of all, I will direct your attention to

23   Box 5.  Do you see the account number listed there?

24   A.   Yes, I do.

25   Q.   How does that account number compare to the account

1    number for the installment loan in the document we were

2    just looking at?

3    A.    That is the loan number.

4    Q.    This form that is on the screen now, was this form

5    created by Security Service Federal Credit Union?

6    A.    No, it was not.

7    Q.    How do you know that?

8    A.    Well, we do not issue Form 1099 OID forms at our

9    financial institution.

10   Q.    Okay.  When your institution issues tax forms, is

11   that how it spells the word "Security"?

12   A.    No.  That is not the spelling of our credit union's

13   name.

14   Q.    What about the address that is reflected there in

15   Pueblo, Colorado.  Would that address appear on a tax form

16   issued by Security Service Federal Credit Union?

17   A.    No.  That is one of our branch offices.  We would

18   normally -- we would issue a form with our corporate

19   address.

20   Q.    Where is that?

21   A.    Our corporate is in San Antonio, Texas.

22   Q.    Where you work?

23   A.    Yes.

24   Q.    Okay.  Did you go back and review Security Service's

25   tax records for 2006 before you testified today?

1    A.   I have reviewed them in the past, just not recently.

2    Q.   Okay.  Did you determine whether or not Security

3    Service Federal Credit Union withheld $29,928 from

4    Mr. Brokaw in 2006?

5    A.   I am sorry, what was the question again?

6    Q.   Yes.  Did Security Service Federal Credit Union

7    withhold over $29,000 from Mr. Brokaw in 2006?

8    A.   No.

9    Q.   Did you -- would you have paid that amount over to

10   the IRS?

11   A.   No.

12        MR. KIRSCH:  Those are all of my questions for

13   Ms. Chavez, Your Honor.  Thank you.

14        THE COURT:  All right.  Thank you.

15        Any cross-examination?

16        DEFENDANT BROKAW:  No.

17        THE COURT:  All right.  Thank you very much,

18   Ms. Chavez, you may step down.

19        The Government may call its next witness.

20        MS. PALUCH:  The United States calls Lynette

21   Cornelius.

22        COURTROOM DEPUTY:  Good morning.  Please enter and

23   remain standing.

24        Your attention, please.

25        Please raise your right hand.

1                        **LYNETTE CORNELIUS**

2     having been first duly sworn, testified as follows:

3              COURTROOM DEPUTY:  Please be seated.

4              Please state your name, and spell your first and

5     last names for the record.

6              THE WITNESS:  My name is Lynette Cornelius.  First

7     name is L-Y-N-E-T-T-E.  Last name is C-O-R-N-E-L-I-U-S.

8              THE COURT:  You may proceed.

9              MS. PALUCH:  Thank you, Your Honor.

10                       **DIRECT EXAMINATION**

11    **BY MS. PALUCH:**

12    Q.    Good morning, ma'am.  Where do you work?

13    A.    Work at the El Paso Combined Courts in Colorado

14    Springs, Colorado.

15    Q.    What is your position?

16    A.    Clerk of Courts.

17    Q.    How long have you been the Clerk of Courts?

18    A.    For 4 years.

19    Q.    How long total have you worked with the court system?

20    A.    This will be my 19th year.

21             THE COURT:  Can we slow down just a little bit.

22             MS. PALUCH:  My apologies.

23             THE WITNESS:  Am I talking too fast, because I do

24    that?

25             MS. PALUCH:  I am a fast talker, too, so I will try

1   to slow it down.

2   Q.   (BY MS. PALUCH)   In preparation for today's

3   testimony, were you asked to review certain documents?

4   A.   Yes.

5        MS. PALUCH:   If we could please publish, Your

6   Honor, page 15 of previously-admitted Government's Exhibit

7   35.

8        THE COURT:   You may.

9   Q.   (BY MS. PALUCH)   Ma'am, this exhibit will show up on

10  the screen in front of you.

11  A.   Yes.

12       DEFENDANT PAWELSKI:   I object to this document

13  being shown in a public venue.   It has private information

14  on it.

15       THE COURT:   It is part of this court proceeding.   I

16  note your objection, and that will be something when we

17  submit the exhibits, we will make sure they are not

18  publicly displayed.   But for the time being, we will

19  proceed.

20  Q.   (BY MS. PALUCH)   I would like to highlight the first

21  form on this page.   Do you see El Paso County Court listed

22  on this page?

23  A.   Yes, I do.

24  Q.   And can you state the amount that is listed in Boxes

25  1 and 4?

```
 1    A.   1 and 4, looks like, counting the zeros here.  $3
 2    million.
 3    Q.   Okay.  And at our request -- first of all, what do
 4    you see in the description?
 5    A.   Court Case Account 05C15015.
 6    Q.   Who is listed as recipient on this form?
 7    A.   John Pawelski.
 8    Q.   And did you have occasion, at our request, ma'am, to
 9    research this form?
10    A.   Yes.
11    Q.   And how did you go about researching this form?
12    A.   Looking into our court files to see if this page was
13    there.  And it is not a form we actually issue.
14    Q.   Do you know if El Paso County Court issues 1099 OID
15    forms?
16    A.   No, we do not.
17    Q.   Did you research, in fact, the court case number that
18    is listed on this form?
19    A.   Yes.
20    Q.   And what, if anything, did you find?
21    A.   That it is a county court civil case that was filed
22    in court.
23    Q.   Is it a case involving Mr. Pawelski?
24    A.   Yes.
25    Q.   And what is the status of that case?
```

```
 1    A.    It is closed.

 2    Q.    Okay.

 3    A.    As I recall.

 4    Q.    Was there a judgment associated with that case?

 5    A.    Yes.

 6    Q.    And do you know the amount of that judgment?

 7    A.    Actually, I can't remember what the amount was.

 8    Q.    Okay.  Fair enough.  Did El Paso County Court

 9    withhold $3 million from Mr. Pawelski and forward that

10    amount on to the IRS?

11    A.    No, we did not.

12    Q.    I would like to turn your attention to

13    previously-admitted Government's Exhibit 38, and we'll

14    look at page 10 of that exhibit.  Do you have that in

15    front of you, ma'am?

16    A.    Yes.

17    Q.    Do you see El Paso County Court reflected on this

18    form?

19    A.    Yes.

20    Q.    And for what tax year is this indicating?

21    A.    2006.

22    Q.    And the name of the recipient on this form?

23    A.    John J. Pawelski.

24    Q.    And do you see a court case listed there?

25    A.    Yes.  06M8047.
```

1   Q.   And does that appear to be a different court case

2   than what we looked at on the other form?

3   A.   That's correct.

4   Q.   Did you have a chance to research that court case?

5   A.   Yes.  That is a misdemeanor case in El Paso County.

6   Q.   Did that misdemeanor case involve Mr. Pawelski?

7   A.   Yes, it did.

8   Q.   Okay.  Did El Paso create this form -- issue this

9   form?

10  A.   No, it did not.

11  Q.   Did you withhold $3 million from Mr. Pawelski on this

12  form?

13  A.   No, we did not.

14  Q.   If you could turn your attention now to Government's

15  Exhibit 34.

16       MS. PALUCH:  And permission to publish the second

17  page of that exhibit.

18       THE COURT:  You may.

19       MS. PALUCH:  And if we could highlight the top

20  portion of that form.

21  Q.   (BY MS. PALUCH)  Do you see El Paso County Court

22  reflected on this form?

23  A.   Yes.

24  Q.   In your position as Clerk of Courts, do you have

25  experience with certain tax forms being submitted to the

649

```
1    IRS?

2    A.   Yes.

3    Q.   Does El Paso County Court ever submit anything to the

4    IRS in handwriting?

5    A.   No, we do not.

6    Q.   To your knowledge, did El Paso County Court submit

7    this document?

8    A.   No, we did not.

9    Q.   Turn your attention to page 4 of this document.

10        MS. PALUCH:  And if we could highlight the top

11   portion of that form.

12   Q.   (BY MS. PALUCH)  And same questions for you, ma'am.

13   Did El Paso County Court issue this form?

14   A.   No, we did not.

15        MS. PALUCH:  If I may have a moment, Your Honor?

16        THE COURT:  You may.

17        MS. PALUCH:  No further questions.

18        THE COURT:  All right.  Any cross-examination?

19        DEFENDANT PAWELSKI:  I have a question, yeah.

20        THE COURT:  Could you please go to the podium.

21        DEFENDANT PAWELSKI:  Sure.

22                     CROSS-EXAMINATION

23   BY DEFENDANT PAWELSKI:

24   Q.   Is it Cornelius?

25   A.   Cornelius.
```

```
1    Q.   Sorry.  Is it possible the amounts on those forms are

2    correct?

3    A.   No.

4    Q.   No?  Why not?

5    A.   Because we usually don't issue that form.  And as I

6    looked at the judgment on the screen, I know that it

7    wasn't $3 million that was awarded.

8    Q.   But you don't know what the amount was?

9    A.   I know that it was -- as I recall, I think it was

10   like in the thousands of dollars, not millions of dollars.

11   Q.   Do you have first-hand knowledge of what happened

12   with that form?

13   A.   No, I do not.

14   Q.   You do not.  Do you have training in IRS forms?

15   A.   No, I do not.

16   Q.   Okay.

17        DEFENDANT PAWELSKI:  Thank you very much.

18        THE COURT:  Any redirect?

19        MS. PALUCH:  Just briefly, Your Honor.

20                   REDIRECT EXAMINATION

21   BY MS. PALUCH:

22   Q.   The amount of money that you were asked about

23   pertaining to that judgment, is that money that El Paso

24   County Court owed to Mr. Pawelski?

25   A.   No.
```

```
1    Q.   What did that amount -- you said it was probably in
2    the thousands, I think you said, or a thousand.  What did
3    that amount reflect?
4    A.   That amount is for a judgment that was issued against
5    Mr. Pawelski by the plaintiff.  The plaintiff won a
6    judgment in that case.  So that amount would have been for
7    the -- in favor of the judgment for the plaintiff, not the
8    defendant.  So we would not have issued a $3 million
9    judgment on that case.  We actually did not issue a
10   judgment on that case.
11   Q.   That judgment would reflect money that Mr. Pawelski
12   owed?
13   A.   That is correct.
14        MS. PALUCH:  Thank you, ma'am.
15        THE COURT:  All right.  Thank you very much,
16   Ms. Cornelius, you may step down.
17        THE WITNESS:  Thank you.
18        THE COURT:  Government may call its next witness.
19        MS. PALUCH:  Yes, Your Honor.  The Government calls
20   Dulce Marroquin.
21        COURTROOM DEPUTY:  Please enter and remain
22   standing.
23        Your attention, please.
24        Please raise your right hand.
25                         DULCE MARROQUIN
```

1    having been first duly sworn, testified as follows:

2             COURTROOM DEPUTY:  Please be seated.

3             Please state your name, and spell your first and

4    last names for the record.

5             THE WITNESS:  Dulce Marroquin.  D-U-L-C-E

6    M-A-R-R-O-Q-U-I-N.

7             THE COURT:  You may proceed.

8             MS. PALUCH:  Thank you, Your Honor.

9                      **DIRECT EXAMINATION**

10   **BY MS. PALUCH:**

11   Q.   Good morning, ma'am.

12   A.   Morning.

13   Q.   Where do you work?

14   A.   Bank of America.

15   Q.   Where is your office located?

16   A.   Los Angeles, California.

17   Q.   How long have you worked for Bank of America?

18   A.   20 years.

19   Q.   What is your position there currently?

20   A.   Custodian of records.

21   Q.   In preparation for your testimony today, were you

22   asked to review certain documents?

23   A.   Yes.

24   Q.   I would like to refer you --

25             MS. PALUCH:  Ask permission to publish page 10 of

1   previously-admitted Government's Exhibit 16.

2        THE COURT:  You may.

3   Q.  (BY MS. PALUCH)  Ma'am, that exhibit will show up on

4   the screen in front of you.

5        MS. PALUCH:  I would like to highlight, if we

6   could, the last form on that page.

7   Q.  (BY MS. PALUCH)  Do you see that form, ma'am?

8   A.  Yes.

9   Q.  Do you see Bank of America referenced there?

10  A.  Yes.

11  Q.  Can you read the name of the recipient on that form?

12  A.  Yes.  George T. Brokaw.

13  Q.  And at our request, did you research this form?

14  A.  Yes.

15  Q.  Were you able to determine whether Bank of America

16  created this form?

17  A.  Yes.

18  Q.  And how did you go about doing that research?

19  A.  We did our research from our tax department and

20  credit card department in our main database and determined

21  that we did not create this document.

22  Q.  Can you look at the description in Box 5.  Do you see

23  a credit card revolving account number listed there?

24  A.  Yes.

25  Q.  Did you research that account number?

```
 1   A.    Yes.

 2   Q.    And what did you find?

 3   A.    This is an existing credit card account.

 4   Q.    In whose name?

 5   A.    In the name of George T. Brokaw.

 6   Q.    Okay.  Do you know if Bank of America has ever issued

 7   a 1099 OID on a credit card account?

 8   A.    No.

 9         THE COURT:  Wait, hold on.  Was that no, you don't

10   know or, no, they haven't?

11         THE WITNESS:  No, they have not.

12         THE COURT:  All right.

13         MS. PALUCH:  Thanks for the clarification, Your

14   Honor.

15   Q.    (BY MS. PALUCH)  Did Bank of America withhold this

16   $8,000 sum for Mr. Brokaw for the year 2006?

17   A.    No, they did not.

18   Q.    I would like to direct your attention to an exhibit

19   that should be before you there in a folder, Exhibit 117.

20   Can you generally state what that exhibit is?

21   A.    These are bank statements for an account ending in

22   1249 on a credit card account.

23   Q.    And is that the same credit card account we just

24   discussed, the same account number?

25   A.    Yes.
```

1    Q.    And is that -- whose name is that account?

2    A.    This is under the name of George T. Brokaw.

3    Q.    And are you considered a custodian of record for

4    those documents in front of you?

5    A.    Yes.

6    Q.    And were those documents kept in the course of

7    business activity for Bank of America?

8    A.    Yes.

9    Q.    Was the making of those records a regular practice of

10   Bank of America?

11   A.    Yes.

12   Q.    And did Bank of America rely on the accuracy of those

13   records in the course of its business?

14   A.    Yes.

15        MS. PALUCH:  Your Honor, at this time I move for

16   the admission and publication of Government's Exhibit 117.

17        THE COURT:  Any objection?

18        DEFENDANT BROKAW:  I object, Your Honor.  This is

19   just all personal financial information.

20        THE COURT:  Overruled.  Exhibit 117 is admitted.

21        (Exhibit No. 117 is admitted.)

22   Q.    (BY MS. PALUCH)  For what period of time are these

23   statements?  Maybe it would be easier if I direct your

24   attention to the first page.  Do you see -- can you state

25   what this first page of Exhibit 117 is?

1    A.   This is the bank statement for the credit card.  I do

2    have my notes in regard to the production.

3    Q.   But for now I will just ask you if you could look,

4    instead of at your notes, look at this first page.  Do you

5    see where it reflects payment due date?

6    A.   Yes.

7    Q.   What was the amount due on this account as of

8    November of 2006?

9    A.   $272.48.

10   Q.   Does that reflect the minimum payment due, ma'am?

11   A.   Yes.

12   Q.   What is the balance?

13   A.   The total balance is --

14        MS. PALUCH:  Can you highlight that portion where

15   it says "new balance."  It is at the about the top of page

16   1.

17   A.   $7,424.10.

18   Q.   And the 1099 OID we just looked at had an $8,000

19   number; correct?  Do you recall that?

20   A.   Yes.

21   Q.   Let's move to Government Exhibit 38, if we could.

22        MS. PALUCH:  And I would ask for permission to

23   publish page 5 of that exhibit.

24        THE COURT:  You may.

25        MS. PALUCH:  And if we could highlight that last

1    form on that page.

2    Q.   (BY MS. PALUCH)  Ma'am, do you see Bank of America on

3    that page?

4    A.   Yes.

5    Q.   And the tax year, again, 2006?

6    A.   Yes.

7    Q.   Okay.  And the amount listed there in both of those

8    Boxes 1 and 4?

9    A.   $6,000.00.

10   Q.   Is that the same account number we have been

11   discussing in Box 5?

12   A.   This is a different account number.

13   Q.   And how is it different?

14   A.   This account is ending on 1955.

15   Q.   And the previous account we looked at?

16   A.   1249.

17   Q.   Okay.  Did you find an account relating to this

18   account number?

19   A.   Yes.

20   Q.   Okay.  And what did you -- what type of an account

21   was that?

22   A.   This is a credit card account.

23   Q.   And in whose name?

24   A.   In the name of John J. Pawelski.

25   Q.   Did you research whether or not Bank of America

```
 1    created this form?

 2    A.    Yes, we did.

 3    Q.    And what did you determine?

 4    A.    That Bank of America did not create this form.

 5    Q.    Okay.  Did Bank of America withhold $6,000 from

 6    Mr. Pawelski and forward that money on to the IRS?

 7    A.    No.

 8    Q.    I direct your attention to Government's Exhibit 118,

 9    which should be in a folder before you, ma'am.  And you

10    have that in front of you?

11    A.    Yes.

12    Q.    If you could state generally what this exhibit is.

13    A.    These are bank statements for the credit card

14    account --

15    Q.    Go ahead.

16    A.    -- ending in 1955.

17    Q.    And is that the credit card account we just discussed

18    with respect to the previous exhibit?

19    A.    Yes.

20    Q.    And in whose name is this credit card?

21    A.    John J. Pawelski.

22    Q.    And, again, are you the custodian of record of Bank

23    of America for these types of records?

24    A.    Yes.

25    Q.    And were these records kept in the regular course of
```

1    business of Bank of America?

2    A.   Yes.

3    Q.   And the making of these records was a regular

4    practice of that activity?

5    A.   Yes.

6    Q.   And did Bank of America rely on the accuracy of these

7    records in the course of its business?

8    A.   Yes.

9         MS. PALUCH:  I would move to admit at this time and

10    publish Government's Exhibit 118.

11         THE COURT:  Any objection?

12         DEFENDANT PAWELSKI:  I object, privacy.

13         THE COURT:  All right.  Exhibit 118 is -- that

14    objection is overruled.  Exhibit 118 is admitted.  You may

15    publish.

16         (Exhibit No. 118 is admitted.)

17         MS. PALUCH:  Thank you, Your Honor.

18         If you could please publish page 5.

19    Q.   (BY MS. PALUCH)  Could you just state generally,

20    ma'am, what page 5 reflects?

21    A.   This is a bank statement for a credit card ending in

22    1955.

23    Q.   Okay.  And if you look down at the bottom where it

24    has "New Balance" and "Due Date," can you state the

25    balance of this account as of February 4 of 2008?

1   A.   $5,175.96.

2           MS. PALUCH:  One moment, Your Honor.

3           THE COURT:  You may.

4           MS. PALUCH:  No further questions.

5           THE COURT:  Any cross-examination?

6           DEFENDANT PAWELSKI:  I have a question.

7                        **CROSS-EXAMINATION**

8   **BY DEFENDANT PAWELSKI:**

9   Q.   Hello.  How are you doing?

10  A.   I am doing well.

11  Q.   Good.  Did Bank of America issue any credit or funds

12  back to John J. Pawelski?

13  A.   I do not know.

14  Q.   You do not know?

15  A.   No.

16  Q.   Are you personally involved with the receipt of that

17  document?

18          THE COURT:  Which document are we referring to?

19          DEFENDANT PAWELSKI:  The 1099 document.

20          THE WITNESS:  I don't understand your question.

21  Q.   (BY DEFENDANT PAWELSKI)  Did you receive the document

22  from John J. Pawelski?

23  A.   No, I did not.

24  Q.   What was the process that Bank of America did, if you

25  know, with that document once it was received?

1    A.   When we were asked to review the document, they

2    researched our database to cross reference whether Bank of

3    America had produced that document, and it didn't.

4    Q.   I am talking about back in 2006 or 2007, whenever it

5    was received.

6    A.   I am not aware what happened at that time, no.

7    Q.   Okay.  So there was no funds issued.  This document

8    was stored away, maybe put in someone's desk.  We have no

9    idea what happened, why it ends up here?

10   A.   No, I do not.

11           DEFENDANT PAWELSKI:  Okay.  Thank you very much.

12           THE COURT:  Any redirect?

13           MS. PALUCH:  Briefly, Your Honor.

14                     **REDIRECT EXAMINATION**

15   **BY MS. PALUCH:**

16   Q.   Mr. Pawelski asked about the document being received.

17   To your knowledge, did Bank of America receive this

18   document back in 2006?

19   A.   No, it did not.

20   Q.   Is the first -- when is the first time you saw this

21   document?

22   A.   When we received the trial subpoena.

23   Q.   And you received this from the Government; is that

24   correct?

25   A.   Correct.

1          MS. PALUCH:  Thank you.  No further questions, Your

2    Honor.

3          DEFENDANT BROKAW:  Your Honor, I have a question

4    for the witness.

5          THE COURT:  You are supposed to do that before

6    redirect.  You may.

7                         **CROSS-EXAMINATION**

8    **BY DEFENDANT BROKAW:**

9    Q.   Just one question.  Good morning.

10   A.   Good morning.

11   Q.   I would like to refer you back to Document No. 117,

12   first page of it.

13         DEFENDANT BROKAW:  Can you put that up there,

14   please?

15   Q.   (BY DEFENDANT BROKAW)  And on that document, what is

16   the total credit limit on that account?

17   A.   The total credit line?

18   Q.   Credit line.

19   A.   $8,000.00.

20   Q.   $8,000.00.  Do you recall the total amount that was

21   listed on the OID as a return of original issue discount

22   credit?

23   A.   Yes.

24   Q.   How much was that?

25   A.   It was $8,000.00.

1        DEFENDANT BROKAW:  No further questions.  Thank

2   you.

3        THE COURT:  Any redirect?

4        MS. PALUCH:  No, thank you, Your Honor.

5        THE COURT:  Thank you very much, Ms. Marroquin, you

6   may step down.

7        Government may call its next witness.

8        MR. KIRSCH:  Thank you, Your Honor.  The Government

9   calls Anthony Dillman.

10        COURTROOM DEPUTY:  Good morning.  Please enter and

11   remain standing.

12        Please raise your right hand.

13                     **ANTHONY DILLMAN**

14   having been first duly sworn, testified as follows:

15        COURTROOM DEPUTY:  Please be seated.

16        Please state your name, and spell your first and

17   last names for the record.

18        THE WITNESS:  Anthony Dillman.  A-N-T-H-O-N-Y

19   D-I-L-L-M-A-N.

20        THE COURT:  You may proceed.

21        MR. KIRSCH:  Thank you, Your Honor.

22                     **DIRECT EXAMINATION**

23   **BY MR. KIRSCH:**

24   Q.   Good morning, Mr. Dillman.

25   A.   Good morning.

```
 1    Q.    Where are you from, sir?

 2    A.    Dallas, Texas.

 3    Q.    What do you do for a living?

 4    A.    I am a fraud investigator for Citibank.

 5    Q.    How long have you held that job at Citibank?

 6    A.    Coming up on 11 years.

 7    Q.    And how long have you been with Citibank generally?

 8    A.    Coming up on 20 years.

 9    Q.    So what sort of duties do you have as a fraud

10    investigator at Citibank?

11    A.    Primarily focus on the credit card realm.  Any fraud

12    related to credit cards, being counterfeit, stolen,

13    reproduced.  I also did the data intrusion of credit card

14    information.

15    Q.    Okay.  Are you familiar through your work with

16    Citibank with any kind of a relationship between Citibank

17    and Sears?

18    A.    Yes.

19    Q.    Can you tell us what that relationship is?

20    A.    Yes.  Sears is a stand-alone company, but Citibank

21    does facilitate their credit cards, their private label

22    Sears card and Sears Mastercard.

23    Q.    When you say Citibank facilitates those, what does

24    that mean?

25    A.    We make all of the credit decision.  We issue the
```

1    plastics, the cards, and we follow up with the

2    collections.  Anything having to do with the physical

3    account, itself, we take care of.

4         THE COURT:  All right.  Sir, I will ask you, can

5    you slow down just a little bit so she can take down

6    everything.

7    Q.   (BY MR. KIRSCH)  Does that mean Citibank ends up

8    maintaining the records that relate to Sears store cards

9    or Sears Master Cards, as well?

10   A.   It does.

11   Q.   Were you asked to review some records before you came

12   to court today?

13   A.   I was.

14   Q.   I want to direct your attention to what I think is

15   there on the stand in front of you marked as Government's

16   Exhibit 128.  Do you have that?

17   A.   I do.

18   Q.   Can you take a look at those and tell me if those

19   were among the records that you were asked to review

20   before you came to court today.

21   A.   Yes, they are.

22   Q.   In a very general sense, can you explain what those

23   records are?

24   A.   There is a mixture of payment records made on a Citi

25   Sears card account.  There are Sears Master Card account

666

```
 1    statements that were mailed on a monthly basis.  That's

 2    it.

 3    Q.   Were you able to determine, before you came to court

 4    today, who the -- what is the name on that account?

 5    A.   Dorothy P. Pawelski.

 6    Q.   Were you able to determine whether or not a John

 7    Pawelski had any signature authority over that account?

 8    A.   I was.

 9    Q.   Did he?

10    A.   Yes.  He was an authorized user.

11    Q.   Those records that you have marked as Government

12    Exhibit 128, were they made in the ordinary course of

13    Citi's business activities?

14    A.   They were.

15    Q.   Would they have been made at or near the time of the

16    transactions by a person who had knowledge about those

17    transactions?

18    A.   Correct.

19    Q.   Would Citibank have kept those records in the

20    ordinary course of its business?

21    A.   Yes.

22    Q.   Would Citibank have relied on the accuracy of those

23    records in conducting its business?

24    A.   Yes.

25    Q.   Do you have any reason to doubt the accuracy of those
```

1    records?

2    A.   I do not.

3    Q.   Okay.

4         MR. KIRSCH:  I will move to admit Government's

5    Exhibit 128.

6         THE COURT:  Any objection?  Any objection to their

7    being admitted?

8         DEFENDANT PAWELSKI:  I have an objection.

9    Obviously it is a privacy issue.

10        THE COURT:  All right.  Overruled.  Exhibit No. 128

11   will be admitted and be published.

12        (Exhibit No. 128 is admitted.)

13        MR. KIRSCH:  Thank you, Your Honor.

14   Q.   (BY MR. KIRSCH)  Can we begin by publishing page 1.

15   If we can highlight the top portion of that.  Can you just

16   explain what this record is, Mr. Dillman.

17   A.   This is a batch receipt for a payment made on this

18   Citi account ending in 4787, is what that denotes at the

19   bottom.  It shows the check is in the card member's name.

20   The top is just a batch receipt.  It is not anything

21   particular to this account or this check.  Just like any

22   other bank, checks come in, they are put into a batch, and

23   that just summarizes that.

24   Q.   Is the full account number for this account reflected

25   somewhere on the screen right now?

1    A.    Yes, it is.

2    Q.    Where is that?

3    A.    That would be on the top right of that receipt.

4    Q.    Is that the number that ends in 4787?

5    A.    That's correct.

6          MR. KIRSCH:  Can we display page 13 of this

7    exhibit, please.

8    Q.    (BY MR. KIRSCH)  Is this one of the other kinds of

9    records that appears within this exhibit, Mr. Dillman?

10   A.    It is.

11   Q.    What is this record?

12   A.    This is the account statement that would be received

13   on a monthly basis.

14   Q.    Okay.  Now I am going to ask you to look at --

15         MR. KIRSCH:  And I will ask for permission to

16   publish previously-admitted Exhibit 38, page 4.

17   Q.    (BY MR. KIRSCH)  And, Mr. Dillman I will direct your

18   attention to the top of this page, the form that is now

19   displayed on the screen.  Do you see that?

20   A.    I do.

21   Q.    The account number that is reflected in Box 5 of this

22   form, how does that compare to the account number in

23   Government Exhibit 128?

24   A.    It is the same number, less the last number is a zero

25   versus a 7.

1  Q.   Okay.  You are looking at the lower left-hand corner

2  of the form?

3  A.   Correct.

4  Q.   How about in Box 5?

5  A.   It is the same account number.

6  Q.   Okay.  Did you make an attempt to determine, before

7  you came to court today, whether or not this form was

8  issued by Citibank in connection with Sears credit?

9  A.   I did.

10  Q.   And was this form issued by Citibank?

11  A.   It was not.

12  Q.   Does Citibank ever issue forms 1099 OID in connection

13  with credit card accounts?

14  A.   No, they do not.

15  Q.   Do you recognize the address that is listed in the

16  payer's name box?

17  A.   Yes.

18  Q.   How do you recognize that address?

19  A.   That is the address of our corporate headquarters in

20  New York City.

21  Q.   Is that an address that is related to the Sears

22  Master Card product?

23  A.   It is not.

24  Q.   Do you recognize the EIN number that is listed in

25  that box underneath Sears credit?

1    A.   I can't say that I know for certain.

2    Q.   Do you know whether or not -- is that the EIN number

3    that would appear on a 1099 issued by Citibank?

4    A.   I can't answer that.

5    Q.   Okay.  Do you know whether or not -- did Citibank

6    withhold $10,350 from John Pawelski in 2006?

7    A.   They did not.

8    Q.   Did Citibank forward $10,350 to the IRS on

9    Mr. Pawelski's behalf in 2006?

10   A.   No.

11        MR. KIRSCH:  Thank you, Mr. Dillman.

12        THE COURT:  All right.  Any cross-examination?

13                   **CROSS-EXAMINATION**

14   **BY DEFENDANT PAWELSKI:**

15   Q.   Good morning, Mr. Dillman.

16   A.   Good morning.

17   Q.   You are the fraud investigator with Citibank?

18   A.   Correct.

19   Q.   When this account was received -- this document was

20   received by Citibank, did it go through some type of fraud

21   investigation at your company?

22   A.   These particular documents, yes.

23   Q.   Can you explain that, please?

24   A.   They were furnished to the Government upon subpoena

25   request, and then they were furnished to me, as I was the

1    representative chosen to come here.

2    Q.   You are not answering the question.  I asked upon

3    receipt at Citibank, was there any fraud investigation

4    prior to this Court hearing?

5         MR. KIRSCH:  Can I ask for Mr. Pawelski to clarify

6    the document he is talking about.

7    Q.   (BY DEFENDANT PAWELSKI)  The 1099 OID and 2006

8    document.

9    A.   Yes.  They were received by us, by Citi.  They were

10   reviewed by the legal department, then by myself as

11   investigator.

12   Q.   And what was the outcome of that?

13   A.   That these are not documents that were issued by

14   Citibank.

15   Q.   Very well.  Did Citibank issue any credit or funding

16   back to John J. Pawelski for that?

17   A.   Not regarding this matter, no.

18        DEFENDANT PAWELSKI:  I don't have any other

19   questions for you, thank you.

20        THE COURT:  Any redirect?

21        MR. KIRSCH:  No, thank you, Your Honor.

22        THE COURT:  Thank you very much, Mr. Dillman, you

23   may step down.

24        Government may call its next witness.

25        MS. PALUCH:  Yes, Your Honor.  The Government calls

 1     Terry Gearhart.

 2             COURTROOM DEPUTY:  Your attention please.

 3             Please raise your right hand.

 4                         **TERRY GEARHART**

 5     having been first duly sworn, testified as follows:

 6             COURTROOM DEPUTY:  Please be seated.

 7             Please state your name, and spell your first and

 8     last names for the record.

 9             THE WITNESS:  Terry Gearhart.  T-E-R-R-Y.  Last

10     name is G-E-A-R-H-A-R-T.

11                       **DIRECT EXAMINATION**

12     **BY MS. PALUCH:**

13     Q.   Good morning, sir.

14     A.   Good morning.

15     Q.   Where are you employed?

16     A.   Employed by Discover Financial Services.

17     Q.   Where is your office?

18     A.   Based in Dallas, Texas.

19     Q.   How long have you worked for Discover Financial?

20     A.   Approximately 2 years.

21     Q.   Prior to that where were you employed?

22     A.   Spent 20 years at Citi.

23     Q.   What capacity did you work in those organizations?

24     A.   Regional fraud investigator assigned to the risk

25     management department.

1    Q.   I think you and I are both fast talkers, so we will

2    try to slow down a little bit for the court reporter.

3         Prior to coming to court today, sir, were you asked

4    to review certain documents?

5    A.   Yes, ma'am, I was.

6         MS. PALUCH:  Your Honor, I would ask for permission

7    to publish page 4 of previously-admitted Government's

8    Exhibit 38.

9         THE COURT:  You may.

10   Q.   (BY MS. PALUCH)  Sir, that document should show up on

11   the screen there in front of you.

12        MS. PALUCH:  And I will ask that the last form on

13   this page be highlighted.

14   Q.   (BY MS. PALUCH)  Do you see that document, sir?

15   A.   Yes, ma'am, I do.

16   Q.   What is the title of that document?

17   A.   It is a Form 1099 OID.

18   Q.   For what tax year, sir?

19   A.   It is for the tax year of 2006.

20   Q.   And do you see Discover's name appearing there as the

21   payer?

22   A.   Yes, ma'am, I do.

23   Q.   What name is listed as the recipient?

24   A.   John J. Pawelski.

25   Q.   What is the amount of money listed in Boxes 1 and 4?

1    A.   In Box 4, it is listed as $15,000.

2    Q.   As federal income tax withheld?

3    A.   Yes, ma'am.

4    Q.   Do you see a credit card referenced, an account

5    referenced in Box 5?

6    A.   Yes, ma'am, I do.

7    Q.   Okay.  Can you compare that to the account number

8    listed below the address of Mr. Pawelski, to the left?  Is

9    that the same account?

10   A.   It is, with the exception of the last digit.  The

11   same 15 digits are the same.  The last digit in the box in

12   the lower corner, left-hand corner is a zero, and in the

13   Box 5, it is -- the last number is a 7.

14   Q.   At our request, did you research this form?

15   A.   Yes, ma'am, I did.

16   Q.   How did you go about doing that?

17   A.   I searched the Discover Credit Card accounts and was

18   able to match that account number in Box 5 with a

19   legitimate account.

20   Q.   Okay.  So you found an account with the number listed

21   in Box 5?

22   A.   Yes, ma'am, I did.

23   Q.   And whose name was that account?

24   A.   It is in the name of John J. Pawelski.

25   Q.   Were you able to determine whether Discover Card

```
 1    issued a 1099 OID for that account?

 2    A.    Yes, ma'am, I was.

 3    Q.    And what did you determine?

 4    A.    Discover did not issue that document.

 5    Q.    And what type of an account is that, sir?

 6    A.    The account number 6011 is a credit card account;

 7    revolving credit card account.

 8    Q.    Would Discover Card ever issue a 1099 OID on a credit

 9    card account?

10    A.    No, ma'am, they would not.

11    Q.    Did Discover Card send $15,000 over to the IRS for

12    Mr. Pawelski?

13    A.    No, ma'am, they did not.

14    Q.    I would like to ask you to look at Government's

15    Exhibit 123, which should be, actually, sir, in a folder

16    there on the witness stand.  Once you have those in front

17    of you, I would ask you generally to describe what those

18    documents are.

19    A.    Okay.

20    Q.    Can you state what those documents are?

21    A.    Those are credit card statements issued to an account

22    holder Dorothy P.  -- is it Pawelski?

23    Q.    Do you see an account number ending at the very top

24    of that document?

25    A.    Yes, ma'am.  That account number, last four of that
```

1    account number is 6737.

2    Q.    Does that compare to the document that we were just

3    looking at?

4    A.    Yes, ma'am, it does.

5    Q.    Okay.  Are you considered a custodian of records for

6    those documents?

7    A.    Yes, ma'am, I am.

8    Q.    Were these documents kept in the course of regular

9    business of Discover Card?

10   A.    Yes, they were.

11   Q.    Was the keeping of those documents a regular practice

12   of Discover Card?

13   A.    That's correct.

14   Q.    And did Discover Card rely on the accuracy of those

15   records in the course of its business?

16   A.    Yes, ma'am.

17         MS. PALUCH:  Your Honor, at this time I move to

18   admit and publish Government's Exhibit 123.

19         THE COURT:  Any objection?

20         DEFENDANT PAWELSKI:  I object.  Full exception

21   issue.

22         THE COURT:  Objection is overruled.  Exhibit 123 is

23   admitted.

24         (Exhibit No. 123 is admitted.)

25         THE COURT:  You may publish.

```
 1          MS. PALUCH:  Thank you, Your Honor.

 2   Q.   (BY MS. PALUCH)  Mr. Gearhart, you testified this is

 3   a credit card account in the name of Dorothy Pawelski?

 4   A.   That's correct.

 5   Q.   Were you able to determine whether any other persons

 6   were authorized to use this credit card?

 7   A.   Yes, ma'am.  There was a secondary on the account.

 8   Q.   And who was that?

 9   A.   That was the same name listed on the 1099 OID form.

10   Q.   Is that John Pawelski?

11   A.   Yes, ma'am, it was.

12   Q.   I am going to ask you to look at page 11 of

13   Government's Exhibit 123, if you could.  And can you

14   state, in looking at that page, what the balance was, if

15   any, of this account at the end of 2006?

16   A.   The balance ending is $9,885.57.

17   Q.   Do you know what the status of this account is now?

18   A.   It was a charge-off account.

19   Q.   What does that mean?

20   A.   That means that Discover Card wrote off the financial

21   loss.

22   Q.   Do you know what that loss was?

23   A.   $9,885.57.

24          MS. PALUCH:  No further questions, Your Honor.

25          THE COURT:  All right.  Any cross-examination?
```

1          DEFENDANT PAWELSKI:  I have a question.

2                    **CROSS-EXAMINATION**

3    **BY DEFENDANT PAWELSKI:**

4    Q.   Good morning, Mr. Gearhart.

5    A.   Good morning.

6    Q.   As a fraud investigator, do you have any records back

7    at Discover that shows that there was a fraud

8    investigation upon receipt of that document back in 2006

9    or -7, whatever it was?

10   A.   No, sir, I do not.

11   Q.   You do not.  Do you have any records showing that

12   Discover Card ever issued a credit or funding based on

13   that document of 1099 OID?

14   A.   No, sir, I do not.

15   Q.   You don't have, or you don't know if they did that?

16   A.   Do not know if they did that.

17   Q.   Do not know if they did that.

18          DEFENDANT PAWELSKI:  Okay.  That is all I need to

19   ask you.  Thank you.

20          THE COURT:  Any redirect?

21          MS. PALUCH:  Yes, Your Honor.  Thank you.

22                    **REDIRECT EXAMINATION**

23   **BY MS. PALUCH:**

24   Q.   Mr. Gearhart, do you know when Discover Card first

25   received that form?

 1   A.   The 1099 form?

 2   Q.   Right.

 3   A.   We did not receive that form.

 4   Q.   Is the first time you saw it when the Government

 5   provided it to you?

 6   A.   Yes, ma'am, that's correct.

 7        MS. PALUCH:  Thank you.

 8        No further questions, Your Honor.

 9        THE COURT:  All right.  Thank you very much,

10   Mr. Gearhart, you may step down.

11        Government may call its next witness.

12        MR. KIRSCH:  John Maloney, Your Honor.

13        COURTROOM DEPUTY:  Your attention, please.

14        Please raise your right hand.

15                      **JOHN MALONEY**

16   having been first duly sworn, testified as follows:

17        COURTROOM DEPUTY:  Please be seated.

18        Please state your name, and spell your first and

19   last names for the record.

20        THE WITNESS:  My name is John Maloney.  J-O-H-N

21   M-A-L-O-N-E-Y.

22                   **DIRECT EXAMINATION**

23   **BY MR. KIRSCH:**

24   Q.   Good morning, Mr. Maloney.

25   A.   Good morning.

1    Q.   Can you please tell us where you work.

2    A.   I work for TCF National Bank.

3    Q.   What is your position there?

4    A.   Corporate security vice president for the Mountain

5    West Region; basically Colorado and Arizona.

6    Q.   So where are you based?

7    A.   Right here in Denver.

8    Q.   Do you also serve as a custodian of records for that

9    bank?

10   A.   Yes, I do.

11   Q.   How long have you held that position at TCF National

12   Bank?

13   A.   For 8 years.

14   Q.   What did you do before you joined TCF National Bank?

15   A.   Before that I was vice president fraud operations for

16   Citi Group, vice president for fraud operations at Chase

17   Bank, and prior to that I was a sworn peace officer,

18   retired from Englewood, Colorado, Police Department as a

19   sergeant.

20   Q.   Before you came to court today, were you asked to

21   review several different records?

22   A.   Yes, I was.

23        MR. KIRSCH:  I will start by asking to publish

24   Government Exhibit 38, page 5.

25        THE COURT:  You may.

1          MR. KIRSCH:  Thank you, Your Honor.

2          We will put this up on the screen for you,

3    Mr. Maloney.  Can we highlight the top two forms there,

4    please.

5    Q.   (BY MR. KIRSCH)  Are you able to see those forms on

6    the screen now, Mr. Maloney?

7    A.   Yes, I can.

8    Q.   Okay.  And are these some of the documents that you

9    were asked to review before you came to court today?

10   A.   Yes, they are.

11   Q.   Who is listed as the -- what are these forms?

12   A.   Well, they are ostensibly 2006 1099 OID tax forms

13   issued by TCF National Bank.

14   Q.   That is the bank that you work for?

15   A.   That's correct.

16   Q.   Did you attempt to determine whether these forms

17   were, in fact, issued by TCF National Bank?

18   A.   Yes, I did.

19   Q.   Were you able to make that determination?

20   A.   Yes, I made that determination.

21   Q.   Were they issued by TCF National Bank?

22   A.   No, they were not.

23   Q.   How do you know that?

24   A.   I spoke with our treasury department that issues all

25   of our tax forms for interest-bearing accounts.  TCF has

682

```
 1    never issued 1099 OIDs.  They're in reference to a bond

 2    product.  We don't issue any bonds, never have since 1923,

 3    when the bank started.

 4    Q.   Do you see the account numbers referenced in Box 5 of

 5    these two forms?

 6    A.   Yes, I do.

 7    Q.   Did you, before you came to court today, did you also

 8    attempt to review records related to accounts with those

 9    numbers?

10    A.   I did.

11    Q.   And did you determine whether accounts with those

12    numbers existed at TCF National Bank?

13    A.   Yes, accounts do exist with those numbers.

14    Q.   What kinds of accounts are those?

15    A.   The one beginning with the 285 is a joint checking

16    account.  And the bottom one, beginning with 485, is a

17    business checking account.

18    Q.   And was the name that is listed as the recipient of

19    these forms, John J. Pawelski, was that name associated

20    with those two accounts?

21    A.   Yes.  With each account, yes.

22    Q.   I am going to now ask you to look at the documents

23    that are on the stand there with you.  Let's start with

24    what is marked as Government Exhibit 126.  Do those

25    records -- are those records for one of the accounts that
```

683

1   you just described?

2   A.   Yes.  There is a signature card, the business account

3   application and documents, and signatures for the account

4   4857100707.  Additionally, there are the bank statements,

5   monthly statements for that account.

6   Q.   Okay.  How about Government Exhibit 127, are those

7   records that relate to one of the accounts you were just

8   describing?

9   A.   Yes.  Once again, these are signature cards and

10  statements and account information for Account 2857100708,

11  to Mr. Pawelski.

12  Q.   With respect to the records contained in both of

13  those exhibits, 126 and 127, were those records that would

14  have been made in the ordinary course of TCF's business

15  activity?

16  A.   Yes.

17  Q.   Would they have been made at or near the time of the

18  transactions reflected there?

19  A.   That's correct.

20  Q.   By a person with knowledge of those transactions?

21  A.   That's correct.

22  Q.   Would TCF have kept those records in the ordinary

23  course of its business?

24  A.   Yes, we do.

25          MR. KIRSCH:  Your Honor, I move to admit and

1     publish Government's Exhibits 126 and 127.

2          THE COURT:  Any objection?

3          DEFENDANT PAWELSKI:  Objections.

4          THE COURT:  Same objection as before, privacy?

5          DEFENDANT PAWELSKI:  Pardon me?

6          THE COURT:  Same objection as before?

7          DEFENDANT PAWELSKI:  Privacy.  Showing all of these

8     people everything I have.  I don't know them.

9          THE COURT:  Objection is overruled.  Exhibits 126

10    and 127 will be admitted.  You may publish.

11         (Exhibit Nos. 126, 127 are admitted.)

12         MR. KIRSCH:  Thank you, Your Honor.

13         Can we start by publishing page 1 of Exhibit 126.

14    Q.   (BY MR. KIRSCH)  What is this page, sir?

15    A.   That is the signature verification form that was

16    produced at the time the account was opened, Account

17    4857100707, March 30, 2004, when that account was opened.

18    The signatures are from John and Ruth Pawelski.

19         MR. KIRSCH:  Can we display page 2 of that exhibit

20    now, please.  And if we can just highlight about

21    two-thirds of the way down that page, or expand from the

22    top down to about two-thirds down.

23    Q.   (BY MR. KIRSCH)  What is this document, Mr. Maloney?

24    A.   That is the business account application agreement

25    for the checking account that Mr. Pawelski opened on that

1    day.

2         MR. KIRSCH:  Then if we could display page 7 of

3    this exhibit.

4    Q.   (BY MR. KIRSCH)  What sort of document is this,

5    Mr. Maloney?

6         MR. KIRSCH:  Maybe we can expand the top half,

7    please.

8         THE WITNESS:  This is a page of statements, a

9    monthly statement for this account, Asset Based Funding.

10   And the statement date was June 30th of 2006.

11   Q.   (BY MR. KIRSCH)  Are the remainder of the documents

12   in that exhibit, are they other statements like this one?

13   A.   Correct.

14        MR. KIRSCH:  Can we please display now page 1 of

15   Government Exhibit 127.

16   Q.   (BY MR. KIRSCH)  And, again, what is this page,

17   Mr. Maloney?

18   A.   That is the signature card that was done on the same

19   date, March 30, 2004, for the other checking account, the

20   personal joint checking account for John and Margaret

21   Pawelski.

22        MR. KIRSCH:  Can we display page 2 of this exhibit,

23   please.

24   Q.   (BY MR. KIRSCH)  And what is this, sir?

25   A.   This is another example of a statement for that

1    account, dated January 19, 2006.

2    Q.   And, again, would the remainder of that exhibit

3    contain other statements like this one?

4    A.   Yes, it does.

5         MR. KIRSCH:  Can we go back now, please, and

6    display Government Exhibit 38, page 5 again.  Highlight

7    those top two forms again, if we could.

8    Q.   (BY MR. KIRSCH)  In the form on the top of the page,

9    Mr. Maloney, do you see the representation that $54,504.32

10   was withheld by TCF bank from Mr. Pawelski?

11   A.   Yes, I see that.

12   Q.   Was that true?

13   A.   No.

14   Q.   Did that happen?

15   A.   It did not happen.

16   Q.   If that had happened, would it have been reflected in

17   the records for that account?

18   A.   It would have been in the statements, yes.

19   Q.   Did you look through the statements to see if it is

20   there?

21   A.   I did, and it was not.

22   Q.   Same question with respect to the second form.  Did

23   TCF National Bank withhold $487,000.56 from the account

24   reflected on that form?

25   A.   No, we didn't withhold 487,000.56.

1    Q.   Would TCF National Bank have paid those amounts to

2    the IRS on behalf of Mr. Pawelski in 2006?

3    A.   No.

4         MR. KIRSCH:   Thank you, Mr. Maloney.

5         THE COURT:   Cross-examination?

6                    **CROSS-EXAMINATION**

7    **BY DEFENDANT PAWELSKI:**

8    Q.   Good morning, John, how are you today?

9    A.   I am fine, thank you.

10   Q.   You say you are the corporate security officer for

11   TCF Bank?

12   A.   Yes, I am.

13   Q.   You have been there 8 years?

14   A.   Yes.

15   Q.   When the bank received the 1099 OID, were you

16   involved with that?

17   A.   Not personally, no.

18   Q.   Okay.  Do you know if there was a fraud investigation

19   for that?

20   A.   I do not.

21   Q.   Are those two bank accounts still open?

22   A.   I would have to check the records on that.  I don't

23   know right off the top of my head.

24   Q.   Okay.  Do you know if TCF Bank ever issued any credit

25   or funding back to John J. Pawelski or anybody else for

1    those 1099 OID forms?

2    A.    Not for those 1099 OID forms, no, they did not.

3    Q.    So no money was spent by TCF Bank?

4    A.    No money was what?

5    Q.    No money was issued from TCF Bank because of those

6    forms?

7    A.    That's correct.

8          DEFENDANT PAWELSKI:  Thank you.

9          THE COURT:  Any redirect?

10         MR. KIRSCH:  Just briefly, Your Honor.

11                     **REDIRECT EXAMINATION**

12   **BY MR. KIRSCH:**

13   Q.    Mr. Maloney, do you know whether TCF Bank ever got a

14   copy of those OID forms back in 2006?

15   A.    No, I don't.  If they were supposedly issued by us,

16   we wouldn't have received them.  And, of course, they were

17   not issued by us, so we were -- never had anything to do

18   with them whatsoever.

19         MR. KIRSCH:  Thank you, sir.

20         THE COURT:  All right.  Thank you very much, sir,

21   you are excused.

22         All right.  We have been going for about 2 hours,

23   so we will take our morning break.  We will recess until

24   about 10:20.

25         Remember, ladies and gentlemen, you are not to

```
 1    discuss this case among yourselves.  You are not to

 2    conduct any research.  Court will be in recess until

 3    10:20.

 4            (A break is taken from 10:03 a.m. to 10:20 a.m.)

 5            (The following is had in open court, outside the

 6    hearing and presence of the jury.)

 7            THE COURT:  All right.  You may be seated.

 8            I understand there is a matter to be brought to my

 9    attention before we bring in the jury.

10            MR. KIRSCH:  Thank you, Your Honor.  Your Honor, I

11    wanted to make the Court and the defendants aware the

12    Marshals -- I don't know if the defendants are intending

13    to offer evidence once the Government rests or not.

14            The Marshals notified me last week that Mr. Morris

15    was in Denver, but it is my guess that Mr. Morris is not

16    in the courtroom today because the Marshals haven't been

17    given any notice about that.  So I wanted to make the

18    Court aware of that and the defendants aware of that so if

19    they did intend to proceed and intend to use Mr. Morris as

20    a witness, measures could be used to take care of that.

21            THE COURT:  I understood from Monday's motion by

22    Mr. Pawelski, he withdrew all of the subpoenas.  That they

23    were not intending it call Mr. Morris or the other

24    witnesses I issued the subpoenas for.

25            MR. KIRSCH:  That may be correct.  I wasn't sure if
```

1       that applied to the writ as well as the subpoena.  So I

2       wanted to mention it.

3             THE COURT:  Do the defendants intend to offer any

4       evidence in their portion of the case?  Do you intend to

5       take the stand?

6             DEFENDANT PAWELSKI:  We have not decided that yet,

7       ma'am.

8             THE COURT:  So at the time we get to that, that is

9       something I will need to have you respond to, or I may

10      need to give you an advisement with respect to that if you

11      do intend to take the stand.

12            Okay.  Nothing further?

13            MR. KIRSCH:  That is all we have.

14            THE COURT:  Okay.  Let's bring in the jury.

15            (The following is had in open court, in the hearing

16      and presence of the jury.)

17            THE COURT:  You may be seated.

18            Government may call its next witness.

19            MR. KIRSCH:  Thank you, Your Honor.  The Government

20      calls Paul Danley.

21            COURTROOM DEPUTY:  Good morning.  Please enter and

22      remain standing.

23            Your attention, please.

24            Please raise your right hand.

25                            **PAUL DANLEY**

```
 1    having been first duly sworn, testified as follows:

 2              COURTROOM DEPUTY:  Please be seated.

 3              Please state your name, and spell your first and

 4    last names for the record.

 5              THE WITNESS:  My name is Paul Danley.  P-A-U-L

 6    D-A-N-L-E-Y.

 7              THE COURT:  You may proceed.

 8              MR. KIRSCH:  Thank you, Your Honor.

 9                       DIRECT EXAMINATION

10    BY MR. KIRSCH:

11    Q.   Mr. Danley, where do you work?

12    A.   For the Treasury Inspector General for Tax

13    Administration in Dallas, Texas.

14    Q.   What is your position there?

15    A.   Digital forensic specialist.

16    Q.   And what does a digital forensic specialist do?

17    A.   Conduct forensic examination of any sort of digital

18    media; from a hard drive to thumb drive to CD, DVDs.

19    Q.   Do you have particularized training related to that

20    work?

21    A.   Yes, sir.

22    Q.   What is your training?

23    A.   Attended multiple courses, beginning with the seized

24    computer evidence recovery specialist course in the

25    federal law enforcement training center down in Glynco,
```

```
 1    Georgia.

 2    Q.    Have you worked as a digital forensic specialist or

 3    in similar capacities with other law enforcement agencies,

 4    as well?

 5    A.    Yes, I have.

 6    Q.    How long have you done that job for TIGTA?

 7    A.    Since May of this year.

 8    Q.    And how long have you done it for other law

 9    enforcement agencies?

10    A.    Approximately 12 years.

11    Q.    Were you involved as a party or a digital forensic

12    specialist for TIGTA, were you involved in the analysis of

13    evidence that was seized as a part of investigation in

14    this case?

15    A.    Yes.

16    Q.    And do you know where -- do you know where that

17    information came from?

18    A.    It came from search warrants that were executed at

19    two residences in Colorado Springs.

20    Q.    Do you know the process that was used to obtain that

21    evidence for purposes of your analysis?

22    A.    Yes.

23    Q.    What was that process?

24    A.    For the computers that were seized at the houses, the

25    hard drives were taken out and attached to hardware.  We
```

1    call it an imaging device.  It does the forensic working

2    or forensic copy of the original evidence.  So it takes

3    every bit that is on the hard drive and makes an exact

4    copy of it for examination.

5    Q.   Is there something that allows you to determine that

6    that copying process has occurred and that it has, in

7    fact, made an exact copy?

8    A.   Yes.  Every time you make a forensic copy of the hard

9    drive, this device creates a log file which explains the

10   time, date.  You punch in your name and everything, who

11   conducted it, how long it took.  It also produces two hash

12   values.  It produces hash values for the original hard

13   drive, and then the other, the copied hard drive, I will

14   call it, and then it compares the hashes and makes sure

15   they match.

16        And the hashes are -- we call them a digital

17   fingerprint.  It is a mathematical algorithm.  You can

18   take a file, such as a Word document, or even a whole hard

19   drive, and run this through an algorithm, and it produces

20   a unique character string.  That is why we call it a

21   fingerprint, because you need numbers only for that.

22        If you change one bit on the hard drive, like

23   opening a file and changing "happy" to "glad" in the Word

24   document and saving it, you get a completely different

25   hash.  So that is the way you will know that the copy we

694

1    made is an exact copy of the original.

2    Q.    Okay.  And you mentioned that you reviewed --

3          THE COURT:  Excuse me.  I am sorry.  Ms. Vigil, it

4    looks to me like you are crewing on something.

5          DEFENDANT VIGIL:  I am not chewing a thing.

6          THE COURT:  There is no gum or food allowed in this

7    courtroom.  So if you are chewing it, I ask you to dispose

8    of it.  If you are not chewing, fine.

9          DEFENDANT VIGIL:  I am not chewing anything.

10         THE COURT:  You may proceed, Mr. Kirsch.

11         MR. KIRSCH:  Thank you, Your Honor.

12   Q.    (BY MR. KIRSCH)  So, Special Agent Danley, you

13   referenced that you helped analyze digital images that

14   came from two locations?

15   A.    Yes.

16   Q.    Was one of those 2260 Palm Drive, Unit C, in Colorado

17   Springs?

18   A.    Yes.

19   Q.    And was the other 513 Shady Crest Circle in Colorado

20   Springs?

21   A.    Yes.

22   Q.    Were you also asked to review several exhibits before

23   you came to court today?

24   A.    Yes.

25         MR. KIRSCH:  I am going to ask now to publish

1    previously-admitted Government Exhibit 269.

2              THE COURT:  You may.

3              MR. KIRSCH:  I will put this up on the screen for

4    you, Special Agent Danley.

5              THE WITNESS:  Okay.

6    Q.   (BY MR. KIRSCH)  Can you see that document on the

7    screen now?

8    A.   Yes.

9    Q.   Is this a document that you found in the course of

10   doing forensic analysis of computers associated with those

11   searches?

12   A.   Yes.

13   Q.   And did you locate this document on computers -- let

14   me back up.  Did you say that you looked at a digital

15   image of a computer from 2260 Palm Drive?

16   A.   Yes.

17   Q.   Did you locate this document on that image from that

18   computer?

19   A.   Yes, I did.

20   Q.   Did you look at images -- did you analyze images of

21   computers that were obtained from 513 Shady Crest Circle,

22   as well?

23   A.   Yes.

24   Q.   Were you able, through the course of your examination

25   or your analysis, to make a determination about who had

1    been using those computers at Shady Crest Circle?

2    A.   The document in question here, it was found in --

3    like I said, on the computers, found in folders on the

4    computers.  They are all Windows systems.  There is user

5    names that were created.

6    Q.   Okay.

7    A.   And under the user names, that is where Windows will

8    store your files.  That is where I found this document,

9    under "files."  The user names that I found were -- I

10   might screw up the residence because I remembered it under

11   the names.  One the computer's user name was "Tom."

12   Another computer from a different residence was "John."

13   And then the other one had a user account of "Mimi."

14        I found this document under those folders under

15   those user names.

16   Q.   You found this -- am I understanding you correctly,

17   you found this document under folders for user for all

18   three of those user names?

19   A.   All three.

20   Q.   Now I am going to ask you to look at a document that

21   I think you will have there, it is marked as 270.

22        MR. KIRSCH:  I don't believe it has been admitted

23   yet.

24   Q.   (BY MR. KIRSCH)  Do you have a folder with 270 there?

25   Do you have a folder -- I am sorry, do you have a manilla

1    folder like this?

2    A.    I am sorry, yes.  270?

3    Q.    Yes.  Do you have 270 there now?

4    A.    Yes, I do.

5    Q.    Is that a document that you recognize?

6    A.    Yes, it is.

7    Q.    How do you recognize that document?

8    A.    I found it on two of the computers that I searched.

9    Q.    What were the user names associated with those

10   computers?

11   A.    Tom and John.

12         MR. KIRSCH:  Your Honor, I move to admit and

13   publish Government Exhibit 270.

14         THE COURT:  Any objection?

15         DEFENDANT PAWELSKI:  No.  I don't think there is an

16   objection on this.

17         THE COURT:  All right.  Exhibit 270 is admitted.

18         (Exhibit No. 270 is admitted.)

19         THE COURT:  You may publish.

20         MR. KIRSCH:  Thank you, Your Honor.

21         Can we just enlarge the top half of that, please.

22   Q.    (BY MR. KIRSCH)  What is the title of this document,

23   Special Agent Danley?

24   A.    Private Registered Indemnity Bond.

25   Q.    What is listed there?  It is sort of in the middle of

1    the screen, where it says "for."

2    A.   It says "for real man."  Underneath that is "straw

3    man."

4    Q.   Okay.  And are there some additional references to

5    "real man" on the screen there, as wells?

6    A.   Yes.  Right below it, "by, on, through:  Real man

7    Epperson.  Real man Pogue," P-O-G-U-E.

8         MR. KIRSCH:  Can we display the bottom of this page

9    now, please.

10   Q.   (BY MR. KIRSCH)  Do you see the blank lines at the

11   bottom?

12   A.   Yes.

13   Q.   What are the captions for those lines?

14   A.   Surety No. 1.  Surety No. 2.  And Principal.

15        MR. KIRSCH:  And now can we display page 5 of this

16   exhibit, please.  And just go ahead and enlarge the top

17   half of that.

18   Q.   (BY MR. KIRSCH)  Does this page have a number of

19   blank lines, as well, Special Agent Danley?

20   A.   Yes.

21        MR. KIRSCH:  Now I am going to ask to -- can I just

22   check on the status on this one other exhibit, Your Honor,

23   please?

24        THE COURT:  You may.

25        MR. KIRSCH:  Thank you, Your Honor.  I will ask now

1    to publish Government Exhibit 271.  I believe it is

2    admitted.

3              THE COURT:  271 is admitted.  You may publish.

4              MR. KIRSCH:  Thank you, Your Honor.

5    Q.  (BY MR. KIRSCH)  Is this a document that you found on

6    one of the computers that you were analyzing, Special

7    Agent Danley?

8    A.  On one of the computers, yes.

9    Q.  Where did you locate this document?

10   A.  On the computer seized from the Brokaw residence

11   under the user name "Tom" on the computer.

12             MR. KIRSCH:  Thank you.

13             Your Honor, those are all of my questions for

14   Special Agent Danley.  Thank you.

15             THE COURT:  Any cross-examination?

16             DEFENDANT PAWELSKI:  I have a couple questions.

17                       **CROSS-EXAMINATION**

18   **BY DEFENDANT PAWELSKI:**

19   Q.  Good morning, Mr. Danley, how are you today?

20   A.  Good.  Fine.

21   Q.  Document 269?

22   A.  Yes.

23   Q.  Would you read for the Court paragraph 1, please?

24   A.  Paragraph 1, "This note shall be posted in full

25   dollar for dollar pursuant to the credit order noted

1    before and presented to payee, United States Department of

2    Treasury, care of trustee of the U.S. Bankruptcy Timothy

3    F. Geithner.  After discharge of the debt, the balance of

4    the funds are to be credited to the U.S. Treasury to be

5    used for the same."

6    Q.    Thank you.  Document No. 270.  Based on your

7    investigation, are any of the names on that document,

8    besides Mr. Geithner, familiar to you; Straw Man,

9    Epperson, Pogue, Wells?

10   A.    No.

11   Q.    Would you move to page 4, please.

12   A.    Page 4, yes.

13   Q.    Would you read paragraph B for the Court, please.

14   A.    "Timothy F. Geithner, Secretary of the Treasury, the

15   United States Department of the Treasury shall ledger this

16   bond as an asset as best suits the needs of the United

17   States Department of the Treasury in accordance with the

18   terms and conditions contained herein for a period of 30

19   years."

20        DEFENDANT PAWELSKI:  Thank you very much, sir.

21        THE COURT:  All right.  Any further

22   cross-examination?

23        All right.  Thank you very much, sir, you are

24   excused.

25        THE WITNESS:  Thank you.

701

```
 1              THE COURT:  All right.  The Government may call its

 2     next witness.

 3              MS. PALUCH:  Yes, Your Honor.  The Government calls

 4     Tim O'Malley.

 5              COURTROOM DEPUTY:  Your attention, please.

 6              Please raise your right hand.

 7                         TIMOTHY O'MALLEY

 8     having been first duly sworn, testified as follows:

 9              COURTROOM DEPUTY:  Please be seated.

10              Please state your name, and spell your first and

11     last names for the record.

12              THE WITNESS:  Timothy O'Malley.  T-I-M-O-T-H-Y,

13     O-'-M-A-L-L-E-Y.

14              MS. PALUCH:  May I proceed?

15              THE COURT:  I am sorry, you may.

16              MS. PALUCH:  Thank you.

17                       DIRECT EXAMINATION

18     BY MS. PALUCH:

19     Q.   Good morning, sir.

20     A.   Good morning.

21     Q.   Where are you employed?

22     A.   Chase Bank, USA National Association.

23     Q.   And where is your office located?

24     A.   My office is in Tempe, Arizona.

25     Q.   How long have you been employed by Chase Bank?
```

1  A.    9-and-a-half years.

2  Q.    And prior to that, were you working in the banking

3  industry?

4  A.    I was.  I have overall 25 years of banking

5  experience.

6  Q.    Okay.  Sir, in preparation for your testimony today,

7  were you asked to review certain documents?

8  A.    Yes, I was.

9       MS. PALUCH:  I would ask that page 12 of

10  previously-admitted Government's Exhibit 16 be published.

11       THE COURT:  It may.

12  Q.    (BY MS. PALUCH)  Sir, you should see that on the

13  screen in front of you.

14  A.    Yes.

15  Q.    And I am going to direct your attention to the second

16  box of that.  And do you see a reference to Washington

17  Mutual Bank there?

18  A.    Yes.

19  Q.    What relationship, if any, does J.P. Morgan Chase

20  have with Washington Mutual Bank?

21  A.    Are J.P. Morgan Chase purchased the assets of

22  Washington Mutual in 2008, September, when the bank was

23  closed by the FDIC.

24  Q.    Is J.P. Morgan Chase considered a custodian of

25  records in the documents acquired from Washington Mutual

1   at that time?

2   A.   Yes.

3   Q.   And who is listed as the recipient on this form?

4   A.   Recipient name is listed as George T. Brokaw.

5   Q.   What is the title of this form?

6   A.   It is a 1099 OID.

7   Q.   And at our request -- first of all, do you see a

8   description of an account number in Box 5?

9   A.   Yes.

10  Q.   And at our request, did you research that account

11  number?

12  A.   I did.

13  Q.   And did you find an account number with that number?

14  A.   Yes.

15  Q.   And in whose name was that account?

16  A.   Tom Brokaw.

17  Q.   And did you research, or were you involved in the

18  researching of whether or not this form was created by

19  Washington Mutual?

20  A.   Yes.

21  Q.   And how did you go about doing that research?

22  A.   I need to refer just a second here.

23  Q.   If you could look at your notes, and then look up at

24  me when you are ready to testify.

25  A.   Very good.

```
 1    Q.   Are you ready to testify?

 2    A.   Yes.  I participated in the search with our tax

 3    reporting withholding services with J.P. Morgan Chase and

 4    reviewed all of the documents that would have been

 5    attached to this account number and also to this

 6    recipient's tax identification number.  There were no such

 7    documents ever issued by Washington Mutual.

 8    Q.   Could you determine whether or not Washington Mutual

 9    Bank forwarded $7,700 to the IRS for the benefit of George

10    Brokaw?

11    A.   They did not.

12         MS. PALUCH:  If we could display the full form

13    there.

14    Q.   (BY MS. PALUCH)  Do you see reference to Key Bank?

15    In your experience, can you say whether or not financial

16    institutions issue tax forms on the same page as other

17    financial institutions?

18    A.   No.

19    Q.   And why not?

20    A.   That would be a gross breach of confidentiality.

21    Q.   I am going to direct your attention to Government's

22    Exhibit 18.

23         MS. PALUCH:  And I would ask that page 11 of this

24    previously- exhibit be published.

25         THE COURT:  It may.
```

1    Q.   (BY MS. PALUCH)   And once that is enlarged, sir, do

2    you see a reference, again, to Washington Mutual?

3    A.   Yes.

4    Q.   And is this the same account that we have been

5    discussing?

6    A.   It is.

7    Q.   And did you research this form?

8    A.   Yes.

9    Q.   And what did you determine?

10   A.   The same; that this form was never issued by

11   Washington Mutual Bank.

12   Q.   Did you determine whether Washington Mutual forwarded

13   any money to the IRS on this account for that tax year,

14   2007?

15   A.   They did not.

16   Q.   I direct your attention to Government's Exhibit 119,

17   which should be located in a folder, sir, there on the

18   witness stand.  If you would look through that exhibit, if

19   you could.  And after you had a chance to do that, if you

20   could state what those records reflect.

21   A.   These are all statements from Washington Mutual Bank

22   regarding a credit card account in the name of Tom Brokaw.

23   Q.   Is that the same account we have been discussing

24   ending in 1863?

25   A.   It is.

1    Q.   And what is the entity listed on these forms?  What

2    is the financial institution?

3    A.   Washington Mutual Card Services.

4    Q.   Okay.  And are you considered a custodian of these

5    records?

6    A.   Yes.

7    Q.   Were these documents kept in the course of

8    regularly-conducted business of J.P. Morgan Chase and

9    Washington Mutual?

10   A.   Yes.

11   Q.   And was the making of the records a regular practice

12   of that activity?

13   A.   Yes.

14   Q.   And does J.P. Morgan Chase rely on the accuracy of

15   these types of records in conducting its business?

16   A.   Yes.

17        MS. PALUCH:  Your Honor, at this time I move for

18   admission of Government's Exhibit 119 and ask it be

19   published.

20        THE COURT:  Any objection?

21        DEFENDANT BROKAW:  Objection, Your Honor.

22        THE COURT:  What basis?

23        DEFENDANT BROKAW:  Privacy.

24        THE COURT:  Overruled.  Exhibit 119 will be

25   admitted.

1              (Exhibit No. 119 is admitted.)

2              THE COURT:  It may be published.

3    Q.   (BY MS. PALUCH)  Sir, were you able to determine when

4    this account was opened?

5    A.   This account was opened in 1986.

6    Q.   Okay.  And can you -- did you determine when it was

7    closed?

8    A.   It was closed in 2008.

9    Q.   Okay.  Do you know the status of it when it was

10   closed?

11   A.   It was charged off for non-payment.

12   Q.   Okay.  I will refer your attention to Government's

13   Exhibit 38, if I could, a previous exhibit admitted.

14             MS. PALUCH:  And I would ask that page 6 of that

15   exhibit be displayed.  If you could highlight the top

16   form.

17   Q.   (BY MS. PALUCH)  Do you see reference there to Chase

18   Credit Card?

19   A.   Yes.

20   Q.   Is J.P. Morgan Chase also referenced as Chase Credit

21   Card?

22   A.   No.

23   Q.   Were you able to determine or research whether J.P.

24   Morgan Chase issued this form?

25   A.   In the research, this particular form was not issued

1    by J.P. Morgan Chase or Chase Bank.

2            MS. PALUCH:  Thank you.  No further questions, Your

3    Honor.

4            THE COURT:  All right.  Cross-examination?

5            DEFENDANT BROKAW:  Yes.

6            THE COURT:  You may.

7                        **CROSS-EXAMINATION**

8    **BY DEFENDANT BROKAW:**

9    Q.   Good afternoon -- good morning, sir.

10   A.   Good morning.

11   Q.   I would like to direct your attention to 119, page 6.

12           DEFENDANT BROKAW:  Can you blow up the top part of

13   that, please.

14   Q.   (BY DEFENDANT BROKAW)  Can you read to us what the

15   annual percentage rate on billing on that account was?

16   A.   Yes.  30.99 percent.

17   Q.   Is that a little bit high, in your estimation?

18   A.   No.

19   Q.   No.  Is that a standard interest rate you would

20   charge to this type of account?

21   A.   I am not qualified to answer that.

22   Q.   Okay.  Would there be some reason why that interest

23   rate would be so high?

24   A.   Again, that's outside the purview of my duties.

25   Q.   And your duties are -- would you state them again,

1   please?

2   A.   Credit card fraud investigation.

3   Q.   You are not familiar with the interest rates that the

4   companies charge?

5   A.   No.

6        DEFENDANT BROKAW:  Thank you.  That would be all.

7        THE COURT:  Any redirect?

8        MS. PALUCH:  No.  Thank you, Your Honor.

9        DEFENDANT PAWELSKI:  I have a question.

10       THE COURT:  I am sorry, excuse me, Mr. Pawelski?

11                      **CROSS-EXAMINATION**

12  **BY DEFENDANT PAWELSKI:**

13  Q.   Mr. O'Malley, you stated in your testimony that Chase

14  bought Washington Mutual in 2008; is that correct?

15  A.   Yes.

16  Q.   Okay.  The forms we looked at, the 1099 OID form from

17  John J. Pawelski was issued in 2006; is that correct?

18  A.   Yes.

19  Q.   Therefore, you had no knowledge, firsthand, of

20  anything that happened at Washington Mutual; is that

21  correct?

22  A.   We are the custodian of records.  That form was

23  actually not issued in 2006, it was dated on the form that

24  was presented, it was dated 2006, but Washington Mutual

25  never issued that form.

1    Q.   Based on your investigation, was there any fraud

2    reporting or investigation by Washington Mutual?

3    A.   No.

4    Q.   Was there ever any funding or credit issued to John

5    J. Pawelski because of the 1099 OID form in your

6    investigation?

7    A.   There was no funding for or to John Pawelski.

8    Q.   Okay.  And my last question, sir, is what type of

9    prompting of your testimony did you receive prior to this

10   hearing?

11   A.   We talked about what I had investigated and

12   discovered in looking at these forms.

13   Q.   Who would be "we," sir?

14   A.   "We."  Myself, the inside counsel, the Assistant U.S.

15   Attorney.

16   Q.   The Assistant U.S. Attorney assisted you in your

17   testimony?

18   A.   No.  We talked about what I discovered.

19   Q.   Okay.  The reason I ask is so far we have had about

20   nine different people come up here from different

21   organizations, and basically the testimony has been the

22   same.  But, thank you very much, Mr. O'Malley.

23          THE COURT:  All right.  Any redirect?

24          MS. PALUCH:  No, Your Honor.

25          THE COURT:  Thank you very much, Mr. O'Malley, you

1    may step down.

2            Government may call its next witness.

3            MR. KIRSCH:  Thank you, Your Honor.  The Government

4    calls Mario Morales.

5            COURTROOM DEPUTY:  Please enter and remain

6    standing.

7            Your attention, please.

8            Please raise your right hand.

9                            **MARIO MORALES**

10   having been first duly sworn, testified as follows:

11           COURTROOM DEPUTY:  Please be seated.

12           Please state your name, and spell your first and

13   last names for the record.

14           THE WITNESS:  My name is Mario D. Morales-Arias.

15   First name is M-A-R-I-O.  Last name is M-O-R-A-L-E-S --

16   A-R-I-A-S.

17           THE COURT:  You may proceed.

18           MR. KIRSCH:  Thank you, Your Honor.

19                          **DIRECT EXAMINATION**

20   **BY MR. KIRSCH:**

21   Q.   Mr. Morales, where are you from?

22   A.   From Phoenix, Arizona.

23   Q.   Do you work there?

24   A.   I do.

25   Q.   Where do you work?

 1     A.    I work for American Express.

 2     Q.    What is your position with American Express?

 3     A.    I am the assistant custodian of records.

 4     Q.    How long have you held that position?

 5     A.    I've held that position for about 18 months now.

 6     Q.    Before you got that position, did you work for

 7     American Express?

 8     A.    Yes.

 9     Q.    For how long?

10     A.    Total, I have been with American Express a little

11     over 8 years.

12     Q.    Before you got your current position, what position

13     did you hold with American Express?

14     A.    I was a manager in the fraud department.

15     Q.    What are your current duties as an assistant

16     custodian of records?

17     A.    I have knowledge of accounts that have come into

18     litigation with American Express, as far as collections

19     go.  I also have knowledge of policies and procedures for

20     certain accounts for American Express.

21     Q.    Before you came to court today, were you asked to

22     review various records?

23     A.    Yes.

24     Q.    I am going to ask you to begin by looking at what is

25     on the witness stand there marked as Government Exhibit

713

```
 1    114.  Does that exhibit include records that you were

 2    asked to review before you came to court today?

 3    A.   Yes.

 4    Q.   Did you determine whether or not those are American

 5    Express records?

 6    A.   Yes.

 7    Q.   In particular -- well, in general, what kind of

 8    records are they?

 9    A.   These are American Express statements for a Gold Card

10    prepared for Mr. George T. Brokaw.

11    Q.   Were those records made in the ordinary course of

12    American Express' business activity?

13    A.   Yes.

14    Q.   Were they made at or near the time of the

15    transactions reflected in the records?

16    A.   Yes.

17    Q.   Does American Express keep those records in the

18    ordinary course of its business?

19    A.   Yes.

20    Q.   And does American Express rely on those records as it

21    conducts its business?

22    A.   Yes.

23         MR. KIRSCH:  Your Honor, I would move to admit and

24    publish Government Exhibit 114.

25         DEFENDANT BROKAW:  Objection.
```

```
 1              THE COURT:  I am sorry, objection?

 2              DEFENDANT BROKAW:  Objection, privacy.

 3              THE COURT:  Overruled.   114 will be admitted.

 4              (Exhibit No. 114 is admitted.)

 5              THE COURT:  It may be published.

 6              MR. KIRSCH:  Thank you, Your Honor.

 7    Q.   (BY MR. KIRSCH)  We will display page 1 of this on

 8    the screen now, Mr. Morales.  Can you see that?

 9    A.   Yes.

10    Q.   And just explain to us what this record is again,

11    please.

12    A.    This is an American Express statement for a Gold Card

13    prepared for Mr. George T. Brokaw.

14    Q.   What is the account number associated with this

15    account?

16    A.   The account number is 372863888931004.

17    Q.   And what kind of an account is an American Express

18    Gold Card?

19    A.   It is a credit card.

20              MR. KIRSCH:  Okay.  All right.  Let me now ask if I

21    can publish, please, Government Exhibit 14, page 10.  And

22    can we expand the bottom of that page, please.

23    Q.   (BY MR. KIRSCH)  Can you see that form on the screen

24    now, sir?

25    A.   Yes.
```

 1   Q.   Is that a document that you were asked to review

 2   before you came to court today?

 3   A.   Yes.

 4   Q.   Do you see the account number listed in the lower

 5   left corner of that form, and also in Box 5?

 6   A.   Yes, I do.

 7   Q.   How does that account number compare to the number in

 8   Government Exhibit 114?

 9   A.   These are the same account numbers.

10   Q.   Did you make an attempt to determine whether or not

11   American Express created this 2005 Form 1099 OID?

12   A.   Yes, I did.

13   Q.   Did American Express create this form?

14   A.   No, they did not.

15   Q.   Does American Express ever issue 1099 OID forms to

16   credit card customers?

17   A.   We do not.

18   Q.   Did American Express withhold $5,000 in federal

19   income tax from Mr. Brokaw in 2005?

20   A.   We did not.

21   Q.   Did American Express pay over $5,000 on Mr. Brokaw's

22   behalf to the IRS?

23   A.   We did not.

24   Q.   Does American Express do any income tax withholding

25   in connection with its credit card accounts?

1    A.    We do not.

2          MR. KIRSCH:    Now I am going to ask to publish

3    Government Exhibit 18, page 10.

4    Q.    (BY MR. KIRSCH)    Can you still see the form on the

5    bottom of the screen there?    Are you still able to see

6    that?

7    A.    Yes, I can.

8    Q.    Does that form purport to come from American Express?

9    A.    Yes.

10   Q.    Does American Express ever issue tax forms in

11   conjunction with other financial institutions like Wells

12   Fargo Bank or First National Bank?

13   A.    Yes, we do.

14   Q.    When you do that, do you do it on the same page, like

15   this?

16   A.    We would not.

17         MR. KIRSCH:    Can you expand this section related to

18   American Express now, please.

19   Q.    (BY MR. KIRSCH)    Does this purport to be a 2007 1099

20   OID form?    Is that what this form represents itself as, a

21   2007 1099 OID?

22   A.    Yes.

23   Q.    Did you make a determination about whether American

24   Express issued this form?

25   A.    Yes.

1    Q.   Did American Express issue it?

2    A.   No.

3    Q.   I will ask you to look at the account numbers listed

4    on this form, again in the lower left and in Box 5.   How

5    do those compare to the account number in Government

6    Exhibit 114?

7    A.   They are the same account numbers.

8    Q.   In 2007, did American Express withhold $5,000 in

9    federal income tax for Mr. Brokaw?

10   A.   No.

11   Q.   Did American Express pay over $5,000 on Mr. Brokaw's

12   behalf to the IRS?

13   A.   No.

14        MR. KIRSCH:   Can I please display now Government

15   Exhibit 20, page 8.

16        If I can have just a moment, please, Your Honor, I

17   will get the right page.   I apologize, Your Honor, can we

18   display Government Exhibit 20, page 10.   And can we expand

19   the bottom of that form.

20   Q.   (BY MR. KIRSCH)   What is the title of that form on

21   the screen, Mr. Morales?

22   A.   This is a 1099 OID.

23   Q.   For what year?

24   A.   2008.

25   Q.   Who is listed as the payer on this document?

718

1    A.    American Express.

2    Q.    How does the account number listed on this document

3    compare to the account number in Government Exhibit 114?

4    A.    These are the same account numbers.

5    Q.    Did American Express issue this 1099 form that is on

6    the screen now?

7    A.    No.

8    Q.    Did American Express withhold $5,000 on Mr. Brokaw's

9    behalf in income tax for 2008?

10   A.    No.

11   Q.    Did it pay the IRS $5,000 on Mr. Brokaw's behalf in

12   2008?

13   A.    No.

14   Q.    MR. KIRSCH:  Thank you, sir.

15         Those are all of my questions, Your Honor.

16         THE COURT:  All right.  Thank you.

17         Any cross-examination?

18         DEFENDANT BROKAW:  Yes.

19         THE COURT:  You may.

20                         **CROSS-EXAMINATION**

21   **BY DEFENDANT BROKAW:**

22   Q.    Good morning, sir.

23   A.    Good morning.

24   Q.    Was there a fraud investigation upon receipt of the

25   1099 OID with the associated documents you have identified

1    here this morning?

2    A.   Can you repeat the question, please?

3    Q.   Did American Express conduct a fraud investigation on

4    the documents before us today?

5    A.   No.

6    Q.   These OIDs -- no.

7         Did your company issue any credits -- I think you

8    may have already answered this -- for funds based on the

9    information off of these 1099 OIDs?

10   A.   No.

11   Q.   Did not.  Did you compare the amounts, the 1099 OID,

12   which was just referenced for 2008, showed a credit amount

13   of $5,000.  Did you compare the amounts on those 1099 OIDs

14   to credits claimed with the amount of credit that went

15   through the account for that particular year?

16   A.   No.

17   Q.   Do you have any first-hand knowledge of these forms,

18   the 1099 OIDs, the filling out of them or the processing

19   of them?

20   A.   Yes.

21   Q.   You do?

22   A.   Of some, yes.  Not these, but, yes, I do.

23   Q.   You are familiar with 1099 OIDs?

24   A.   Not with OIDs.

25   Q.   I am a little confused.  Can you clarify that,

1   please?

2   A.   American Express issues 1099 Cs and 1099 Ks.

3   Q.   Okay.

4   A.   Not 1099 OIDs.

5   Q.   Not OIDs.  Thank you.

6        What type of prompting did you have before coming

7   in here this morning?  Did you have some assistance or

8   help relating to these forms we are talking about?

9   A.   No.

10        DEFENDANT BROKAW:  No further questions.  Thank

11   you, sir.

12        THE COURT:  All right.  Any further examination?

13        All right.  Any redirect?

14        MR. KIRSCH:  Thank you, Your Honor.

15                    **REDIRECT EXAMINATION**

16   **BY MR. KIRSCH:**

17   Q.   Mr. Morales, do you have any record of American

18   Express receiving copies of any of those form 1099 OIDs we

19   looked at before the Government's investigation began?

20   A.   We did not.

21   Q.   You don't have it in your records that those were

22   sent to you?

23   A.   We do not.

24   Q.   Would you have expected -- well, let me ask a

25   different question.  If American Express prepares tax

1    forms to send to the IRS, does it send a separate copy to

2    itself?

3    A.    No.

4         MR. KIRSCH:  Thank you, sir.

5         THE COURT:  All right.  Thank you very much,

6    Mr. Morales, you may step down.

7         THE WITNESS:  Thank you.

8         THE COURT:  Government may call its next witness.

9         MR. KIRSCH:  Your Honor, can we have one moment to

10   confirm who that is?

11        THE COURT:  You may.

12        MR. KIRSCH:  Your Honor, we have one more witness,

13   but she is still en route.  We are expecting her any

14   minute, but we do not have her right here.  I apologize.

15        THE COURT:  So do you know when she is expected?

16        MR. KIRSCH:  We are expecting her in the next 10 to

17   15 minutes.  She is on her way from the airport.

18        THE COURT:  I need to take care of legal matters,

19   so, ladies and gentlemen, we will take a break.  Remember,

20   you are not to talk about this case among yourselves or

21   research anything.  We will call you back in when the

22   witness arrives and I have finished taking care of the

23   legal matters I need to take care of.

24        All right.  Jury is excused.  Everybody else

25   remain.

1           (The following is had in open court, outside the

2    hearing and presence of the jury.)

3           THE COURT:  You may be seated.

4           We can use this time to do the charging conference.

5    You all were provided earlier this morning with the

6    proposed jury instructions and verdict form.  So at this

7    point, we will just go ahead and go through those

8    instructions and have a charging conference.

9           DEFENDANT VIGIL:  I choose to sit down.

10          THE COURT:  So the way I conduct the charging

11   conference, we will go through them instruction by

12   instruction.  If either side has any objections, let me

13   know and we will discuss those.  If you do not have

14   objections, I will approve that as the final instruction

15   with that number.

16          So we start with Instruction No. 1, which is my

17   standard, basic instruction with respect to introduction

18   to the final instructions.  Any objections?

19          MR. KIRSCH:  Not from the Government, Your Honor.

20          DEFENDANT PAWELSKI:  I take exception to the fact

21   that we have a jury trial.  As I stated on Monday, I have

22   never given consent to that jury trial.  And you have

23   placed it on top of us without any due process.

24          THE COURT:  All right.  I heard your objections,

25   those have been made for the record.  This is a charging

1    conference with respect to jury instructions.  Do you have

2    any objections to these jury instructions other than your

3    general objection to this Court's jurisdiction over you?

4         DEFENDANT BROKAW:  I take exception to the jury

5    trial likewise, Judge.

6         THE COURT:  All right.  So noted.

7         DEFENDANT VIGIL:  I take exception.  You should be

8    fulfilling your duty as a trustee --

9         THE COURT:  So noted.

10        DEFENDANT VIGIL:  -- closing the case.

11        THE COURT:  Do you have any objection to

12   Instruction No. 1 in particular?  I don't know if you want

13   to participate in the charging conference.  You have

14   participated this morning.  I think you should participate

15   because this is the law that will be given to the jury,

16   but that is your choice, as I told you on Monday.

17        DEFENDANT VIGIL:  Are you on this form, or are you

18   on this?

19        THE COURT:  We are on the jury instructions,

20   themselves, the ones that say "Jury Instructions" on them.

21   Instruction No. 1 is my standard instruction, introduction

22   to final instructions.

23        No objections?  All right.  Instruction No. 1 will

24   be issued.

25        Instruction No. 2 is the purpose of jury and duty

724

1    to follow instructions, which is my standard instruction.

2    The highlighting is essentially that I like to enter the

3    full names of the defendants there, and then I like to

4    refer to them as Mr. or Ms. as opposed to defendants.  So

5    I have made those changes.

6            The Government proposed the language that is

7    stricken at the middle of that page, which starts with

8    "similarly, the defendants' voluntary absence to the

9    courtroom is unrelated to their guilt or innocence."  I

10   actually moved that to Instruction No. 5, because I

11   thought it flowed better there and it did not stick out so

12   much.  So it is included, but included in Instruction No.

13   5.

14           DEFENDANT BROKAW:  Judge, on Instruction No. 2, I

15   take exception to my name being spelled in upper and lower

16   case.  I did not consent to use my name, and I have not

17   consented to be surety for the all capital letters name.

18           THE COURT:  All right.  That is fine.  Your

19   objection is noted.  It is overruled.

20           Any other objections?

21           DEFENDANT PAWELSKI:  I have the same objection,

22   Judge.  I am not a surety for the all capital letters

23   name.

24           DEFENDANT VIGIL:  You are using our name without --

25   well, we do not consent to that.

725

 1            THE COURT:  All right.  Your objection is noted.

 2   It is overruled.  Any other objections?

 3            MR. KIRSCH:  Not from the Government, Your Honor.

 4   Thank you.

 5            THE COURT:  All right.  Instruction No. 2 will be

 6   submitted as proposed.

 7            Instruction No. 3 is the presumption of innocence,

 8   burden of proof and reasonable doubt.  I have just

 9   modified it to indicate that we don't have a single

10   defendant here, we have three.  So it is "each defendant."

11   "The Government has the burden of proving each defendant

12   is guilty beyond a reasonable doubt."  Other than that, it

13   is my standard instruction.  Any objection?

14            MR. KIRSCH:  Not from the Government.

15            DEFENDANT VIGIL:  Exception as noted before.

16            THE COURT:  You can have a continuing objection on

17   that basis if you wish so you don't have to keep stating

18   it.  I will note you object to all of the instructions on

19   the basis you previously noted.  Those objections are

20   overruled as to this.

21            DEFENDANT VIGIL:  I object and take exception.

22            THE COURT:  Objection No. 3 will be tendered as

23   proposed.  It will be issued as proposed.

24            Instruction No. 4 is multiple defendants.  I only

25   added the language indicating we'll have a verdict form

```
 1    that will provide them with the questions that they need

 2    to answer in order to comply with this instruction.

 3           That was submitted by the Government, but it gives

 4    a pattern instruction from the Tenth Circuit.  Any

 5    objection?

 6           MR. KIRSCH:  No objection, Your Honor.

 7           THE COURT:  Any objection beyond what has already

 8    been made by the defendants to the other instructions?

 9    Hearing none, Instruction No. 4 will be issued to the

10    jury.

11           Instruction No. 5 is evidence defined.  This is the

12    one where I included language about the defendants being

13    voluntarily absent from the courtroom.  I also have

14    included, because of some of the statements that were

15    made, that second paragraph -- I am sorry, the third

16    paragraph, that begins with "nothing else is evidence."  I

17    have now modified that to say -- the second sentence would

18    read, "the lawyers' and defendants' statements and

19    arguments are not evidence.  Their questions are not

20    evidence."

21           And then we have the insert, which reads "the

22    defendants' voluntary absence from the courtroom --" and I

23    changed this to "-- during portions of this trial is

24    unrelated to their guilt or innocence.  Their absence is

25    not evidence in this case and should not enter your
```

1    thinking."  And we should strike "to be considered."  That

2    was a typo.

3          Actually, no, I wanted to leave that in.  The

4    language would be, "should not enter your thinking."  I am

5    sorry, "should not be considered."  So we are striking

6    "enter your thinking."

7          So it should read, "their absence is not evidence

8    in this case and should not be considered as you decide

9    whether each defendant has been proven guilty of the

10   crimes charged."  Go forward, and it is the same as it

11   was.  "My legal rulings are not evidence.  My comments and

12   questions are not evidence."

13         Then, the part that is stricken down below, I have

14   reinstated that based on what has taken place here today,

15   except that I have deleted the second sentence, which

16   says, "I also ruled that you could not see some of the

17   exhibits that the party wanted you to see," because I have

18   not done that during this trial.

19         And I have stricken the last clause, the second to

20   last sentence.  So that one now reads, "do not speculate

21   about what a witness might have said."

22         Any objections to this instruction as modified?

23         MR. KIRSCH:  No, Your Honor.  Thank you.

24         THE COURT:  Any objection from the defendants?

25         DEFENDANT VIGIL:  Usual exception.

1          THE COURT:  All right.  So noted.

2          Instruction No. 6, evidence direct and

3    circumstantial.  This is my standard instruction with no

4    modifications.

5          MR. KIRSCH:  No objection, Your Honor.

6          THE COURT:  Any objections from the defendant other

7    than the standard?  No?  All right.  Instruction 6 will be

8    given.

9          Instruction No. 7 is credibility of the witnesses.

10   Again, I have just changed it because I don't like to

11   refer to them after we originally refer to them as

12   defendants, I refer to them as Mr. or Ms.  And, actually

13   at this point, I will need to know whether the defendants

14   intend to testify so that I know whether in this

15   instruction I need to include the defendants.

16         DEFENDANT PAWELSKI:  Speaking for the three of us,

17   I think we need to a recess to discuss that.

18         THE COURT:  We will take a brief recess after we

19   conclude that so you all can discuss that, and I will need

20   to know.  I will also need to give you an advisement

21   before we conclude, as well.

22         So depending on whether or not the defendants

23   testify, we may or may not have the language which is

24   stricken.  All right.  If they testify, we will leave that

25   language out.  Otherwise, it is my standard instruction.

1    Any objection?

2         MR. KIRSCH:  No objection, Your Honor.

3         DEFENDANT PAWELSKI:  Objection on the fact that you

4    are using my name versus the defendant's name.

5         THE COURT:  That objection will be noted for all

6    three of the defendants.  It is overruled, and it will be

7    issued.

8         Instruction No. 8, voluntariness of statements.  It

9    says, "if applicable."  I will strike that because there

10   was testimony with respect to one of the witnesses today

11   about statements that were made by the defendants.  And I

12   think -- I recall there was testimony previously.  So we

13   will strike, "if applicable," and we will give this

14   instruction.

15        Any objection?

16        MR. KIRSCH:  Your Honor, no objection.  I believe

17   that the witness' testimony today was about a statement

18   made by Mr. Brokaw.  I don't believe we have offered any

19   evidence of statements made by either of the other two

20   defendants.

21        The Court -- the instruction still covers that.  If

22   the Court wanted to limit it to Mr. Brokaw, we would have

23   no objection to that, either.  I wanted to point that out

24   to the Court.

25        THE COURT:  All right.  I think that would be

 1    clearer if it was just the statement was attributed to

 2    Mr. Brokaw.  We will strike Mr. Pawelski and Ms. Vigil

 3    from this instruction.

 4         MR. KIRSCH:  Your Honor, the one other point that I

 5    would make about that is that that statement was not

 6    alleged to have been made after the commission of the

 7    crimes charged in this case.  It was alleged to have been

 8    made during the course of the commission of the crimes

 9    charged in this case.

10         THE COURT:  Okay.  I will make that change, as

11    well.  So during the course of the commission of the

12    crimes charged in this case.

13         Any objections as modified?

14         DEFENDANT BROKAW:  I am not in full agreement with

15    that.  I am not sure what Mr. Kirsch is talking about,

16    what it is going to read.

17         THE COURT:  What it is going to say is "evidence

18    has been presented about statements attributed to

19    Mr. Brokaw alleged to have been made during the course of

20    the commission of the crimes charged in this case but not

21    made in court."  That is the change we made to this

22    instruction based on the testimony of the witness earlier

23    today.

24         DEFENDANT BROKAW:  Is that in reference to

25    Mr. Deering's testimony, Your Honor?

1          MR. KIRSCH:  It is, Your Honor.

2          THE COURT:  Yes.  Any objection from the Government

3    as to that as modified?

4          MR. KIRSCH:  No, Your Honor.  Thank you.

5          THE COURT:  Mr. Brokaw?

6          DEFENDANT BROKAW:  None.

7          THE COURT:  Okay.  Then Instruction No. 8 will be

8    given as modified.

9          Instruction No. 9, I took this out because I

10   include this as part of Instruction No. 7.  I don't like

11   this to be a stand-alone instruction because it calls too

12   much attention to that, and I think it should be part of a

13   more general.  So that language is included in Instruction

14   No. 7 and deleted as a separate instruction.

15         MR. KIRSCH:  No objection from the Government, Your

16   Honor.

17         THE COURT:  Any objection from the defendants?

18         DEFENDANT PAWELSKI:  No objection.

19         DEFENDANT BROKAW:  Did you say you are deleting it?

20         THE COURT:  I am deleting it as a stand-alone.

21   That instruction is in No. 7.

22         DEFENDANT BROKAW:  Okay.

23         THE COURT:  All right.  That is deleted then.  We

24   need to re-number, starting at No. 10.  That will become

25   No. 9.  But we will go ahead and refer to it as 10 for

1    purposes of this conference.  That is a standard

2    instruction that I give without the dates.  Any objection?

3         MR. KIRSCH:  No objection, Your Honor.

4         DEFENDANT PAWELSKI:  I object.  There is no dates

5    on here.

6         THE COURT:  Right.  It is a general instruction as

7    to the phrase of the used on or about certain dates.  It

8    is referring to what is in the Indictment.  That objection

9    is overruled.  Any other objections from the defendants?

10        DEFENDANT VIGIL:  What good does it do for us to

11   take exception?

12        THE COURT:  You make it for the record for appeal

13   purposes, Ms. Vigil.

14        DEFENDANT VIGIL:  Yeah, right.

15        THE COURT:  Instruction No. 10 will be given as

16   issued.

17        Instruction No. 11 is a standard instruction about

18   the use of the conjunctive and disjunctive "and" or "or."

19        MR. KIRSCH:  No objection, Your Honor.

20        THE COURT:  Any objection from the defendants?

21        DEFENDANT PAWELSKI:  One moment.  I am still

22   reading.  I take exception to that No. 11, Judge.

23        THE COURT:  What is your objection?

24        DEFENDANT BROKAW:  It is vague and not clear.  I

25   don't think it could be clear to the jury members.

1          THE COURT:  All right.  What suggestions do you

2     have to make it more clear?

3          DEFENDANT BROKAW:  Eliminate it.

4          THE COURT:  That is not going to be -- it will be

5     included.  If you have specific suggestions as to how to

6     make it more clear -- this is a standard instruction the

7     Court has used in every case that it has tried.  So the

8     objection is overruled.  The instruction will be given as

9     stated.

10          Instruction No. 12, caution, punishment.  This is,

11     again, the Court's standard instruction.  Any objection?

12          MR. KIRSCH:  No objection, Your Honor.

13          DEFENDANT PAWELSKI:  Absolutely objection.

14          THE COURT:  What is the basis of your objection,

15     Mr. Pawelski?

16          DEFENDANT PAWELSKI:  I don't believe that you have

17     power to find any of us guilty since you are the trustee

18     and we are the --

19          THE COURT:  I will not be making the decision as to

20     guilt or innocence, that is the jury's decision.  This

21     instruction merely says that I will determine if they find

22     you guilty, what punishment is to be issued, and they need

23     not -- they should not consider or discuss the possible

24     punishment.

25          The objection is noted.  It is overruled.

1    Instruction No. 12 will be given.

2         Instruction No. 13 is just a reiteration of the

3    Indictment, excluding the charges against Ms. Mueller,

4    because she was dismissed as a defendant due to her

5    health.  And it is the standard practice of this Court to

6    provide the Indictment to the jurors in full.

7         Any objection?

8         MR. KIRSCH:  Not from the Government, Your Honor.

9         THE COURT:  Any objection from the defendants?

10        DEFENDANT VIGIL:  The standard exception.

11        THE COURT:  Okay.

12        DEFENDANT BROKAW:  This Indictment is -- has been

13    referred to the Treasury Department for discharge.  That

14    would be my exception.

15        THE COURT:  All right.

16        DEFENDANT BROKAW:  It is in the documents before

17    the Court, Judge.

18        THE COURT:  All right.  That objection is

19    overruled.  Those objections are overruled.  The

20    Indictment will be included -- the Indictment, as

21    modified, to exclude the charges against Ms. Mueller,

22    although there are references to her here and testimony as

23    to her involvement, will be provided to the jury as

24    submitted in this instruction.

25        That takes us to Instruction No. 14, the Count 19

1   conspiracy.  The Court did add to what had been submitted

2   by the Government, the second element, which is that there

3   has to be at least one overt act, because I believe that

4   is what the Tenth Circuit requires.

5        And I realize that the Government deleted it

6   because there is a Third Circuit case that Section 286

7   doesn't have an overt requirement.  There is no Tenth

8   Circuit authority on that matter that I could find.  So I

9   thought it is safer to include it.  And there has been

10  plenty of testimony with regard to overt acts.

11       MR. KIRSCH:  Your Honor, the Government agrees

12  there is no Tenth Circuit authority.  But we want to make

13  our position clear that we don't agree that the Tenth

14  Circuit would require an overt act for 286.  Nevertheless,

15  under the circumstances of this case, we're not objecting

16  to the instruction being given as the Court has drafted

17  it.

18       THE COURT:  Okay.  Any other objections from the

19  defendants as to Instruction No. 14?

20       DEFENDANT BROKAW:  I take exception, Judge.  This

21  law makes it a crime to conspire to defraud the United

22  States by obtaining the payment or allowance of any false

23  or fictitious claim.  I did not receive any payment or any

24  allowance of any claim.  And I think the other people here

25  would agree that we have not received any benefit from any

1     of the claims or charges that have been brought forth in

2     this Indictment.

3             THE COURT:  Those are matters the jury is to

4     determine.  Those are factual matters as to whether that

5     has been proved.  What this instruction does is say that

6     is what you have to find.  These are the elements you

7     would have to find.

8             DEFENDANT BROKAW:  You mean the jury has to find

9     out whether I received any benefit?

10            THE COURT:  They would have to determine whether

11    there was evidence presented by the Government that the

12    first element was met; that you agreed with at least one

13    other person to obtain or aid and obtain the payment or

14    allowance of any false, fictitious or fraudulent claim.

15            This instruction just sets out the law.  They then

16    have to find whether there was evidence presented to

17    support that.  So your objection is noted and overruled.

18    The Court will give this instruction, as modified, to

19    include that section element of one overt act, at least.

20            Instruction No. 15, Counts 2 through 12, false

21    claims against the Government.  The only modification I

22    made was to make it clear that each defendant has to be

23    considered separately for each crime that is being

24    charged.

25            MR. KIRSCH:  No objection, Your Honor.

1           DEFENDANT PAWELSKI:  Take exception to your words

2      "the Government."  I don't know what that is.

3           THE COURT:  The prosecution.  The Government.

4      False claims against the Government.  The United States

5      Government.  When I said -- oftentimes I refer to the

6      Government and prosecution as the same, but this

7      Government is the United States Government.

8           The objection is overruled.  Instruction 15 will be

9      given as noted.

10           Instruction No. 16 is Count 14, which is the

11      conspiracy to corruptly endeavor to obstruct and impede

12      the internal revenue laws.

13           MR. KIRSCH:  No objection, Your Honor.

14           THE COURT:  Any objection from the defendants?

15           DEFENDANT PAWELSKI:  I take exception to it.

16           THE COURT:  What is the basis of your exception?

17           DEFENDANT VIGIL:  I take exception that there was a

18      conspiracy.

19           THE COURT:  I understand that you dispute that, but

20      the objection needs to be to whether or not this is a

21      correct statement of the law related to what has to be

22      shown in order to prove you guilty of a conspiracy.

23           DEFENDANT PAWELSKI:  Since none of us are

24      knowledgeable about the basis of this statement, how could

25      we know that it is correct or not?

 1         THE COURT:  Well, that is what I advised you of

 2    when you decided you did not want an attorney appointed,

 3    that you would be responsible for knowing what the law was

 4    or researching it and finding it.  So if that is the basis

 5    of your objection, I am overruling it, and Instruction No.

 6    16 will be given as listed.

 7         Instruction No. 17, unanimity of theory.  This is

 8    just to clarify for the jurors that they have to be

 9    unanimous, not only as to the elements, but they also have

10    to be unanimous as to what the overt act was.  Any

11    objections?

12         MR. KIRSCH:  None from the Government, Your Honor.

13         DEFENDANT BROKAW:  Standard objection.

14         THE COURT:  That is overruled.  The instruction

15    will be given as stated.

16         Instruction No. 18, Counts 15 through 17, which are

17    the actual acts that are alleged to have been to corruptly

18    endeavor to obstruct or impede the due administration of

19    the internal revenue laws.  This is the Tenth Circuit

20    Pattern Instruction.  Any objections?

21         DEFENDANT BROKAW:  I am still reading that, Judge.

22         THE COURT:  All right.

23         MR. KIRSCH:  Government has no objection.

24         DEFENDANT BROKAW:  I take exception, Judge, to

25    "defendants knew was likely to obstruct or impede."  My

1    mindset was never knowingly in this mode.  And I don't

2    know how the jury could determine if any defendant -- who

3    I am here speaking for the trust -- if any defendant knew.

4    How could a jury know what their mindset was?

5         THE COURT:  All right.  Your objection is noted.

6    It is overruled.  That is a matter for the jury to

7    determine based on all of the evidence presented.  This

8    instruction will be given as stated.

9         Instruction No. 19 is the knowingly instruction.

10   The only change I made to this that you do not have is

11   that in the second-to-the-last sentence, where we said

12   "infer if the defendant deliberately blinded himself," I

13   have added "or herself," because we have a female

14   defendant here.

15        MR. KIRSCH:  I apologize if we didn't make this

16   clear, that at least the Government is not -- would

17   propose that this instruction, based on the evidence that

18   has been introduced during the trial, that this

19   instruction end at the end of the first sentence.

20        THE COURT:  That was what I had originally had.  I

21   wasn't sure if I may have missed something.  So the

22   original -- my original edits to this had been to exclude

23   everything after the first sentence, because I didn't

24   think there was evidence, and the defendants haven't put

25   on anything with respect to deliberately blinding

1    themselves.

2           MR. KIRSCH:  We agree with that, Your Honor.  I

3    don't believe we have sufficient evidence of efforts to

4    deliberately blind themselves to support that portion of

5    the instruction.  So we would ask that just the first

6    sentence of this instruction be given.

7           THE COURT:  All right.  So I will strike that based

8    on the lack of evidence to that effect at this point.  So

9    this instruction will have only the first sentence in it.

10          Any objections by the defendants?

11          DEFENDANT BROKAW:  Let me read it.

12          DEFENDANT PAWELSKI:  "When the word 'knowingly' is

13   used in these instructions, it means the act was done

14   voluntarily and intentionally, and not because of mistake

15   or accident," and the rest is gone?

16          THE COURT:  The rest is gone.  Because there has

17   been no evidence as to any of that.  Any objections?

18          DEFENDANT PAWELSKI:  I have no objection to that.

19          THE COURT:  All right.  And Instruction No. 19 will

20   be given as modified.

21          The last instruction is my standard instruction

22   with respect to the instructions to the jury on the duty

23   to deliberate, to select a foreperson, and to fill out the

24   verdict form.  Only change I made is to capitalize Court

25   Security Officer and to insert iPad and tablet as

1    additional electronic devises.  And then to delete

2    references to "defendants" and insert references, for the

3    most part, to Mr. or Ms., with a surname.

4         MR. KIRSCH:  No objection to No. 20 from the

5    Government, Your Honor.

6         THE COURT:  I assume the defendants have their

7    standard objection to the use of their names?

8         DEFENDANT VIGIL:  Why is it not all capitals?

9         THE COURT:  Because this is how my instruction

10   reads.

11        MR. KIRSCH:  Your Honor, just for the record, I

12   will also point out that the first Superseding Indictment

13   does not list the defendants' names in all capitals, it

14   lists them in upper and lower case.  So the instructions

15   are mirroring the charging documents in this case.

16        THE COURT:  All right.  Any other objections from

17   the defendants?

18        DEFENDANT BROKAW:  Standard.

19        THE COURT:  The standard objections are noted and

20   overruled.  Instruction No. 20 will be given as indicated.

21        Instruction No. 21 are the communications with the

22   Court.  This is to instruct the jury they can have no

23   communication with me unless it is in writing, and I will

24   not communicate with them unless I first consult with the

25   parties.  It is my standard instruction.

1        MR. KIRSCH:  No objection from the Government, Your

2   Honor.

3        THE COURT:  Any objection from the defendants?

4        DEFENDANT VIGIL:  I have a question.

5        THE COURT:  You may.

6        DEFENDANT VIGIL:  Why is -- why are you using the

7   upper lower case name when it is the artificial person

8   that is actually being pursued here.

9        THE COURT:  That is not a valid question for this

10  conference, therefore, I will not respond to that.  It is

11  the way it is.

12       Is there any objection to Instruction No. 21 as

13  stated?  No objection?  Then Instruction No. 21 will be

14  given.

15       Then you should also have a verdict form, which

16  essentially just states each count and the defendant who

17  is charged in that count and whether the jury finds them

18  unanimously guilty or not guilty.  So it is -- this is a

19  very standard form.

20       Any objections to the form?  The only thing I did

21  is to change what was submitted on the conspiracy counts.

22  I inserted A, B and C to separate out each different

23  finding that they need to make.

24       MR. KIRSCH:  No objection to this form from the

25  Government, Your Honor.

1          THE COURT:  Any objection from the defendants?

2          DEFENDANT VIGIL:  Standard objection.

3          THE COURT:  That is noted and overruled.  That will

4     be the form of the verdict.

5          At this point I believe that I need to give the

6     defendants what is called in state court a Curtis

7     Advisement.  We will take a break so you can all confer

8     among yourselves.

9          As defendants in a criminal case, you have the

10    right to testify in your own defense.  No one may make you

11    testify.  No one may prevent you from testifying.  That

12    decision is entirely up to you.  Now, if you do choose to

13    testify, the Government will be allowed to cross-examine

14    you and may disclose facts that are unfavorable to you to

15    the jury.

16         Now, by giving you this advisement, I am not giving

17    you any advice regarding whether or not you should

18    testify.  I am just giving you advice regarding what your

19    rights are.

20         Now, if you decide to testify, you will be taking

21    an oath and you must tell the truth.  And the prosecutor

22    can cross-examine you and bring out facts that may help

23    their case or would cause the jury to disbelieve you or

24    both.

25         Now, if you decide not to testify, that cannot be

1    held against you, and I will so instruct the jury.  The

2    prosecutor would not be able to cross-examine you if you

3    do not testify.

4         Now, do you understand these rights that I have

5    just explained to you?

6         DEFENDANT PAWELSKI:  I comprehend them, yes, ma'am.

7         DEFENDANT VIGIL:  I comprehend.

8         DEFENDANT BROKAW:  Likewise.

9         THE COURT:  Do you have any questions to me about

10   those rights?

11        DEFENDANT VIGIL:  Is there a difference between

12   testifying and a closing statement?

13        THE COURT:  Your closing argument is only argument,

14   and I have told the jury, and will tell them again, that

15   what you say in closing argument is not evidence.  So that

16   is the difference, is that whatever you say in court

17   without testifying is not evidence, and there may be

18   objections if you are bringing out facts in argument that

19   are facts that you did not submit testimony on.  And I

20   would sustain those objections if you raise facts that

21   have not been testified to.

22        All right.  With that being said, then, we will

23   take a brief recess.  We've kept the jury waiting out for

24   awhile.  I would say -- how long do you think you need to

25   confer to decide whether you are going to testify?

```
 1            DEFENDANT PAWELSKI:  30 minutes.

 2            DEFENDANT BROKAW:  30 minutes, tops.

 3            THE COURT:  How many?

 4            DEFENDANT VIGIL:  30 minutes.

 5            THE COURT:  We have taken more than 30 minutes of

 6    the jury's time.  If you want, I guess we can tell the

 7    jury we will break for lunch, if that is what you need.

 8    So we will tell the jury we will break for lunch at this

 9    time.

10            Ms. Hartmann, if you can let them know, we will

11    then be in recess until 12:10.  And then when we come

12    back, before we bring the jury in, I will ask whether or

13    not you intend to testify.  And then we will move forward

14    with the Government's case, then directly into the

15    defendant's case.

16            All right.  Court will be in recess until 12:10.

17            (Lunch is taken from 11:37 a.m. to 12:10 p.m.)

18            THE COURT:  All right.  You may be seated.

19            DEFENDANT VIGIL:  I choose to sit down at this

20    time.

21            THE COURT:  All right.  Mr. Pawelski?

22            DEFENDANT PAWELSKI:  Judge Arguello, this morning I

23    put an emergency motion for the court to declare a state

24    of judicial bias in this case.  That has not been ruled

25    on.  Also, I placed a civil rights violation lawsuit
```

1    against yourself and the prosecuting attorneys.  That puts

2    you in conflict of interest with me and Mr. Brokaw.  And

3    we placed an indemnity bond to set reversionary interest

4    back to the United States of America.  You are in

5    violation of the oath of office and should recuse

6    yourself.

7         THE COURT:  Your motion is denied, both motions

8    that you tendered.

9         DEFENDANT PAWELSKI:  What facts of law are you

10   using to deny them?

11        THE COURT:  Because you cannot create a conflict of

12   interest by just filing a spurious lawsuit against me.

13   There is Tenth Circuit precedent.

14        DEFENDANT PAWELSKI:  This isn't a spurious lawsuit.

15        THE COURT:  I am denying your motions.  We are

16   proceeding.

17        Do you all intend to testify today?  Have you made

18   a decision?

19        DEFENDANT PAWELSKI:  I am not.

20        THE COURT:  You are not testifying?

21        DEFENDANT PAWELSKI:  No, ma'am.

22        THE COURT:  All right.  Ms. Vigil?

23        DEFENDANT VIGIL:  I have no intentions of

24   testifying at this time.

25        THE COURT:  All right.  Mr. Brokaw?

```
 1            DEFENDANT BROKAW:  I have no intention of
 2    testifying.  I do want to make a closing statement to the
 3    jurors.
 4            THE COURT:  All right.  Is there anything further
 5    before we bring in the jury?
 6            MR. KIRSCH:  Your Honor, just for scheduling
 7    purposes, then, are we going to move straight into
 8    instructions after the Government rests, and then
 9    closings?
10            THE COURT:  Yes.
11            MR. KIRSCH:  Thank you, Your Honor.
12            THE COURT:  Actually, I should ask, if you don't
13    intend to testify, do you intend to put on any evidence?
14            DEFENDANT PAWELSKI:  Evidence of what?
15            THE COURT:  A defense.  At the end of the -- you
16    have the right to confront and cross-examine all witnesses
17    and evidence.  You have the right to put on your own
18    testimony.  You don't have to, as I gave you the
19    advisement.  If you intend to, I need to know if you are
20    going to have any witnesses here to testify.
21            DEFENDANT PAWELSKI:  No, we will not.
22            THE COURT:  All right.  Ms. Hartmann, would you
23    please bring in the jury.
24            (The following is had in open court, in the hearing
25    and presence of the jury.)
```

1            THE COURT:  You may be seated.

2            DEFENDANT VIGIL:  I choose to be seated.

3            THE COURT:  All right.  The Government may call its

4    next witness.

5            MS. PALUCH:  Thank you, Your Honor.  The Government

6    calls Darcy Emme.

7            COURTROOM DEPUTY:  Please enter the box and remain

8    standing.

9            Your attention, please.

10           Please raise your right hand.

11                           **DARCY EMME**

12   having been first duly sworn, testified as follows:

13           COURTROOM DEPUTY:  Please be seated.

14           Please state your name, and spell your first and

15   last names for the record.

16           THE WITNESS:  Darcy Emme.  D-A-R-C-Y.  Last name is

17   E-M-M-E.

18           THE COURT:  You may proceed.

19           MS. PALUCH:  Thank you, Your Honor.

20                        **DIRECT EXAMINATION**

21   **BY MS. PALUCH:**

22   Q.   Good afternoon, ma'am.  Where do you work?

23   A.   First Premiere Bank.

24   Q.   Where is your office?

25   A.   Sioux Falls, South Dakota.

749

1    Q.    How long have you worked for First Premiere Bank?

2    A.    17 years.

3    Q.    How many years total have you worked in the Banking

4    industry?

5    A.    For 25.

6    Q.    And in that 25 years, have you become familiar with

7    forms 1099?

8    A.    Yes.

9    Q.    What type of forms 1099 are you familiar with?

10   A.    1099 C.

11   Q.    Okay.  And what are those used for?

12   A.    Cancellation of debt.

13   Q.    When First Premiere would issue such a 1099, how

14   would you go about that, or where would you submit those

15   forms?

16   A.    We would submit a form to the IRS and send one to the

17   cardholder.

18   Q.    Would you ever receive back a 1099 form mailed back

19   to yourself?

20   A.    No.

21   Q.    Okay.  Were you asked to review certain documents in

22   preparation for your testimony today?

23   A.    Yes.

24   Q.    I will refer your attention to what has already been

25   admitted --

750

1          MS. PALUCH:  And ask for permission to publish page

2    13 of Government's Exhibit 35.

3          THE COURT:  You may.

4          MS. PALUCH:  If we could highlight the bottom

5    portion of that page.

6    Q.   (BY MS. PALUCH)  Do you see a reference to First

7    Premiere Bank on that page?

8    A.   Yes.

9    Q.   Who is listed as the recipient on this form?

10   A.   John Pawelski.

11   Q.   And do you see in Box 5 a credit card account number

12   there?

13   A.   Yes.

14   Q.   And at our request, did you research that account

15   number?

16   A.   Yes.

17   Q.   And what, if anything, did you find?

18   A.   The account number listed on the form, for instance,

19   is missing a zero, so it is not a full credit card number.

20   Q.   Did you find -- I will ask you to move forward,

21   closer to the microphone.

22          Did you find an account number similar to what is

23   listed here on page 13?

24   A.   Yes.  We found credit card information regarding this

25   particular account.  Would have been application

```
 1   information and cardholder statements and notes.
 2   Q.   And in whose name was that account?
 3   A.   John Pawelski.
 4   Q.   Did you determine whether First Premiere Bank issued
 5   this Form 1099 OID?
 6   A.   No, we did not.
 7   Q.   Does First Premiere Bank ever issue 1099 OIDs for
 8   credit cards?
 9   A.   No.
10   Q.   Would First Premiere Bank have withheld $5,000 and
11   submitted it to the IRS on behalf of Mr. Pawelski?
12   A.   No.
13   Q.   Direct your attention to Government's Exhibit 122,
14   which should be on a folder there, ma'am, on the stand.
15   Can you look at that exhibit and state what that appears
16   to be.
17   A.   A screen shot of account information for this
18   particular account.
19   Q.   Okay.  And the documents that fall behind that first
20   page, generally, how would you describe those pages?
21   A.   Page 2 is --
22   Q.   I will stop you there.  If you can just generally
23   describe what this exhibit is.
24   A.   Account monthly balances for the particular
25   cardholder.
```

752

```
 1    Q.   Does this pertain to the account we just discussed on

 2    the previous exhibit?

 3    A.   Yes.

 4    Q.   In the name of John Pawelski?

 5    A.   Yes.

 6    Q.   Are you considered a custodian of records of those

 7    documents?

 8    A.   Yes.

 9    Q.   Were these documents kept in the regular course of

10    business conducted by First Premiere Bank?

11    A.   Yes.

12    Q.   Was the making of these records a regular practice of

13    that activity?

14    A.   Yes.

15    Q.   And did First Premiere Bank rely on the accuracy of

16    these records in the course of its business?

17    A.   Yes.

18         MS. PALUCH:  Your Honor, at this time I move to

19    admit and publish Government's Exhibit 122.

20         THE COURT:  Any objection?

21         DEFENDANT PAWELSKI:  I take exception to that.

22    That violates the privacy act.

23         THE COURT:  All right.  The objection is noted.

24    Exhibit 122 will be admitted.

25         (Exhibit No. 122 is admitted.)
```

1          THE COURT:  It may be published.

2          MS. PALUCH:  Thank you, Your Honor.

3    Q.   (BY MS. PALUCH)  On this first page, Ms. Emme can you

4    describe generally what this page is?

5    A.   It is a screen shot of account information for the

6    referenced credit card.

7    Q.   For the account we have been discussing?

8    A.   Yes.

9    Q.   Does it indicate when this account was opened?

10   A.   The open date is 2/24/04.

11   Q.   Does it state when the account was closed, if it was

12   closed?

13   A.   I do not show a close date on this particular screen.

14   Q.   Do you show a sold date?

15   A.   Not on this screen.

16   Q.   Okay.  Let's go to the second page.  My apologies,

17   page 2, if you could.  Do you see an open date and a sold

18   date on this page?

19   A.   Yes.

20   Q.   What is the sold date?

21   A.   3/1/07.

22   Q.   And what does that mean, sold date?

23   A.   The credit card in question would have been charged

24   off and sold to a third-party creditor -- excuse me,

25   third-party collection agency.

1    Q.   And what was the balance on the account when it was

2    sold?

3    A.   418.54.

4    Q.   Okay.  And if you could turn to page 7 of that

5    document.  What does this document reflect?  What is the

6    information on this page?

7    A.   This is income information that was provided on the

8    application.

9    Q.   And who would have provided that?

10   A.   The cardholder.

11   Q.   And what is that first entry, that number under

12   income?

13   A.   Monthly income.  $5,208.

14   Q.   And this is information received from Mr. Pawelski?

15   A.   Yes.

16   Q.   The next line, $4,000?

17   A.   $4,167 monthly income.

18   Q.   Okay.  If you could turn to page 11, please.  What is

19   the title of that document?

20   A.   E-mail address.

21   Q.   And the e-mail address reflected there, would that

22   have been provided by Mr. Pawelski?

23   A.   Yes.

24   Q.   Pages 2 through 12 --  12 through 17 of this

25   document, what do they represent, starting, actually, with

1    13?

2    A.   Credit card statements correlating to the credit card

3    account for John Pawelski.

4    Q.   Okay.  And in your research, did you determine

5    whether First Premiere Bank ever withheld any money from

6    this account and forwarded that on to the IRS on behalf of

7    Mr. Pawelski?

8    A.   No.

9         MS. PALUCH:  No further questions, Your Honor.

10        THE COURT:  All right.  Thank you very much.

11        Cross-examination?

12                      **CROSS-EXAMINATION**

13   **BY DEFENDANT PAWELSKI:**

14   Q.   Hello, Ms. Emme.  How are you today?

15   A.   Good.

16   Q.   Good.  You are the custodian of records at First

17   Premiere Bank; is that correct?

18   A.   Yes.

19   Q.   Were you involved with the receipt of the 1099 OID

20   from John J. Pawelski?

21   A.   We don't receive 1099s, we generate them to the IRS

22   and to the cardholder.

23   Q.   Okay.  Was there any -- did you have any fraud

24   investigation concerning that document that we just talked

25   about?

1    A.    We researched the records.

2    Q.    When did you do that?

3    A.    When we received the summons to appear.

4    Q.    Summons to appear.  What happened back in 2006 or

5    whenever that was allegedly received?

6    A.    I am not quite sure what you are asking me, sir.  I

7    am sorry.

8    Q.    Was there any investigation for fraud upon the

9    receipt at First Premiere Bank of that document?

10   A.    We did not receive a 1099 form.  Is that what you are

11   asking?

12   Q.    You did not receive it.  Okay, that is fine.

13         Okay.  Did your company issue any credits or

14   funding to John J. Pawelski due to that form?

15   A.    No.

16   Q.    Okay.  Okay.

17         THE COURT:  Excuse me, ma'am, could you please turn

18   off your phone.

19   Q.    (BY DEFENDANT PAWELSKI)  Do you have any first-hand

20   knowledge of the 1099 OID form that was received, or

21   allegedly received?

22   A.    No, I do not.

23   Q.    Okay.  And the last question I have is what type of

24   prompting of your testimony did you receive prior to this

25   hearing?

1      A.    I received no prompting.

2            DEFENDANT PAWELSKI:  Thank you very much.

3            THE COURT:  Any redirect?

4            MS. PALUCH:  No, Your Honor.  Thank you.

5            THE COURT:  All right.  Thank you very much, you

6      may step down.

7            THE WITNESS:  Thank you.

8            THE COURT:  All right.  The Government may call its

9      next witness.

10           MS. PALUCH:  The Government rests, Your Honor.

11           THE COURT:  All right.  My understanding from the

12     defendants is that they do not wish to put on any

13     evidence; is that correct?

14           DEFENDANT BROKAW:  Defending the trust, I don't see

15     any need.

16           DEFENDANT PAWELSKI:  We do have a closing statement

17     we would like to state to the jury.

18           THE COURT:  All right.  We first need to get the

19     jury instructions, which are being copied right now.  I

20     don't think they are ready.  So I think probably the best

21     bet is to, unfortunately, take another recess.  It depends

22     how quickly we can get things copied.

23           But the process from here is I will go -- you will

24     each have a copy of the jury instructions.  I will read

25     them to you.  Then we will go to the closing arguments of

```
 1   both sides.  Then the matter will be turned over to you

 2   for your deliberations.

 3        So at this point we will take a brief recess until

 4   we can see whether or not we have the jury instructions

 5   available.  I will bring you back in when we know we are

 6   ready to proceed.  So the jury is excused.  Court will be

 7   in recess.

 8        DEFENDANT VIGIL:  I choose to stand.

 9        (A break is taken from 12:26 p.m. to 12:43 p.m.)

10        THE COURT:  You may be seated.

11        DEFENDANT VIGIL:  I choose to be seated.

12        THE COURT:  Are we ready to bring the jury in?

13        MR. KIRSCH:  Yes, Your Honor.

14        THE COURT:  All right.  Ms. Hartmann, please bring

15   in the jury.

16        (The following is had in open court, in the hearing

17   and presence of the jury.)

18        DEFENDANT VIGIL:  I choose to rise.

19        THE COURT:  All right.  Ladies and gentlemen, you

20   may be seated.

21        DEFENDANT VIGIL:  I choose to sit.

22        THE COURT:  Ladies and gentlemen, you have in front

23   of you jury instructions, which I will be reading to you.

24   It will take a little bit of time because they are a

25   little bit of a hefty packet.  You can read along as I
```

1    read, or you can just listen as I read.  I tend to be more

2    of a visual learner, so I retain better if I see what I am

3    hearing, which is why I give you copies.

4         (Jury instructions read in open court but not

5    reported per agreement of the parties.)

6         THE COURT:  All right.  With that, then, the

7    Government has the opportunity to do closing argument,

8    then the defendants will have an opportunity to do closing

9    arguments, and then the Government will have an

10   opportunity to present a short rebuttal.

11        You may proceed.

12        MR. KIRSCH:  Thank you, Your Honor.

13                    **CLOSING ARGUMENT**

14   **BY MR. KIRSCH:**

15        May it please the Court, Mr. Brokaw, Mr. Pawelski,

16   Ms. Vigil, and members of the jury.  You have now had the

17   opportunity to see exactly what Ms. Paluch told you you

18   would see over the course of this trial.  You have had the

19   opportunity to see the evidence that demonstrates that

20   these three defendants, over the course of years, were

21   trying to cheat the Government out of tens of thousands,

22   hundreds of thousands, sometimes millions of dollars.  And

23   you have seen the evidence that establishes the

24   astonishing lengths to which the defendants went to try to

25   carry out their efforts to cheat the Government out of

1    that money

2            The Judge just told you that there are a couple of

3    things that you don't need to be considering when you are

4    making your determination.  You don't need to consider and

5    you shouldn't consider the fact that the defendants

6    exercised their rights to be absent for part of this

7    trial.  Just like you don't need to consider, where is

8    Ms. Mueller or where is Mr. Morris, who, by the way, is

9    the "CM" that is referenced in the Indictment.  That is

10   Curtis Morris.

11           You have the same job that a jury has in any trial;

12   that is to evaluate the evidence that you've heard and

13   determine whether or not the Government did its job.  We

14   have the same job that we have in any trial; to present

15   you with evidence and to convince you beyond a reasonable

16   doubt that the defendants are guilty of the charges in the

17   first Superseding Indictment, and we believe we have done

18   that.

19           As you heard, there are two sets of charges for you

20   to consider in this case.  I am going to describe them in

21   the opposite order from the way Ms. Paluch described them,

22   the same order in which they appear in the first

23   Superseding Indictment.  So I want to start with the first

24   set of charges that relates to the conspiracy to make

25   false claims for refund and the presentation of false

1    claims for refund.  Those are the 286 and the 287 charges

2         With respect to all of those charges, the

3    Government is not required to prove that the defendants

4    actually succeeded in getting the false claims.  When you

5    look at the elements, again, of conspiracy, as the Judge

6    just described to you, that crime is complete when two

7    things have happened.  First, when each of the defendants

8    has made the agreement to present false claims for refund.

9    And, second, when at least one defendant has engaged in at

10   least one overt act in furtherance of that agreement

11        Of course, you also know from the evidence that

12   that conspiracy was, in fact, successful, at least for a

13   time.  Mr. Brokaw, you heard and saw the letter, which

14   established he got a credit for over $62,000 based on the

15   false claim that was contained in his 2008 tax return.

16   Fortunately, the IRS figured it out sometime later and

17   reversed that credit.

18        But for some period of time, he had received over

19   $62,000 of credit against his previous outstanding tax

20   liabilities on the basis of the false refund that he

21   claimed in his 2008 return.

22        And you have seen in evidence, and I will show you

23   just a few of them here again now, you have seen the

24   evidence which establishes every one of the returns set

25   forth in those 286 and 287 counts and which establishes

762

1    that every one of the acts set forth in the manner and

2    means took place.

3         This is an example of one of Mr. Brokaw's false

4    returns.  This is the 2006 return.  And in this return,

5    you will recall that he falsely claimed on the basis of

6    multiple false forms 1099 OIDs, that there was over

7    $112,000 in federal income tax withheld from him that

8    year.  And on the basis of those false OIDs, he asked for

9    a fraudulent refund of almost $72,000 for that year.

10        You saw Ms. Vigil's tax return for 2005.  You saw

11   that she falsely claimed that over almost $374,000 in

12   income tax was withheld from her that year.  And on the

13   basis of that, she falsely claimed a refund of over

14   $372,000.

15        And, finally, you saw the various returns from

16   Mr. Pawelski.  This is his 2006 return.  You saw on this

17   one that he claimed that over $14 million had been

18   withheld from him in income tax that year, all supported

19   by completely made-up Form 1099 OIDs.  And he asked on the

20   basis of that for a refund of almost $9.2 million.

21        You all have seen Form 1099 OID after Form 1099 OID

22   over the course of this trial.  And I'm going to indulge

23   you and not show you those again.  But I can summarize the

24   testimony that you heard from about 30 different witnesses

25   about those OIDs in about 2 minutes.  Here I go.

1        Number one, not a single one of the institutions

2    listed in those forms 1099 OID actually issued them or

3    created them.  All of the rest of the testimony, every

4    single one of those witnesses identified one or more of

5    the following additional problems with those forms:

6        Number one, they had the wrong address.

7        Number two, it had the wrong EIN number.

8        Number three, there were misspellings, including

9    misspelling of the entity that was supposedly issuing the

10    form.

11        Number four, the account number was wrong or the

12    account numbers within the form didn't even match.

13        Number five, the form was handwritten.

14        Number six, the form was also contained on the same

15    page as forms of other institutions.  And every witness

16    told you they would never do that.

17        Number seven, many of the companies told you we

18    don't even issue forms 1099 OIDs.

19        That is how you know that every single one of those

20    forms was false and fraudulent.  And, of course, the

21    defendants knew that, because it was the defendants that

22    were creating the forms.

23        The Judge also explained to you that in order to

24    convict the defendants of participating in a conspiracy,

25    you have to find that there was interdependence.  And she

1    told you that interdependence means that the defendants

2    were acting together for their shared mutual benefit.

3         And, of course you know they were doing that

4    because you have seen, again and again, the evidence about

5    how even with respect to these false tax returns, various

6    defendants were helping each other mail them or deliver

7    them or certify or notarize the mailing or the delivery of

8    each of them.

9         But you also saw e-mails in which these defendants

10   were communicating directly about these fraudulent forms.

11   You saw, for example, this form from Mr. Brokaw.  This

12   e-mail from Mr. Brokaw.  This is the one that Mr. Brokaw

13   sent after he got that refund based on the fraudulent 2008

14   return.

15        And what did he tell Mr. Morris, who had helped him

16   prepare that return?  He told Mr. Morris, you should put

17   this info, plus the other victories out in an e-mail

18   message.  If you filed a tax return for a refund that you

19   think you're owed, that is not a victory, that's just what

20   is coming to you.  A victory occurs when you have

21   succeeded in your objective of cheating the Government out

22   of $62,000 to which you weren't entitled.

23        You saw this e-mail from Ms. Vigil to Curtis

24   Morris.  This is the e-mail that you recall was contained

25   in a chain discussion between he and her about the filing

1    of her return for 2005.  And in some other e-mails they

2    explicitly discussed including the Mistar Financial OID.

3    That is the one that was actually included with that

4    return.

5        But what did she say when Mr. Morris told her about

6    what kind of refund she might be able to expect.  "I would

7    love to get 220,000 back for '05.  Let's go with that for

8    now and see what happens."

9        That's not language used by someone who's filing a

10   return for a refund they think they are entitled to.  That

11   is someone who is taking a flyer and seeing if she can

12   cheat the Government out of a couple hundred thousand

13   dollars.

14       Finally, you saw this e-mail from Mr. Pawelski to

15   Mr. Morris.  This is the one where they were having a back

16   and forth about the OID forms that needed to be included

17   with Mr. Pawelski's response.  And Mr. Morris, you will

18   recall before this, was saying where are these forms?  I

19   am not sure where the 1099 forms are.

20       What was Mr. Pawelski's response?  I already gave

21   them to you but, hey, if you don't have them, I can

22   re-create them.  Not a problem.  We are dealing with

23   fraudulent documents, you need more, I will make more.

24       The second set of charges that you all need to

25   consider are the charges that relate to the obstruction of

1    the due administration of the internal revenue laws.  And,

2    again, you have to -- you have two kind of charges to

3    consider.  You have the conspiracy charge for the

4    obstruction, and then you have an individual charge for

5    each of the defendants.

6         And when you go back and compare the paragraphs in

7    the Indictment, the paragraphs that are referenced in

8    those individual counts, what you will see is that each

9    one of those paragraph numbers references a previous

10   paragraph in which an act in which that particular

11   defendant participated.  That is how those cross

12   references work for counts, I think it is 15, 16 and 17.

13        The Judge also gave you some definitions to use

14   when you are considering those counts, and a couple of

15   those are important.  I want to discuss them with you a

16   little bit so we can talk about how the evidence relates

17   to those.

18        You need to find that the defendants were acting

19   corruptly.  You need to find that they were endeavoring.

20   And you need to find that the endeavor was to obstruct or

21   impede the due administration of the internal revenue

22   laws.

23        Corruptly means that the defendants were acting

24   with the intent to gain an unlawful advantage or benefit.

25   And it doesn't have to be for themselves.  It can be for

1    themselves or it can be for other people.  You heard

2    evidence during this trial about both.  And we will talk

3    about some of that evidence again in just a moment.

4         Endeavor means the defendants were acting knowingly

5    and intentionally to bring about a desired result.  But,

6    again, just like the first set of charges, the Government

7    doesn't have to prove that the defendants actually

8    succeeded.  Again, I will suggest to you that we proved

9    that they did actually succeed in obstructing and impeding

10   the administration of the internal revenue laws, but we

11   don't have to prove that.

12        All you have find is that the defendants were

13   acting in a manner that made it likely to obstruct the due

14   administration of the internal revenue laws or to impede

15   that.  The due administration of the internal revenue

16   laws.  It includes everything you have heard about from

17   the IRS and the TIGTA witnesses.  The IRS's efforts to

18   ascertain taxes.  The IRS's efforts to collect taxes.

19   Efforts to conduct criminal investigations related to

20   taxes.

21        Those are all part of the due administration of the

22   internal revenue laws.  That's the testimony that you

23   heard.  That is what all of those exhibits that you saw

24   related to.

25        Let's start by talking about how the IRS began by

 1   trying to deal with these defendants.  You saw letter
 2   after letter in which the defendants were warned that the
 3   positions that they were taking were considered frivolous.
 4   Here is the warning letter that was sent to Mr. Pawelski
 5   for tax year 2005.  Here is the warning letter that was
 6   sent to Mr. Brokaw for tax year 2006.  Here is a warning
 7   letter that was sent to Mr. Brokaw for tax year 2007.
 8   Here is a warning letter that was sent to Mr. Brokaw for
 9   tax year 2008.
10        Every single one of these letters not only warned
11   the defendants that the IRS considered their positions
12   frivolous, but told them that they would be subject to
13   civil penalties if they didn't withdraw the returns.
14        And how did the defendants respond to these?
15   Usually they did what Mr. Brokaw did with these right
16   here; they wrote some nonsense language on the front of
17   it, like "Accepted for Value," and sent it back to the IRS
18   again and said, no, this was a correct return.  Pay my
19   refund.  Pay my claims for refunds for tens of thousands
20   or hundreds of thousands or millions of dollars.
21        Now, we don't have one of these forms for Ms. Vigil
22   in evidence, but what do we have?  We have Ms. Vigil's
23   admission that she got the letter right here in her e-mail
24   to Curtis Morris.  I just got a letter from our friends at
25   the IRS.  They have determined that the info filed as a

1    return of tax on December 15, 2008 is frivolous.  What did

2    Ms. Vigil think of that response?  "Blah blah blah."

3         I want to be clear here, this prosecution doesn't

4    have anything to do with the defendants' beliefs or any

5    kind of political position that the defendants want to

6    take.  Okay.  We showed you this exhibit, this "no income

7    tax" banner in Mr. Brokaw's desk during the execution of

8    the search.

9         One of the great things about our nation is that we

10   are not only allowed, but we encourage people to have a

11   variety of beliefs about political issues just like this

12   one.  We allow people to display banners like this.  They

13   can put it in their house.  They can put it on their car

14   and drive around with it.  They can proclaim it on the

15   street corner or on the courthouse steps.

16        But the other great thing about our country is that

17   we're a nation of laws.  And when you have expressed a

18   belief like that, and your position is lost, you have not

19   won, then you are required to follow the law.  So when you

20   have expressed a position like that, and it has been

21   determined to be unlawful, you don't get to go out and buy

22   fake fancy paper that says "secured promissory note" or

23   "Non-Negotiable Unlimited Private Bond for Setoff or

24   discharging an indemnity bond.  You don't get to go have

25   this paper, like Mr. Pawelski and Ms. Vigil had on the

1    kitchen table of the residence where they lived.  And you

2    don't get to make up fake documents, print them on this

3    kind of paper so they look official, then try to submit

4    them to the IRS or various other Treasury Department

5    officials so you can try to get rid of your tax debt.

6         And you saw throughout the trial the documents, the

7    completed documents like that that the defendants

8    submitted.  There is the hundred billion dollar Private

9    Register Bond for Setoff in Mr. Brokaw's name, signed by

10   Mr. Pawelski, as well.  There is the hundred billion

11   dollar Private Registered Bond for Setoff in

12   Mr. Pawelski's name, signed by Mr. Brokaw.  There is the

13   hundred billion dollar Private Registered Bond for Setoff

14   in Ms. Vigil's name, signed by all three of the defendants

15   sitting right there.

16        And, of course, you saw that they didn't just

17   create these documents for themselves, they created them

18   for other people, as well.  There is the hundred billion

19   dollar Private Registered Bond for Setoff created for

20   their associate, William Rogers.  He is the "WR" listed in

21   the Indictment.

22        There is the Private Registered Bonded Promissory

23   Note prepared for Nancy Berryman, another one of their

24   associates.  She is the "NB" who is listed in the

25   Indictment.

 1              And you saw copy after copy of these bonds over the

 2       course of the trial.  And the reason -- part of the reason

 3       that you saw so many copies and you saw these so many

 4       times is that the defendants sent them to Secretary

 5       Geithner.  Sometimes they sent them to the IRS.  They had

 6       copies of them in their house.  They had copies in their

 7       house that demonstrated that they had mailed them to the

 8       IRS or to Secretary Geithner.  That is part of the reason

 9       that you saw those so many times, because they appeared in

10       all manner of different places.

11              You also saw evidence that besides these bonds, the

12       defendants used any manner of other kind of bogus

13       documents and bogus techniques to try to pay off their

14       outstanding taxes or to pay off the outstanding taxes for

15       other people.  You saw the documents on which their money

16       order over something, that was actually a payment voucher.

17              You saw all of the documents in which each and

18       every one of these defendants wrote "Accepted for Value"

19       across something that was a bill and tried to send that

20       back in to the IRS and claim that that somehow constituted

21       payments.

22              And you saw those were written even on things like

23       utility bills.  Mr. Brokaw's life insurance policy.  And,

24       again, when you go back to the Indictment, when you look

25       through the overt acts that are alleged in the second

```
 1    conspiracy related to obstructing the IRS, you are going
 2    to find that every single one of those acts is supported,
 3    with the exception of one EFT in the name of Ms. Mueller,
 4    every single one of those acts is supported by an exhibit
 5    that you have and can look at back in the jury room.
 6          But let's talk just a little bit more about the
 7    EFTs.  Now, again, we don't have an EFT in Ms. Vigil's
 8    name, but we know she knows about them.  How do we know
 9    that?  Because you have this e-mail.  And Ms. Vigil
10    described that process in this e-mail to Mr. Morris.  You
11    write checks on the account and the bank has to honor them
12    or pay whoever you write the checks to, but you don't have
13    to deposit any funds into the account.  What a deal.
14          That would be a great deal, and Ms. Vigil knew it.
15    That is part of the reason that you know that she knew
16    these things weren't legitimate.  Mr. Brokaw knew these
17    things weren't legitimate.  Mr. Pawelski knew these things
18    weren't legitimate.
19          When Mr. Brokaw wrote this check for over $522,000
20    and sent it in to the IRS, he wrote it on a check on an
21    account that he had closed three days before.  Mike
22    Gorham, from Wells Fargo, told you that.  He knew that
23    wasn't a valid payment.  He knew the IRS at least
24    shouldn't credit his account for $522,000 for that.
25          When Mr. Pawelski wrote this check to the IRS for
```

1    $132,000, he knew that just writing "EFT" on it didn't

2    change the fact that he closed this account years earlier.

3    And whatever the IRS did with this check, it wasn't going

4    to cause them to get $132,000 to settle his tax debt.

5          And Mr. Brokaw certainly knew that when he wrote a

6    check on behalf of his associate, Charles Ledford, the

7    "CL" named in the Indictment, when he wrote this check to

8    the Clerk of the District Court here for almost $6 million

9    on the same closed account, that by now had been closed

10   for over a year, he knew that that wasn't a good

11   instrument; that the District Court wasn't going to get

12   paid.

13         And, again, let's give him the benefit of the

14   doubt, and let's assume that he didn't know that when he

15   first sent it in.  Do you remember Ms. Gleeson's testimony

16   about that?  She said she returned it with a letter that

17   said the check is drawn on a closed account.  What did

18   Mr. Brokaw do, mail it right back to her and said, no,

19   take this as payment.

20         The defendants, you heard, didn't just stop there,

21   though.  They didn't stop with just trying to use all of

22   these fraudulent methods to discharge the taxes they owed.

23   They actually went out and tried to interfere with and

24   impede the lawful efforts of the various collection

25   officers that were working on their cases.

1        And, again, you saw document after document that

2    proved this.  I am not going to try to show you all of

3    those again, but I will give you a sample again.  Here is

4    the Administrative Affidavit of Specific Negative Averment

5    that Mr. Brokaw -- I am sorry, that Ms. Vigil sent to

6    Mr. Frankel after the search warrant was executed on her

7    residence.

8        She claimed, I believe, that he owed her about $18

9    million in this document.  Here is the second demand for

10   settlement for $36 million that Mr. Brokaw sent to

11   Mr. Pryor.  Here is the final demand for payment that

12   Mr. Brokaw sent to Ms. Green.  He wanted $72 million from

13   her.  Here is the notice of final judgment that

14   Mr. Pawelski sent to Special Agent Frankel asking him,

15   again, for millions of dollars based on the fact that

16   Mr. Frankel had been an affiant on a search warrant for

17   his house.  Here is the maritime lien that was filed in

18   the name of Mr. Pryor by Mr. Brokaw that claimed Mr. Pryor

19   owed him $1.1 billion.  Finally, here is maritime lien

20   prepared by Mr. Brokaw against Ms. Green, the woman you

21   will remember whose only involvement was to supervise

22   people from a different state and sign the letters that

23   gave Mr. Brokaw an opportunity to withdraw his frivolous

24   positions.  Based on that, Mr. Brokaw claims she owed him

25   $2.2 billion.

1          Of course, you saw one other thing, too.  All of
2    these things that we have talked about demonstrate that
3    the IRS was actually impeded.  You have heard about -- you
4    heard from a number of witnesses here who had to deal with
5    all of these filings.  And, of course, you didn't hear,
6    but you know about the countless other people at the
7    Department of Treasury who had to spend time dealing with
8    this avalanche of documents that the defendants were
9    filing.
10          You heard about the other people in the Treasury
11   Department.  You heard about the people doing the
12   screening of the letters that were sent to Timothy
13   Geithner.  You heard about the various people in the IRS
14   that work with handling the returns.  And Ms. Morgan told
15   you different stamps get applied to those returns once
16   they go to different sections.
17          When you get back in the jury room, take a look at
18   some of those returns, look at how many stamps are on some
19   of them.  I counted six on just one of Mr. Brokaw's
20   returns.  Those are hours, scores of hours of time that
21   was wasted by people who had to deal with these documents
22   that the defendants were filing.
23          But, as you know, the defendants did more than
24   that.  The defendants actually took steps to try to
25   actually intimidate, personally intimidate the IRS

1    officials who were working on their cases.

2         You saw the evidence of this people search

3    performed by Mr. Pawelski but found in Mr. Brokaw's

4    residence that had Pryor's home address on it.  You saw

5    this other people search, same thing, performed by

6    Mr. Pawelski, but found in Mr. Brokaw's residence that

7    lists Mr. Pryor, that lists members of his family, lists

8    his home address.

9         You heard Ms. Wray testify about the fact that she

10   got documents like this one at her home address in Dillon,

11   and how concerned she was about that.

12        And, finally, you heard and you saw -- you heard

13   from Ms. Green, and you saw the response that she had when

14   she realized that taxpayers, taxpayers who had clearly had

15   a grievance against her and the IRS, had gone to the

16   trouble of figuring out her home address, her date of

17   birth, and the names of her kids.

18        If you had any doubt, you shouldn't after you look

19   at those documents.  That's how you know these defendants

20   had corrupt intent.  You don't get the home addresses and

21   the names of government employees' kids if you are acting

22   legitimately.  That's how you know their efforts had a

23   real effect.  That proves that they're guilty of the

24   obstruction counts, just as they are of the false claim

25   counts.

1          Make them guilty with your verdicts.  Thank you.

2          THE COURT:  Thank you very much, Mr. Kirsch.

3          Do the defendants wish to make a closing argument?

4          THE COURT:  Mr. Brokaw, you may proceed.

5          DEFENDANT BROKAW:  Thank you.

6                        **CLOSING ARGUMENT**

7     **BY DEFENDANT BROKAW:**

8          Overt acts?  Absolutely not.  Knowingly making

9     false, fictitious and fraudulent claims?  Absolutely not.

10    There is a big difference between the truth and the whole

11    truth.  And I would like to take a few minutes to explain

12    what my thinking was so that the jury could understand my

13    beliefs and actions that have been laid out here in the

14    alleged crimes committed.

15         MR. KIRSCH:  Your Honor, I am going to object to

16    Mr. Brokaw now, not under oath, attempting to explain his

17    beliefs and actions.

18         THE COURT:  Sustained.

19         Mr. Brokaw, I told you that if you did not take the

20    stand, you could not put in any facts into this case.  You

21    can argue the law.  You can argue the evidence that has

22    been put in, but you cannot introduce new facts.

23         DEFENDANT BROKAW:  I can talk about the

24    Constitution?

25         THE COURT:  You can talk about the law.

778

 1          DEFENDANT BROKAW:  That is the supreme law of the

 2     land.  Okay.  We are all blessed, ladies and gentlemen, to

 3     live in America, the greatest Nation ever founded.  And

 4     what makes it such a wonderful country, as Mr. Kirsch

 5     alluded to earlier, is that we all have the opportunity of

 6     liberty and freedom.

 7          And why is America different from any other

 8     country?  It is because of the founding document, the

 9     Declaration of Independence, was eloquently penned by

10     Jefferson when he talked about, we have unalienable

11     rights.  God given rights.  And that the purpose of the

12     Government is to defend those rights.

13          When it comes a time where we feel like those

14     rights are being a bridged and not listened to by the

15     Government, and there is a fair amount of that out there

16     in the news lately, we -- it can cause people to react a

17     certain way.

18          I taught school for awhile.  I was in the insurance

19     and financial business for over 40 years.

20          THE COURT:  Mr. Brokaw, I am sorry, these are all

21     facts that you did not testify to and were not introduced

22     into evidence, therefore, you cannot argue them.

23          DEFENDANT BROKAW:  Back to the Constitution.  The

24     Constitution says, Article VI, is the supreme law of the

25     land.  Notwithstanding, there can be no role making that

1    supersedes the Constitution.  And in the second clause, in

2    Article VI, it says that it is the supreme law of the land

3    that in every court, every judge in this country shall

4    take notice thereof.

5         In the third clause of that it says that

6    Mr. Kirsch, Ms. Paluch, Judge Arguello, and every other

7    elected official in the country, shall take an oath to

8    defend that Constitution.  Okay.  I studied the laws

9    relating to this, and I came to some conclusions.

10        MR. KIRSCH:  I make the same objection, Your Honor.

11        THE COURT:  Well, as long as he is only arguing

12   law.

13        DEFENDANT BROKAW:  I am talking about the laws,

14   Mr. Kirsch.

15        MR. KIRSCH:  I thought he indicated he was going to

16   state his conclusions about the law.

17        THE COURT:  If he miscites the law, the law is

18   stated in the jury instructions, and that is the law they

19   are to follow.  If he gets off field, I will stop him.

20        DEFENDANT BROKAW:  Okay.  We were charged under --

21   the defendants are charged under Title 18 United States

22   Criminal Code, and under Title 26 of the internal revenue

23   code.  I want to talk about those for a few minutes.  In

24   my studying to arrive at what I believed about the

25   Internal Revenue Code and Title 26, I came to several

780

1    conclusions.  The income tax was enacted --

2         THE COURT:  I will have to interrupt you because

3    now you are getting into things that should have been

4    testified to, and the law is as I have given it to the

5    jury.  That is the law.  You can argue that law.  You

6    cannot now bring in your interpretation of the law or why

7    you did what you did.

8         DEFENDANT BROKAW:  I can talk about Mr. Pryor on

9    the stand the other day when he referenced the liens and

10   levies that he was -- that he had put upon myself and

11   others?

12        THE COURT:  Wait a minute.  Now, Mr. Pryor didn't

13   put any liens on you, did he?

14        DEFENDANT BROKAW:  Mr. Pryor put levies on me.

15        THE COURT:  For back taxes?

16        DEFENDANT BROKAW:  That's correct, Judge.  What

17   were alleged to, Judge.  Mr. Pryor put levies on me.  If

18   you notice, when I was talking to Mr. Leland Deering this

19   morning, asked him about the search here in the Federal

20   District Court.  There were no court orders.  There were

21   no judgments.  There were no orders from the judge, such

22   as the judge sitting here, authorizing such a lien or a

23   levy.  Those are administrative processes created by the

24   IRS.

25        There is never any administrative process.  In

1    looking at that particular section that deals with the

2    liens and levies, and I wrote back to Mr. Pryor and to

3    Ms. Green and to other folks asking them to clarify that.

4    How were they putting those liens on me?

5         And Title 26 -- the charging instrument is 7212, I

6    believe.  But in Title 26, 7701 defines that section that

7    Mr. Pryor was talking about about levies.  And one of the

8    questions we wrote back to Mr. Pryor and --

9         MR. KIRSCH:  Your Honor, I object to Mr. Brokaw

10   testifying outside the evidence about questions that he

11   provided to Mr. Pryor.

12        DEFENDANT BROKAW:  I take exception, Your Honor,

13   because I am talking about the statute that references

14   liens and levies that Mr. Pryor was testifying about.

15        THE COURT:  You are trying to introduce evidence

16   that you did not introduce during the trial, and you can't

17   do that, and I told you you couldn't do that.  No new

18   facts get to be brought in without your having introduced

19   that evidence.

20        DEFENDANT BROKAW:  But Mr. Pryor introduced the

21   issue of levy and lien.  And on that document that were

22   presented in the Court is Section 6331 of Title 26.

23   That's all I am talking about is that particular document

24   that --

25        THE COURT:  You are trying to introduce other

 1    facts.  You can talk about that is what is on the

 2    document.

 3              DEFENDANT BROKAW:  I am talking about that fact.

 4              THE COURT:  You are talking about questions you

 5    wrote back that weren't introduced that weren't testified

 6    to.  You can't do that.

 7              DEFENDANT BROKAW:  I can't even say --

 8              THE COURT:  I explained to you that you could not

 9    introduce any facts in your argument if you did not

10    introduce evidence to support those facts.

11              DEFENDANT BROKAW:  I am just referencing the notice

12    of levy that was sent, okay.  And our reference back to

13    that in Section 6331, which is what they reference on

14    that.  It does not apply to me.  That is why I took

15    exception.  That section does not apply to me.  And it is

16    written right on the section that it applies to government

17    employees.  That is what my research -- part of my

18    research led me to.

19              Also, when Mr. Frankel, sitting back here, was

20    testifying, he testified that he was the principal point

21    person, I believe, for the search warrants that were done

22    at the two residences that started this whole process.

23    The search warrants were initiated by Mr. Frankel.  And we

24    wrote back to Mr. Frankel with questions.

25              MR. KIRSCH:  Objection, again, Your Honor.

```
 1        THE COURT:  Mr. Brokaw, these are legal issues that
 2   I have already dealt with.  They are not factual in this
 3   case.  I ruled on your objections to the search warrant.
 4        DEFENDANT BROKAW:  Okay.  Let's go to Title 18.
 5   This is the section where we are charged with criminal
 6   violations of the criminal code.  And in Title 18,
 7   evidence was sent in to this court from one Harvey Lapin,
 8   who is the director of prisons in federal prison --
 9        MR. KIRSCH:  Objection, Your Honor, this is not
10   evidence during this trial.
11        DEFENDANT BROKAW:  -- who declared in Title 18 --
12   that declared Title 18 was not a valid law and was not
13   passed by Congress.
14        THE COURT:  I will instruct the jury to disregard
15   any statement he is making with respect to this.  It is
16   not evidence.
17        DEFENDANT BROKAW:  Title 11 went to the Supreme
18   Court.
19        THE COURT:  If you do not comply with my
20   requirements -- I explained what you could and could not
21   do -- I will have to have you sit down.
22        DEFENDANT BROKAW:  Ladies and gentlemen,
23   information was presented in this trial that was blocked
24   and not allowed to be brought forward, and that is the
25   reason that a lot of us, we sat there and didn't
```

```
 1    participate.  The information was blocked.  The
 2    information about Title 18, which has now gone to the
 3    Supreme Court for a hearing, should be brought forth in
 4    this trial.  You should not make a decision in this case
 5    until you see that information.  That is one item.
 6            The prosecutor has not provided any proof that
 7    there has been any overt acts.  The positions that I took
 8    were based on my strong belief system that I was doing
 9    what was right and just.  There was no intent to commit
10    any type of a crime.  And there was certainly no
11    conspiracy.
12            The Constitution allows us the right of freedom of
13    assembly.  If three or four of us want to get together and
14    study and learn things about our laws and our tax system
15    and our financial system, we certainly have the right to
16    do that.
17            The prosecution has not proven that there has been
18    any financial gain by any of us.  And, in fact, there was
19    not.  The purpose that we acted was to discharge Internal
20    Revenue Service alleged debt.  There has not been any
21    payment to any of us.  There has been no proof provided
22    that any alleged acts were made with intent to defraud the
23    Federal Government.
24            Since the money system is all based on fiat
25    currency, and I know Mr. Kirsch is going to say something
```

1    about this real soon.  Since the Internal Revenue Service

2    and the Federal Reserve were founded in 1913, the value of

3    our dollar has gone down 97 percent, and you are all aware

4    of that.  That is not right.

5         That is our intent from the beginning, to try to

6    fix that problem.  We have done a lot of work studying the

7    financial system in this country.  We have spent months

8    and years studying the laws.

9         THE COURT:  Mr. Brokaw, I will interrupt you

10   because this has nothing to do with the claims that are

11   made against you and your defenses.

12        DEFENDANT BROKAW:  If I am not allowed to say any

13   more --

14        THE COURT:  Not with respect to that.

15        DEFENDANT BROKAW:  Look at all of the evidence

16   before reaching a verdict.

17        THE COURT:  Mr. Pawelski, do you wish to make an

18   argument?  Same limitations apply.

19                        **CLOSING ARGUMENT**

20   **BY DEFENDANT PAWELSKI:**

21        Ladies and gentlemen of the jury, first I presume

22   that some of you already think we are guilty.  The

23   accusations made by the prosecutor of -- the accusations

24   made by the prosecutor, the prosecutor has the burden of

25   proof beyond a reasonable doubt that the alleged crimes

1    were done with malice and overtly created.

2          You as a jury can determine both facts and law, no

3    matter what the judge says.  None of the evidence brought

4    forth during this trial were original records, thereby,

5    must be questioned for validity.  None of the witnesses

6    brought forth any first-hand knowledge which could be used

7    to determine a crime.

8          If there was an attempt to thwart legitimate tax

9    collection by issuing the alleged registered private

10   offset bond, why does it state as follows:  "This note

11   shall be posted in full order for dollar pursuant to the

12   credit order noted above to be presented to the payee,

13   United States Department of the Treasury.  After discharge

14   of the debt, the balance of the funds are to be credited

15   to the U.S. Treasury to be used for the benefit of the

16   same."

17         We didn't ask for any money.  We wanted to reduce

18   the national debt.  Mr. Kirsch claims that these bonds

19   were some way of getting around some type of big tax

20   liability.  We brought forth a bonded registered indemnity

21   bond written to "straw man," whoever that would be.  Part

22   of that is a document, it says, "Timothy Geithner,

23   Secretary of Treasury, United States Department of

24   Treasury shall ledger this bond as an asset as it best

25   suits the needs of the United States Department of the

 1   Treasury, in accordance with the terms and conditions set

 2   forth herein for a period of 30 years."

 3        That was testified to by Mr. Paul Danley, who is

 4   the security agent for the Treasury Inspector General's

 5   Office.  So if we are so bad and we wanted to get all of

 6   these billions, millions of dollars, which I have no idea

 7   where they get all of these numbers, why wouldn't these

 8   documents state that?

 9        As far as Counts 1 and 14, the prosecutor has not

10   provided any proof that there has been an overt act to

11   perform a crime, thereby, there is no conspiracy.  My

12   friends and I may have been naive to be able to do that,

13   but we surely were not going out there to try to get

14   millions and billions of dollars, as they claim.

15        As far as Count 1, also, the prosecutor has not

16   proven there has been any financial gain.  The testimony

17   today stated there was no financial gain to us.  Both

18   myself and the prosecutor have asked if any money has been

19   transferred, received or sent.  The answer is none.  There

20   was no moneys.  If there is no payment or loans, there is

21   no crime.  That is the Judge's rules.

22        Count 2, there has been no proof provided any

23   alleged acts were made with intent to defraud or file a

24   false claim.  Any claims that were provided were taken off

25   from the IRS.  These are their forms.  We didn't make them

1    up.  They were theirs.

2         During our many months of studying the financial

3    tax system, I found no law that filing a government

4    document will be illegal.  If they are going to make

5    something illegal, they have to notify the public.

6    Therefore, I did not knowingly file any false documents.

7         MR. KIRSCH:  Objection, Your Honor.

8         THE COURT:  Sustained.

9         DEFENDANT PAWELSKI:  Prosecutor has not brought

10   forth that any obstruction that occurred by the alleged

11   actions.  Prosecutor has not presented any knowingly and

12   intentional effort to bring about the alleged desired

13   result, therefore, there is no crime.

14        The Constitution, as everyone knows, states that I

15   have a right to face my accuser.  How can I question my

16   accuser when it is a fictitious entity.  Unless my accuser

17   is in the room, is there anyone in this courtroom that has

18   a claim against me?  Mr. Rutkowski, do you have a claim

19   against me, sir?

20        MR. KIRSCH:  Objection to the question, Your Honor.

21        THE COURT:  Mr. Pawelski, that is inappropriate.

22        DEFENDANT PAWELSKI:  Based on the silence, no one

23   has a claim against me or my friends, and you need to

24   acquit.  Ladies and gentlemen, thank you for your time.  I

25   am sorry you had to go through all of that.  All I ask is

1    that you look at the evidence as presented, use it in a

2    strict, logical manner.  Try to avoid Mr. Kirsch's rants,

3    and let us go home to our family.  Thank you so much.

4         THE COURT:  Ms. Vigil?

5                        **CLOSING ARGUMENT**

6    **BY DEFENDANT VIGIL:**

7         Ladies and gentlemen of the jury, none of you have

8    had a smile.  When you see somebody with no smile, give

9    them yours.  You are all so serious.  So I just think we

10   should lighten up a little here.

11        But I have some questions.  Did we kill anyone?

12   Did we sell drugs?  Did we do human trafficking?  No.  We

13   mailed paperwork.  We found forms that are on irs.gov.

14   Legitimate forms.

15        Did we at the time have knowledge that we were

16   doing something wrong?  We were told by Curtis Morris and

17   a few others that we weren't.

18        MR. KIRSCH:  Objection to the testimony, Your

19   Honor.

20        THE COURT:  All right.  Ms. Vigil.  Ms. Vigil, I

21   told you that you cannot introduce new facts that you did

22   not introduce in your case.

23        DEFENDANT VIGIL:  Okay.  So, as Mr. Brokaw and

24   Mr. Pawelski have said, we did not get a penny out of any

25   of this.  We were doing things to benefit the U.S., is how

1    I was looking at it.  So that was the intent.  And the

2    Government here wants to put us away for the rest of our

3    lives for doing this, for the rest of our lives.

4        MR. KIRSCH:  Okay, Your Honor, I have to object at

5    this point to the reference to punishment.

6        THE COURT:  Sustained.

7        DEFENDANT VIGIL:  And do you know that as a jury,

8    you can say, by the letter of the law the defendant is

9    guilty, but we also disagree with that law, so we vote not

10   guilty.

11       MR. KIRSCH:  Objection.

12       THE COURT:  The jury will disregard that.  That is

13   not the law.

14       DEFENDANT VIGIL:  So if you haven't looked into

15   jury nullification, you need to.

16       THE COURT:  Ms. Vigil, it is inappropriate to bring

17   up that topic.

18       DEFENDANT VIGIL:  It is something you should have

19   instructed them to do, and you have not.

20       THE COURT:  Ms. Vigil, you had the opportunity to

21   contribute to the jury instructions, and you chose not to

22   give me anything with respect to that issue.

23       DEFENDANT VIGIL:  Well, then that's -- well, the

24   only other thing I want to know is, does anyone in this

25   room have a claim against me?  Silence is acquiescence

1    that there is no one in this room that has a claim against

2    me; isn't that correct?

3            THE COURT:  This is your closing argument.

4            DEFENDANT VIGIL:  Well, that is correct.  If you

5    didn't know that, silence is acquiescence.  So everyone

6    here is being silent when we asked, who has a claim

7    against us?

8            So I just ask you to ask yourselves if it is fair,

9    equitable to be denied the rest of your life for

10    paperwork?  That is all I have to say.  Thanks.

11            THE COURT:  Mr. Kirsch, you may proceed.

12            Your Honor, can I ask for the screen to be changed

13    to the computer in the back, please.

14            THE COURT:  Yes.

15                        **CLOSING ARGUMENT**

16    **BY MR. KIRSCH:**

17            You all know, I am sure, that the defendants are

18    not here because they chose to peaceably assemble.  They

19    are not here because they chose to study law.  They are

20    not here because of whatever conclusions they drew based

21    on their study of the law.  They are here because of the

22    evidence that -- because of what they did that has been

23    demonstrated by the evidence that you have heard over the

24    course of this trial.

25            You are here because they prepared original

1     documents, like those that you saw, such as Government

2     Exhibit 203, I believe it is page 74, one of the original

3     bonds that Ms. Lucas told you and Mr. Lee told you were

4     mailed to the Department of Treasury.

5          These say, of course, that they're supposed to be

6     applied for credit to the account of each of the

7     individual taxpayers.  But now the defendants want you to

8     believe that the purpose of all of these documents had

9     nothing to do with offsetting the tens of thousands or the

10    hundreds of thousands of dollars that they owed for years

11    of taxes, about which they had been notified and liens and

12    levies and everything else.

13         No.  What they want you to believe now is that

14    their purpose in creating fake documents like this was to

15    submit these fake documents to the Secretary of the

16    Treasury, and that somehow that was going to reduce the

17    national debt and benefit the United States.  That is

18    complete hogwash.  It is ridiculous.  It is ridiculous

19    that they would even suggest that you all are so dumb as

20    to believe that.

21         And the idea that where do these numbers come from?

22    Where do these numbers that the Government has been

23    throwing around, where do they come from?  They came from

24    documents like this, the very documents that the

25    defendants prepared.  The very tax liens or levies that

1    the defendants sent back to the IRS.  That's where the

2    numbers came from that we have been talking about.  We

3    didn't make them up.  That is either what the defendants

4    owed or it is what they claimed.

5         Obviously the defendants didn't murder anybody;

6    they are not charged with that.  They are not charged with

7    child exploitation or human trafficking or whatever else

8    it is that you heard about.  They are charged with

9    obstructing and impeding the internal revenue laws, and

10   they are charged with making false claims for refunds

11   against the United States.

12        You all know that they did both of those things.

13   You all know that for folks who purport to be concerned

14   with their own privacy, that they weren't concerned about

15   the privacy of Mr. Pryor or Ms. Green or Ms. Wray in their

16   homes.

17        You all know that each of these defendants is

18   guilty of each of the crimes with which they are charged,

19   and I ask you to find them so.  Thank you.

20        THE COURT:  All right.  Ladies and gentlemen, you

21   have heard the evidence, you have been instructed as to

22   the applicable law, and you have heard the argument of the

23   parties.  I remind you that the closing argument by both

24   sides is not evidence in this case, and you should not

25   consider it as evidence in this case.

1           Now, in a moment I am going to submit this case to

2   you, but there is one additional matter I need to discuss

3   with you.  Many of the exhibits that you will see do have

4   Social Security numbers or other personal identifying

5   information contained in them.  Those exhibits were

6   necessary for this case, so I allowed them to be admitted

7   into evidence, but that is sensitive evidence, and I am

8   sure you understand why I am directing that if you have

9   written any type of this type of sensitive evidence in

10  your notes, that you are not to take those notes outside

11  of the courthouse.  And if you haven't written any of this

12  information in your notes, then you should not make any

13  such notes during your deliberations.

14          Now, also at the beginning of this trial, I told

15  you we would select a jury of 12, plus one alternate.  The

16  alternates are selected in the event one or more of you

17  became ill and could not participate throughout the entire

18  trial.  And, as you remember, I had two alternates.  One

19  person had to be dismissed, at her request, due to undue

20  hardship.

21          However, the alternates cannot serve as jurors.

22  They cannot deliberate as part of the case when the jury

23  deliberates and, therefore, at this time I am going to

24  need to release one of you.  And I apologize in advance

25  that you are being excused and that you spent the week

1    here and you can't participate in these deliberations.

2         The one juror who will be excused at this time is

3    going to be drawn by random.  Ms. Hartmann has put your

4    cards in there with your numbers on them.  She is going to

5    spin that box, and then she is going to draw a card, and

6    that number will be the alternate juror.

7         COURTROOM DEPUTY:  Juror No. 129.  The person is in

8    Seat No. 5.

9         THE COURT:  So Juror 129, in Seat No. 5, you have

10   been selected as the alternate juror.  I thank you very

11   much for your service.  Now, when I ask the Court Security

12   Officer to take the jurors back to jury deliberation room,

13   you should go back, gather your belongings, turn your

14   badge in, then you may leave and go home.

15        You still shouldn't talk about this case with

16   anyone or with other jurors before you leave, or with

17   anyone else, because there is a slight possibility that if

18   someone on this jury cannot continue to deliberate, that I

19   may need to call you back.  So we will be in touch with

20   you to let you know if we need you back or when the jury

21   has reached a verdict.  Okay?

22        ALTERNATE JUROR:  Yes.

23        THE COURT:  All right.  The rest of you are now

24   going to be escorted to the jury deliberation room and you

25   will begin your deliberations.  You are now able to

1    finally discuss this case among yourselves, but you cannot

2    discuss it unless all of you are present.  And you may not

3    discuss it with anyone other than your co-jurors.

4            It is past 2:30, and I promised you that you could

5    leave before 2:30.  So if you decide you don't want to

6    stay any later this afternoon, you are free to leave.  I

7    would suggest what you do in that case is select your

8    foreperson, then decide if you don't want to stay and

9    deliberate further, that is a decision you all make.

10           If you don't want to stay, just give a note to the

11   Court Security Officer, which will tell me what time you

12   intend to be back in the morning and to continue your

13   deliberations.  If you wish to deliberate beyond 3 o'clock

14   or so, you are welcome to do that.  We have to be out of

15   the building by 5:30 today, though.  Okay.

16           So, with that being said, would the Court Security

17   Officers please come forward.

18           Ms. Hartmann, would you administer the oath to the

19   Court Security Officers.

20           (The Court Security Officers are sworn.)

21           THE COURT:  All right.  Sir, would you take these

22   instructions, with the original verdict form, and make

23   sure the jury has those.

24           Would the jury please follow the Court Security

25   Officers out.

 1                (Deliberations commence at 2:40 p.m.)

 2                (The following is had in open court, outside the

 3      hearing and presence of the jury.)

 4                THE COURT:  All right.  You may be seated.

 5                Ms. Hartmann, have you gathered all of the exhibits

 6      admitted into evidence?

 7                COURTROOM DEPUTY:  I was going to wait to see if

 8      the defendants wanted to participate.

 9                THE COURT:  So, Ms. Hartmann is gathering all of

10      the exhibits.  The parties can look them over to make sure

11      there is no error in what is being included.  So I will

12      expect you to do that immediately after I recess so that

13      the exhibits can then be taken back to the jury room.

14                In addition, I need to make sure that both the

15      Government and the defendants remain within 10 minutes of

16      this courthouse so that when a question comes up from the

17      jury, or if a verdict is returned, we can contact you and

18      we can proceed within about 10 or 15 minutes of that

19      notice.

20                So you also need to give Ms. Hartmann a cell phone

21      or a phone number where you can be reached.  I am not

22      going to call everybody back when the jury leaves.  If

23      they give me a note, what we will do is call you to let

24      you know they intend to be back at what time in the

25      morning.  Or, if you don't hear from us, that means they

1    have decided to continue to stay to deliberate this

2    afternoon.

3            Are there any questions of me on how to proceed at

4    this time?

5            MR. KIRSCH:  Not from the Government, Your Honor.

6    Thank you.

7            THE COURT:  All right.  Nothing from the

8    defendants?

9            All right.  So you all will stay, do the exhibits,

10   and make sure you give the contact information to

11   Ms. Hartmann, and remain within 10 minutes of this

12   courthouse.

13           Court will be in recess.

14           Actually, I do need you to vacate the courtroom,

15   unless you sit at the back, because I have another hearing

16   coming in at 3 o'clock.

17           (Court is in recess at 2:42 p.m.)

18

19

20

21

22

23

24

25

1

2

3                **R E P O R T E R ' S    C E R T I F I C A T E**

4

5            I, Darlene M. Martinez, Official Certified

6    Shorthand Reporter for the United States District Court,

7    District of Colorado, do hereby certify that the foregoing

8    is a true and accurate transcript of the proceedings had

9    as taken stenographically by me at the time and place

10   aforementioned.

11

12           Dated this 7th day of February, 2015.

13

14

15           _____

16           s/Darlene M. Martinez

17           RMR, CRR

18

19

20

21

22

23

24

25